1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3    HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE

4

5  UNITED STATES OF AMERICA,              )
                                          )
6                     Plaintiff,          )
                                          )
7       vs.                               )   Case No. CR 14-282 R
                                          )
8  DAVID PRITCHARD and                    )       TRIAL DAY 1
   CHRISTOPHER JAMES BLAUVELT,            )     (Pages 1 - 100)
9                                         )
                      Defendants.         )
10 _____)

11

12              REPORTER'S PARTIAL TRANSCRIPT OF
                      TRIAL PROCEEDINGS
13           TRIAL DAY 1:  OPENING STATEMENTS
                 TUESDAY, OCTOBER 14, 2014
14                      1:06 P.M.
                 LOS ANGELES, CALIFORNIA
15

16

17

18

19

20

21

22 _____

23     MYRA L. PONCE, CSR NO. 11544, RPR, RMR, CRR
           FEDERAL OFFICIAL COURT REPORTER
24         312 NORTH SPRING STREET, ROOM 430
           LOS ANGELES, CALIFORNIA 90012
25                  (213) 894-2305

UNITED STATES DISTRICT COURT

```
 1                    APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:

 4       STEPHANIE YONEKURA
         Acting United States Attorney
 5       BY:  ELLYN M. LINDSAY
         BY:  BYRON J. MCLAIN
 6           Assistant United States Attorneys
         United States Courthouse
 7       312 North Spring Street
         Los Angeles, California  90012

 8

 9   FOR THE DEFENDANT DAVID PRITCHARD:

10       LAW OFFICES OF MICHAEL W. EMMICK
         BY:  MICHAEL W. EMMICK
11           Attorney at Law
         3701 Highland Avenue, Suite 305
12       Manhattan Beach, California  90266

13

     FOR THE DEFENDANT CHRISTOPHER JAMES BLAUVELT:
14
         LAW OFFICES OF STEPHANIE AMES
15       BY:  STEPHANIE AMES
             Attorney at Law
16       12100 Wilshire Boulevard, Suite 800
         Los Angeles, California  90025
17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1          LOS ANGELES, CALIFORNIA; TUESDAY, OCTOBER 14, 2014

2                            1:06 P.M.

3                             -oOo-

4          (The following is a Partial Transcript

5           of the Trial Proceedings.)

6          THE COURTROOM DEPUTY:  Calling Item No. 1, CR 14-282

7  R, United States of America vs. David Pritchard and Christopher

8  James Blauvelt.

9      Counsel, please state your appearances.

10         MS. LINDSAY:  Good afternoon, Your Honor.

11  Ellyn Lindsay and Byron McLain for the United States.

12         MR. EMMICK:  Good afternoon, Your Honor.  Mike

13  Emmick appearing with David Pritchard who's here to my right.

14         MS. AMES:  And good afternoon, Your Honor.

15  Stephanie Ames appearing with Christopher Blauvelt.

16         THE COURT:  All right.  As you know, in this court

17  you make your opening statements to the entire jury panel

18  before we start.  With that, that will be the Government, then

19  Mr. Pritchard, and then Mr. Blauvelt.

20      And the -- you make the objections to people for cause at

21  the bench.  But, otherwise, we take -- ten to the defendants

22  and six to the Government.  And we start as soon as we get the

23  jury down.

24      Anything to take up other than that?

25         MS. LINDSAY:  Your Honor, I -- pretty late in the

```
1    game, I remembered that I needed to get an order to disclose --
2            THE COURT:  Beg your pardon?
3            MS. LINDSAY:  Pretty late in the game, I remembered
4    that I needed to get an order to turn over the grand jury
5    testimony.  There's just one witness who has grand jury
6    testimony, and I submitted an order today.  I wanted to make
7    Your Honor aware of that so that I can give that testimony over
8    as quickly as possible.
9        And I've discussed it with your clerk so that she can
10   retrieve the order, but I would just ask that Your Honor sign
11   the order so that I can make that disclosure.
12           THE COURT:  All right.  We'll get the order, and
13   we'll --
14           MS. LINDSAY:  Also, Your Honor, we did -- I did want
15   to let you know that we had previously supplied copies of our
16   proposed opening statement slides to the defense.  And it's our
17   understanding that they don't have any objection to them.
18           THE COURT:  All right.  Then we'll take a recess
19   while we get the jury panel in.
20           THE LAW CLERK:  All rise.
21           THE COURT:  And everybody over to this side
22   (indicating) of the courtroom in the back.
23           THE LAW CLERK:  This court is now in recess.
24           (Break taken.)
25           (In the presence of the prospective jurors.)
```

UNITED STATES DISTRICT COURT

1          THE COURTROOM DEPUTY:  Stand and raise your right

2     hand.

3          Ladies and gentlemen, do you solemnly swear that you will

4     make true answers to such questions as may be put to you,

5     touching upon your qualifications to serve as jurors upon the

6     trial in the cause now before this Court, so help you God?

7               THE PROSPECTIVE JURORS:  (Collectively) I do.

8               THE COURTROOM DEPUTY:  Okay.  Thank you.  Please be

9     seated.

10               (Roll call was taken.)

11               (Pause in the proceedings.)

12               THE COURTROOM DEPUTY:  Calling Item No. 1, CR 14-282

13     R, United States of America vs. David Pritchard and Christopher

14     James Blauvelt.

15          Counsel, please state your appearances.

16               MS. LINDSAY:  Good afternoon, Your Honor, and ladies

17     and gentlemen.  I'm Ellyn Lindsay with the U.S. Attorney's

18     Office in Los Angeles.  With me is Byron McLain, Assistant

19     United States Attorney in Los Angeles, and Special Agent Eric

20     Potocek of the FBI.

21               MR. EMMICK:  I'm Mike Emmick.  This is my client

22     David Pritchard.  I guess that's all.  Thanks.

23               MS. AMES:  And good afternoon, Your Honor, ladies

24     and gentlemen.  My name is Stephanie Ames.  And this is my

25     client Christopher Blauvelt.  Thank you.

**UNITED STATES DISTRICT COURT**

1           THE COURT:  All right.  Members of the jury panel,

2   you have been called this afternoon to the trial of an

3   Indictment naming David Pritchard and Christopher Blauvelt,

4   Cherie Brown, and Gregory Pusateri, but you will be concerned

5   only with the defendants David Pritchard and Christopher

6   Blauvelt who are charged in this Indictment with Title 18,

7   United States Code, Section 1341, mail fraud; Title 18,

8   United States Code, Section 1343, wire fraud; Title 18,

9   United States Code, Section 1349, attempted wire fraud;

10  Title 15, United States Code, Section 77e(a)(1) and 77x, offer

11  and sale of unregistered securities; and 18 U.S.C.,

12  Section 2(a), aiding and abetting.

13      You will -- you will hear the opening statements of

14  counsel, and so they will clarify for you what they present --

15  what they will present in connection with those -- with those

16  charges that I have stated to you.  And they will be first by

17  the United States Attorney, then by Mr. Pritchard's attorney,

18  Michael Emmick, and then Steven *[sic]* Ames, the counsel for

19  Christopher Blauvelt.

20      All right.  Government wish to make an opening statement?

21          MR. MCLAIN:  Good morning, ladies and gentlemen.

22      This case is about the theft of money through lies and

23  deceit.  The victims in this case were robbed of their

24  investments, but the weapon of choice by the defendants was not

25  a knife or a gun.  Instead, their weapon of choice was the

1  telephone or written letters that were sent out to all of the

2  victims.

3       This case is about movie investment fraud.  And the

4  evidence in this case will show that the two defendants caused

5  over 750 different investors to invest approximately

6  $22 million in two entities, GigaPix Studios and *OZ3D*, LLC.

7       The evidence in this case will show that GigaPix Studios

8  was supposed to be a movie production and distribution company

9  that was going public and was going to make millions of dollars

10  for the investors.  It did not.

11       The evidence in this case will show that *OZ3D* was supposed

12  to be the 3D version of the *Wizard of Oz* and that investors

13  were told that this movie was in production and coming out in

14  movie theaters soon.  It was not.

15       And as a result, the victim investors in this case lost

16  all of the money that they sent in.  But these defendants

17  profited handsomely by using their investor money for their own

18  personal benefit.  And as a result, these two defendants have

19  been charged with mail fraud, wire fraud, and the offering and

20  selling of unregistered securities.

21       Now, the first defendant is Mr. David Pritchard.  And he

22  was the president and director of GigaPix.  The second

23  defendant is Mr. Chris Blauvelt.  And he was the founder, the

24  CEO, and the former CFO of GigaPix.

25       And the way in which the scheme worked in this case is

1    that Mr. Chris Blauvelt was in charge of the salesmen.  And the

2    evidence in this case will show that Mr. Chris Blauvelt hired

3    individuals called fronters.  And these fronters would use lead

4    lists that they were given and scripts and contact these

5    various investors and try to gauge and get a sense as to how

6    interested they might be in investing in GigaPix and in *OZ3D*.

7         And once these investors expressed any type of interests,

8    then their information was passed on to the closers, the people

9    who were brought in to close the deal, to say what was

10   necessary to get these particular investors to invest in

11   GigaPix and *OZ3D*.

12        And these investors sent in their money in prepaid

13   envelopes from FedEx that they were given by the defendants,

14   wrote checks out to GigaPix Studios and *OZ3D*.

15        Now, the evidence that the Government will present to you

16   will be in three broad categories.  First and foremost, you

17   will actually hear from the victim investors themselves.  We

18   will put some of them up on the stand so that they can testify

19   to you and let you know exactly what they were told by these

20   defendants and their employees in order to get them to invest

21   in GigaPix Studios and *OZ3D*.

22        Second, you will hear from former employees at GigaPix who

23   will testify about the true state of the company and that

24   misrepresentations and misstatements were told to these

25   investors just to get them to invest.

And then finally, ladies and gentlemen, you will hear from the statements of the defendants themselves as they were interviewed by FBI agents in this case.  And the FBI agents will take the stand and will tell you what statements the defendants made, admitting to their own culpability in the scheme.

Now, the first piece of evidence evidencing the scheme of raising $22 million for GigaPix and *OZ3D* from over 750 different investors.  And again, this money was broken up into two different categories.  So approximately 14 million of the dollars went toward GigaPix and 8 to $9 million went toward *OZ3D*.

And the defendants represented to these investors that a majority of the money that they raised would be used to produce and distribute films, but this was not true.  Instead, the money was used for their own personal profit, and the investors lost everything that they put into these entities.

Now, the first category of evidence from the victim investors.  They will testify that they were told that this company GigaPix was a financially successful company.  They were told that they would receive high returns on their investments and that they needed to invest quickly or they'd miss out on the opportunity of a lifetime.  They were told that these investments had very little or no risk.

And these investors will take the stand and will testify

1   that they were told that 65 percent of the money that they sent

2   in for *OZ3D* in particular would be used to produce and

3   distribute the movie.  But none of this was true.

4       These investors were also told that the salespeople that

5   were calling would only receive about 10 percent or 20 percent

6   in commissions and finders' fees, that GigaPix would be going

7   public within a short period of time.  These investors were

8   told that the production of the movie *OZ3D* had already begun.

9   But again, ladies and gentlemen, the evidence in this case will

10  show that that was not true.

11      And these investors will testify that they were supposed

12  to receive returns on their investment soon after investing, as

13  short as within 18 months.

14      Now, you will also hear from these investors that they did

15  receive documents called Private Placement Memorandum, or PPMs.

16  These are about 40- to 50-page documents that supposedly

17  describe what these entities, GigaPix Studios and *OZ3D*, LLC,

18  are.  And some of these investors will testify that they read

19  the documents, some will testify that they just flipped through

20  them, and some of them will testify that they didn't read them

21  at all.

22      But in all of these instances, these investors were told

23  representations that were in direct contradiction as to what

24  was in these documents.  And they relied on the representations

25  and on the statements that were made to them by the salespeople

1   but even, in particular, by these two defendants, Mr. Chris

2   Blauvelt and Mr. David Pritchard.

3        Now, the second category of evidence that you will hear

4   will be from the former employees at GigaPix.  And they will

5   testify that none of GigaPix's past projects were profitable

6   for any of the company's investors.  They will testify that the

7   investments in GigaPix and *OZ3D* were highly risky and anyone

8   who invested in these projects had to be willing to lose their

9   entire investment.

10       They will testify that a substantial portion of the

11  victims' money invested in these two entities was used to pay

12  commissions to salespeople, telemarketing expenses, overhead,

13  nothing that had to do with the production and promotion of

14  GigaPix Studios or this movie *OZ3D*.

15       These former GigaPix employees will testify that only very

16  preliminary steps were ever taken for GigaPix to go public and

17  it was highly unlikely for this company to go public.  They

18  will testify that *OZ3D*, the movie, was never in production,

19  even though the victim investors were told otherwise.

20       And they will also testify that GigaPix and *OZ3D*,

21  Mr. Chris Blauvelt in particular, were the subject of

22  regulatory actions in several states.  And these regulatory

23  actions were cease and desist orders.  And the states that

24  issued these cease and desist orders, basically giving GigaPix,

25  *OZ3D*, and the defendants notice that they might be violating

1  securities laws, they were given notice of this in April of

2  2005 by the State of Wisconsin, September of 2008 by the State

3  of Oregon, July 2010 by the State of Alabama, and in October of

4  2010 by the State of Washington.  But these cease and desist

5  orders weren't just limited to these four states.  It also

6  included Colorado, Connecticut, and our very own state of

7  California.

8       And so as part of the Government's evidence in this case,

9  we will actually have an expert testify -- testify by the name

10  of Professor Hicks.  And he will testify about the Securities

11  Act of 1933 and Section 5 of that Act and that securities are

12  often required to be registered with the SEC for the very

13  purpose of protecting vulnerable investors like many of those

14  involved in this case and like many of those that invested in

15  GigaPix Studios and *OZ3D*.

16       He will testify that there was no exemption to

17  registration applicable to these defendants.  So as a result,

18  their securities needed to be registered with the SEC, but they

19  were not.

20       You will also hear that of the $14 million that was raised

21  from these victim investors, only 20 percent was used toward

22  anything related toward production and promotion of GigaPix

23  Studios.  And of the 8 to $9 million that was raised for *OZ3D*,

24  the movie, less than 5 percent of that money was used toward

25  *OZ3D*.

1      So how was the money used?  The evidence in this case will

2   show that Defendants David Pritchard and Mr. Chris Blauvelt

3   took in almost $3 million of the investor money directly to

4   themselves and that almost $2 million of this money was spent

5   on personal expenses.  It was spent on their restaurant bills

6   for breakfast and lunch and dinner.  It was spent on them

7   paying for their own personal taxes, buying automobiles for

8   themselves and for their friends, personal hotel stays,

9   expenses that were personal to them and had absolutely nothing

10   to do with GigaPix or *OZ3D*.

11      And then finally, ladies and gentlemen, the third category

12   of evidence that you will hear in this trial by the Government

13   will be admissions from Mr. David Blauvelt.  He was interviewed

14   on March of 2012 by FBI agents.  And these FBI agents will take

15   the stand and will tell you that Mr. Blauvelt admitted that

16   GigaPix had these regulatory issues with the State of

17   California for cold calling.

18      He admitted that GigaPix's previous films were not a

19   financial success and made very little money, even though

20   investors were told differently.  He admitted that GigaPix

21   Studios could not survive without these funds from the

22   different investors.  He admitted that he sent out update

23   letters that contained misstatements about GigaPix and *OZ3D*.

24      And then, also, Mr. Pritchard was interviewed in June 2014

25   of this year.  And the FBI will take the stand and say that

1    Mr. Pritchard admitted during his statement that GigaPix was

2    not financially sound from 2010 to 2012, while these defendants

3    were taking in investor funds from as early as 2006 all the way

4    to 2012.

5        He admitted that GigaPix investors received update letters

6    that he and others like Mr. Blauvelt had wrote and mailed out

7    to them and that *OZ3D* was never in production.  Mr. Pritchard

8    admitted that in his interview with FBI agents.  And that by

9    2011, he had serious doubts about this movie ever getting made,

10   yet they continued to raise money from investors.

11       Mr. Pritchard admitted that if an investor had seen a

12   letter that said *OZ3D*, quote, "in production," it would be

13   obviously misleading.  And he admitted that he sent things

14   personally to investors that were misleading or he admitted

15   information about the true state of GigaPix when he spoke to

16   investors.

17       Ladies and gentlemen, that is the evidence that the

18   Government will present to you.  And at the end of this case,

19   my colleague, Ms. Ellyn Lindsay, will come before you, those of

20   you who are on the jury, and explain to you the elements of

21   mail fraud, the elements of wire fraud, the elements of

22   offering and selling unregistered securities.  And it will be

23   at that time that the Government will ask you to find these two

24   defendants guilty of all charges.

25       Thank you.

1          THE COURT:  Does Defendant Pritchard wish to make an

2    opening statement?

3          MR. EMMICK:  Yes, sir.

4       Well, good afternoon.  My name is Mike Emmick.  I

5    introduced myself earlier.  I'm a lawyer, and my client is

6    David Pritchard.

7       If you could stand up.

8       David is my client, and he is one of the two defendants

9    that have been charged in this case.

10      What we're going to be talking about right now is what

11   this case is really about.  You've heard what the opening is

12   from the Government.  And all openings lean in favor of that

13   party.  We're going to give you a different perspective on

14   these things.  And because these are some remarks that will

15   tell you about the case as a whole, if you'll listen, that will

16   give you a different perspective on these things.  It will be

17   helpful to you.

18      I'm only going to cover about five different subjects.

19   I'm not going to be up here for a long, long time.  But I think

20   it will be useful for you, and it will also prepare you for the

21   case as it starts to come out.

22      What I'd like to talk about first is this company called

23   GPX, GigaPix, because the company is not just all mushed

24   together.  It's not like a telemarketing company where you only

25   have people who are making phone calls to salespeople.  You

1  have, in a sense, two halves.  You have the sales half, and you

2  have the production half.  And the sales half covers one of the

3  defendants; that's Mr. Blauvelt.

4      And it also has two other people whose names you will

5  hear, a woman by the name of Brown and a man by the name of

6  Pusateri.  Those are the salespeople.  Those are the people who

7  are making calls.  You'll hear that they have closers and

8  openers, people that talk, people who are supervisors.  Those

9  are the seller types.

10     Now, you haven't heard me talk about my client's name in

11  that connection.  That's because there are two halves to the

12  company.  There's the production half.  My client is the one

13  who's in charge of the production half.  And "in charge of the

14  production half," that means that he is going out and he's

15  getting the scripts put together, he's hiring interpreters,

16  he's hiring consultants, he's putting together the movies.

17  It's a different part of GigaPix itself.

18     You will hear -- I think you did hear that GigaPix

19  ultimately got investments from about 750 people.  I think you

20  will hear that my client only talked maybe 10 or 12 times to

21  any of these people, at most.  And you will only hear from

22  three or four witnesses that he talked to them at all.

23     That is the simple setup of the GigaPix.  You've got the

24  production people, and you've got the salespeople.

25     What I'd like to talk about next is:  Well, how is it that

**UNITED STATES DISTRICT COURT**

1    a person ends up in that production side of things?  What does

2    that mean?  What's the production?

3         This is not just any old person who's walked in off the

4    street because he's going to do some production.  Mr. Pritchard

5    has gotten five Emmy Awards.  He has been a senior executive in

6    charge of -- I hope you don't mind if I slip the glasses on.

7    It happens when you hit 60.

8         He was one of the senior executives at Great Western, one

9    of the senior executives at Chase National Bank.  He started

10   private companies, public companies.  He spent a lot of time in

11   foreign countries in different industries.  The simple way to

12   say it is he's been in this business for 25 years.  And he has

13   been a working man for 40 years.  He's an extremely successful

14   and creative producer.

15        Um, I mentioned I was going to touch on five points.  The

16   first one is about how the company is set up.  And he's the one

17   who's in charge of production.  And that's my quick description

18   of what his history is like.

19        The next thing I think it's worth thinking through is

20   that -- you might think to yourself that if people are making

21   phone calls and trying to get money, they're trying to get

22   money and they're trying to do it in a hurry and maybe it will

23   just take place over a couple of months or couple of weeks or

24   whatever it will be.

25        You'll find that this company started in 2002 by

1   Mr. Blauvelt.  It goes on for years without my client being

2   involved in it at all.  My client has been doing work for a

3   production of movies by the name of *Captain Abu Raed* in another

4   country, in Jordan.  He comes here into the United States, he

5   joins GigaPix, he joins GigaPix starting in about 2006, and

6   he's only part-time.  So he works into about 2007.

7       And then a number of things start happening.  And it's

8   useful -- I guess you call it kind of an easy-minded kind of

9   chronology to walk through when some of these things were

10   happening because this is not just a couple-year case or a

11   couple-month case.  It starts in 2002.  My client joins in

12   2006.  It goes another seven years up to 2012.  Finally, they

13   have to declare bankruptcy.

14       Let's talk a little bit about some of the events that

15   caused that -- that company to not do very well.

16       Those of you who are familiar with some level of

17   investment know that when the recession hit our country, things

18   did have some bad times.  It would be silly for us to just say,

19   hey, I know the recession had nothing to do with it.  Those of

20   you who have some familiarity know it has something to do with

21   it.

22       You will also hear about other things that were

23   problematic for GigaPix itself.  For example, one of the things

24   that happened with GigaPix is that they were supposed to be

25   filing certain kinds of things with either the SEC or with

1    particular states.  They're called cease and -- they're called

2    registrations.  And if the SEC or whoever it is finds out about

3    it, they can send a notice and say you should be registering.

4    And that's actually called a cease and desist.

5         But from our point of view, the thing to ask yourself is:

6    Who made arrangements to have that cease and desist sent?  What

7    you'll find is that it's my client.  It's David Pritchard who

8    actually arranged for that because he knew about these cease

9    and desist orders.  He was in charge of production, and he

10   noticed that we had a couple of these things occur and he said

11   let's fix this.  And they did fix it.  They did fix it, and

12   they hired lawyers to help them fix it.  And you will actually

13   hear from some of those lawyers.

14        There's a lawyer out of Philadelphia who helped out,

15   there's a lawyer out of New York who helped out.  One of their

16   names is Uchimoto.  That's the one out of Philadelphia.

17   There's a woman named Pepper out of New York.  Those are people

18   who are helping get over these problems.  They are not big-time

19   legal problems.  They are things where my client was trying to

20   fix the problems.

21        Another aspect of this is that as my client is trying to

22   put this together, he is seeing that investors can come of two

23   kinds, sort of the low-level investor, which are common variety

24   kind of investors, people who put in 5,000, maybe $10,000,

25   garden-variety people.

1        And there are also investors who are the big company

2   investors, the big fund investors.  Those are the people that

3   my client, Mr. Pritchard, dealt with.  He did on three or four

4   occasions have some discussions with individual investors, but

5   most of what he was trying to do was to use his creative side

6   to try to put together bigger investments and to try to make

7   cost savings in particular places.

8        And when I say "particular places," let me just be a

9   little more specific because we'll have maps and you'll see

10  that, you know -- remember I said Philadelphia, that's where

11  one of the lawyers were.  New York was where one of the other

12  lawyers were.  They actually set up production for GigaPix in

13  Iowa.  They set it up in Iowa because Iowa offered them cost

14  savings, and the cost savings were very substantial.  Tax

15  incentives, 50 percent.

16       So I talk about that.  It sounds like it should be a good

17  thing.  It turns out that the cost incentives -- they had a new

18  governor come into Iowa, and they just jerked it out, jerked it

19  out from under them.  They had already spent several million

20  dollars putting together the Iowa shop.  They were putting

21  together a movie called *Blackbeard*.  They took away the

22  incentives.  The fact was -- well, it was crushing blows.

23       The fact that there was some cease and desist, that was an

24  annoyance, but that gets handled by the lawyers.  But when they

25  actually -- when they actually had Iowa jerk that from under

them, they had to figure out something else to do.  And they
tried to cut deals.

In fact, one of the things you'll hear a lot of details
about is how my client was trying to reach out to the many
companies and the many people whom he has come to know in his
career in order to make this work.  In fact, Toronto is one of
these places.  Toronto is where they were trying to set up the
productivity of *OZ3D*.  Remember that there are these two
companies, one is GigaPix.  *OZ3D* is owned by GigaPix.  And in a
sense, this is how they handle the money between these two
companies.

They tried to set this up in Toronto.  They came very
close to having it all work out.  And you'll hear, in fact,
that, yes, they were in production.  And the reason they were
in production is that other investors made public announcements
that they were completing the investments.  And that is what
entitles you to announce that things are in production.

So those are sort of four of the five points that I said I
was going to touch on.

What I'm going to suggest now is, you know, we've been
moving along chronologically, in a manner of speaking.  And in
about 2007/2008, Mr. Pritchard is thinking to himself, We've
got to figure out a way to make this work.  Some of these big
investors simply were uncomfortable with Mr. Blauvelt.

And so what Mr. Pritchard is trying to do is he's trying

1    to bring in some other kinds of investors.  And he does that

2    and he tries very hard.  But when the cease and desist orders

3    start coming out, he has them fixed, but it's a little bit of a

4    discouragement.  And then when Iowa pulls that away, he then --

5              THE COURT:  Move on to the case, Counsel.  Just tell

6    us what the -- what you're going to introduce.

7              MR. EMMICK:  Yes.

8         And what we'll be introducing is that after that, he had a

9    different kind of a plan.  And that different kind of a plan

10   was to have Mr. Blauvelt give up his 91 percent ownership, come

11   down to merely 51 percent ownership, and give up control.

12        What's the advantage of that?  The advantage of that is

13   that people are no longer investing depending on how

14   Mr. Blauvelt looked.  They're going to be investing based on

15   how the company is going to be run.  In fact, the arrangement

16   was for an expert -- I shouldn't call him an expert -- but a

17   financial guy by the name of Cardwell who is actually going to

18   come into that company and is going to run the company himself.

19   That is his plan.  Blauvelt is going to be out.  And he,

20   Mr. Pritchard, is going to be out as well because that's going

21   to work.  That's how the new investments are going to happen.

22        That starts up.  Mr. Blauvelt, in fact, leaves.  And

23   that's in 2011.  And after about six months, Mr. Blauvelt

24   decides, I'm just not sure if this is going to work.  And he

25   decides, because he has 51 percent, that he's going to rejoin.

1       At that point, times get difficult.  There are lots of

2    different efforts that Mr. Pritchard still tries to make.  And

3    at that point -- at about that point, the Government has opened

4    an investigation.  You might think to yourself, Open an

5    investigation?  All right, interesting.  What happens in that

6    investigation?  That, in fact, is that fifth point that I'm

7    going to be getting into right now.

8       Because in 2012, the company has to declare bankruptcy.

9    They just couldn't put together all the things that

10   Mr. Pritchard was trying to put together.  It just didn't work.

11      Two years later, there was actually about 300

12   questionnaires sent out to various different investors.  And

13   they found three or four who were willing to say something

14   about Mr. Pritchard.  They talked to a lot of these insiders,

15   but they never talked and never asked --

16          THE COURT:  No, Counsel, that's not this case.  They

17   never talked.

18          MR. EMMICK:  They did not talk --

19          THE COURT:  Investigation is not part of this case.

20          MR. EMMICK:  One of the things that the Government

21   said in its opening was that my client made some admissions.

22   What I want to suggest to you is the context of that and what

23   you will hear about that.

24      First, 11 police officers, FBI agents showed up at their

25   house, entered the house with automatic weapons, pushed around

```
 1   their mother who is 93 years old.
 2           MS. LINDSAY:  Objection, Your Honor.  Highly
 3   argumentative.
 4           THE COURT:  The objection is sustained.
 5       Stay off of your arguments, Counsel.
 6           MR. EMMICK:  I will do that.
 7       Those actions made him mad.  They asked him whether or not
 8   he wanted to be interviewed.  Let me tell you among the things
 9   that he said.  You saw some of the things that the prosecutors
10   have emphasized.  I'll tell you some of the things that we will
11   emphasize.
12       One of the things, for example, is he said, "Why didn't
13   you call?"  He has been indicted.  Nobody has called him.
14   Nobody has asked him any questions.  They have simply indicted
15   him --
16           THE COURT:  That's an argument, Counsel, please.
17           MR. EMMICK:  A second thing that he asked is whether
18   they would be taping.
19           THE COURT:  Don't argue the case, Counsel.
20           MR. EMMICK:  I think what you'll find is that there
21   are big differences between what the agent says about what was
22   said and about what Mr. Pritchard will say about what was said.
23   You will have an opportunity to think through whether what the
24   agent says makes any sense at all.  You will hear, for
25   example --
```

1          THE COURT:  That's argument, please.

2          MR. EMMICK:  I think what you'll find is that errors

3    were made, significant errors, that his statements were not

4    admissions.  And when you hear them from him, you will shake

5    your head and you will say that man is innocent.

6      Thank you.

7          THE COURT:  Defendant Blauvelt wish to make an

8    opening statement?

9          MS. AMES:  Yes, Your Honor, thank you.

10     And good afternoon again, ladies and gentlemen.  My name

11   is Stephanie Ames.  And I am counsel for Mr. Christopher

12   Blauvelt.

13     I will keep my comments short, and I will allow the

14   evidence to speak for itself.  But I will submit to you that

15   evidence will show that GigaPix and *OZ3D* were not schemes and

16   that Christopher Blauvelt was not a participant or a planner in

17   any sort of scheme.

18     Instead what you're going to learn is that Christopher

19   Blauvelt founded GigaPix in 2002.  And that's because as a

20   successful businessman, he saw an opportunity in the movie

21   industry, in film, and in television to create a company that

22   he wanted to be like Pixar.  Pixar was making amazing success,

23   and he saw the opportunity and the space within the industry to

24   make something like that.  And so that was his goal when he

25   founded GigaPix in 2002.  And he was both the founder and the

1    CEO of that company.

2         So that's exactly what he set out to do.  And in order to

3    do that, he hired the best people that he could find for the

4    jobs.

5         First, he found some office space, large enough to be able

6    to create a studio, to house salespeople, to house creative

7    people.  He purchased super-computers so that they could create

8    all the graphics, they could do all this animation in filming.

9    And they purchased also a 3D printer to be able to create those

10   models and whatnot.

11        And he sought out and he hired the best people that he

12   could find in modeling, in writing, animation, artists, IT

13   people, everything that you would need to be able to run a

14   successful movie and television business.

15        And in searching out for those best people, he hired on

16   David Pritchard in 2006.  And you've already heard from

17   Mr. Pritchard's attorney, his many successes in the past and

18   including successes with Phil Roman, that he had won -- he had

19   five Emmys.  And this is the kind of person that Mr. Blauvelt

20   wanted to have running the company as president, with him as

21   CEO.

22        So also what they did in the process was they needed to

23   raise money.  And they did that by hiring attorneys and using

24   documentation that was prepared by those attorneys in order to

25   be in compliance with the securities laws.

1      Now, admittedly, there were some problems, but they

2   pursued that by hiring, again, attorneys to take care of those

3   problems and deal with those issues.

4      And along the way, they also made award-winning films.

5   GigaPix was a producer of *Captain Abu Raed* which won 27

6   national and international awards, including The Audience Award

7   at the Sundance Film Festival.  GigaPix produced *Baker Boys:*

8   *Inside the Surge* which earned an award at every film festival

9   and competition in which it played.  They produced television

10   series like *Workaholics* which was picked up by Comedy Central

11   and another -- a number of other meaningful projects.

12      But unfortunately, you will also hear that critical

13   success does not always mean financial success.  But you will

14   see all the efforts that were made in making this a successful

15   company, and that was their goal.

16      And at the end of this case, ladies and gentlemen, you

17   will see that -- you'll see someone, Christopher Blauvelt, who

18   was working to create a successful company.  And at the end, I

19   will ask you to return verdicts of not guilty on all counts.

20      Thank you.

21         THE COURT:  All right.  Members of the jury, so that

22   you have it in mind, the statements made by the Government and

23   by defense counsel are not evidence that you are considered --

24   that you are to consider if you are chosen as a juror.  It's

25   what the lawyers think that they can present.  The rules of

1 | evidence may or may not allow them to present that evidence to
2 | you.  And you're going to make the determination after you hear
3 | the evidence that comes from the witness stand by witnesses who
4 | are called, the orders that are made by the Court during the
5 | trial of this matter, and that is the evidence which you will
6 | consider.
7 |     All right.  Fill the jury box.
8 |     (Proceedings continued, were reported, but
9 |      are not transcribed herein for purposes.
10 |      of this Partial Trial Transcript.)
11 |     * * * * *
12 |     (Opening statements concluded at 2:14 p.m.)

1
2
3
4
5
6
7
8
9
10
11
12          **(THIS PAGE INTENTIONALLY LEFT BLANK.)**
13
14
15
16
17
18
19
20
21
22
23
24
25

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )


         I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


         DATED THIS 2ND DAY OF NOVEMBER, 2014.


                    /S/ MYRA L. PONCE
         _____
         MYRA L. PONCE, CSR NO. 11544, RMR, CRR
              FEDERAL OFFICIAL COURT REPORTER