1  MICHAEL W. EMMICK, CSB No. 91446
   Law Offices of Michael W. Emmick
2  3701 Highland Avenue, Suite 305
3  Manhattan Beach, CA 90266
   Telephone: (310) 546-3456
4  Facsimile: (310) 546-3455
   Email: Mike@Emmicklaw.com
5

6  Counsel for Defendant DAVID PRITCHARD

7

8              UNITED STATES DISTRICT COURT

9         IN THE CENTRAL DISTRICT OF CALIFORNIA

10                    WESTERN DIVISION

11

12  UNITED STATES OF AMERICA, )      CASE NO.  CR 14-282-R-1
                              )
13              Plaintiff,    )
                              )
14     v.                     )      DEFENDANT DAVID PRITCHARD'S
                              )      RULE 33 MOTION FOR NEW TRIAL;
15                            )      MEMORANDUM OF POINTS AND
    DAVID PRITCHARD, et al.,  )      AUTHORITIES; DECLARATION OF
16                            )      DAVID PRITCHARD; EXHIBITS
                              )
17              Defendants. )
                              )      Date:  December 8, 2014
18  _____)      Time:  1:30 pm
                                     Courtroom:  8, 2nd Floor - Spring St.
19

20
        Defendant David Pritchard hereby files this Motion for a New Trial under Federal
21
    Rule of Criminal Procedure 33.  The filing is based on the attached Memorandum of
22
    Points and Authorities, the declarations of five witnesses, and copies of 10 exhibits.
23
    Also being submitted are 65 quite long documents, totaling about 400 pages, which are
24
    too long for electronic or physical filing.  However, they are being provided to the Court
25

26  ////

27  ////

28
                                         1

    DEFENDANT DAVID PRITCHARD'S RULE 33 MOTION FOR NEW TRIAL;
    MEMORANDUM OF POINTS & AUTHORITIES; DECLARATION OF DAVID PRITCHARD

and the government for ready access. This motion is also based on the files and records in this case, any later filings, and any argument at the hearing.

Dated: November 6, 2014

Respectfully submitted,

MICHAEL W. EMMICK
Counsel for Defendant David Pritchard

2

DEFENDANT DAVID PRITCHARD'S RULE 33 MOTION FOR NEW TRIAL;
MEMORANDUM OF POINTS & AUTHORITIES; DECLARATION OF DAVID PRITCHARD

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. Introduction

This is defendant David Pritchard's motion for a new trial, required in the interests of justice, under Federal Rule of Criminal Procedure 33(a). The motion is largely based on newly discovered evidence, and on other grounds in addition to the newly discovered evidence. See Fed. R. Crim. P. 33(b).

Directly attached to this motion are a long declaration from defendant David Pritchard and follow-up declarations from four of Mr. Pritchard's witnesses at trial, as their testimony was limited by rulings of the Court. Those four witnesses are Bill Uchimoto, Kip Konwiser, Kerry Brooks, and Jim Cardwell.

Also directly attached to this motion are 10 exhibits, which are the most important (and shortest) of approximately 65 more-lengthy exhibits related to this motion. The more complete version of those 65 exhibits will be forwarded and made available to the Court, but because of their size -- about 400 pages total -- the exhibits could not all be attached to the motion or filed electronically. As a result, we have simply attached copies of the 10 shorter and most central exhibits. The entirety of the 65 exhibits are readily available to the Court and opposing counsel.

Finally, we have recently received transcripts from the trial, and we are reviewing those transcripts now. We will file a supplement to this Rule 33 motion when that review is completed and can be tied into specific allegations discussed herein.

## II. Summary of Reasons for New Trial

A new trial is required for four inter-related reasons. The main reason is that we have recently acquired documents that demonstrate the truth of Mr. Pritchard's written

3

statements in his newletters, his PPMs, and other documents. These documents contradict the government's claims at trial that these statements were false. Below we will list those statements, and show how the new documents show the statements to be true rather than false, and suggest why the government was mistaken about their claims in trial.

Second, we were unable to obtain and introduce those documents earlier because there was far too little time to prepare for the trial. Although this case was indicted and understood to involve "cold-calling," at trial the case became a much more complex business matter involving the two defendants and their independent entertainment company, Gigapix (GPX). The case covered 11 years of GPX activity from 2002 to 2012. The investigation lasted three years, from 2011 to 2014. Most of GPX's documents had been stored in bankruptcy court since 2012.

The trial dynamics changed at the last minute when the case was severed, excluding Pusateri and Brown from this trial. When that happened, the government radically changed its approach to the case against Mr. Pritchard. Originally, nine investors were planned to be called as witnesses against the four defendants. After the severance, the government called only two witnesses who claimed to have had short phone calls with Mr. Pritchard several years before. The government's changed its emphasis to particular statements in newsletters and Private Placement Memoranda (PPMs), and on arguable personal expenditures, which had not been particularly important during the original "cold-calling" version of the case.

To respond to that changed approach, Mr. Pritchard tried to obtain some of the relevant GPX or OZ3D documents, but that was a very extensive task. There was too little time to prepare for the trial at all, much less to find documents responsive to approach to the trial.

4

Similarly, the government had not provided much discovery about these allegedly false written statements because the government had not originally regarded them as particularly important, at least when compared to the "cold calls" made by the other three defendants. That is presumably why the government did not investigate the statements in much detail or consider the statements' meaning, context, and background.

The parties (including Mr. Pritchard) tried to provide the necessary additional time to prepare adequately for the trial. They submitted stipulations to begin the trial in April 2015, eleven months from the indictment date. However, the Court denied those requests and set the trial in 12 weeks, apparently believing that the trial would involve simple evidence of cold-calling by the defendants, as described in the indictment.

That extremely short time frame was worsened for Mr. Pritchard, who became ill for six weeks and therefore made an additional request for a continuance. That request was denied as well.

For an old and complex case like this, six weeks of trial preparation time is woefully inadequate, and, for reasons described below, it dramatically hurt Mr. Pritchard's ability to defend himself at trial.

Also problematic was the Court's limitation on the defense witnesses, which was apparently brought on by the Court's mistaken belief that the government would continue to treat the case as "cold-calling."   The defense witnesses had been identified assembled at the last minute in order to respond to the prosecution's new allegations of false statements, personal versus business expenditures, pre-production versus post-production costs, and alternative sources of funding and auditing for GPX. Although those defense witnesses knew a great deal about Mr. Pritchard's work for GPX, the Court severely limited their testimony because it was not about cold-calling.

5

As to allegedly false statements themselves, the government seems to have greatly under-investigated the statements and context. The newly-found GPX documents demonstrate conclusively that Mr. Pritchard's written statements were not false or misleading at all.

Mr. Pritchard's work was in fact directed at helping the Gigapix shareholders, not defrauding them. He provided accurate newsletters; he sought to obtain funding through large industrial investors rather than small private investors; and he worked to reduce Mr. Blauvelt's role in the business.

Finally, contrary to the government's allegations at trial, Mr. Pritchard made little or money at all while working at GPX, and he had little or no incentive to lie or even exaggerate to the investors or shareholders.   Mr. Pritchard was not a stockholder, and he owned no GPX shares. Unlike the GPX salesmen, Mr. Pritchard received no commissions from any sales. Although he was promised a good salary when he joined GPX, he voluntarily gave up that salary during the recessionary years from 2010-12. In fact, Mr. Pritchard actually *gave* money to GPX from his outside income in a prior entertainment contract.

Thus, the government's overall presentation about of Mr. Pritchard's actions and role was completely unsupportable. This motion is being filed to point out those inconsistencies as supported by recently obtained GPX documents and supportive testimony from Mr. Pritchard's witnesses.[1]

---

[1] After the verdicts, Mr. Emmick had a brief discussion with three of the jurors, including the Foreperson. All three stated that there was much less evidence of intent against Mr. Pritchard than against Mr. Blauvelt. However, the jury concluded that the Pinkerton rule compelled the verdicts against Mr. Pritchard because he seemed to be working with Mr. Blauvelt, and the crimes being committed by Mr. Blauvelt and others were reasonably foreseeable. That is apparently why Mr. Pritchard's verdicts were the same as Mr. Blauvelt's verdicts, even though the evidence against each of them was quite different. The three jurors also said that the jury as a whole was crying at the conclusion of deliberations because, in their view, the actual evidence against Mr. Pritchard was not very strong, and Mr. Pritchard was not necessarily deserving of a felony conviction. However, the jurors felt obliged to vote to convict Pritchard under the Pinkerton rule.

6

## III. The New Evidence Demonstrating That Mr. Pritchard's Statements In The Newsletters And PPMs Were In Fact Truthful.

The government's trial theory against Mr. Pritchard -- the non "cold-calling" theory -- was based largely on a number of supposedly false statements on GPX newsletters and PPMs. Those statements were not alleged in the indictment, but they were emphasized on direct and cross-examination. Indeed, during closing argument, the AUSA put special emphasis on the case not being about "cold-calling.

As demonstrated by the attached exhibits (and the 400 pages of exhibits available to the Court and counsel), the particulars of those allegations are simply false. The mistakes apparently arose because of the government's last-minute need for some probable wrong-doing by Mr. Pritchard, who had virtually nothing to do with the "cold-calling" sales of GPX stock to investors.

When reviewed in more detail, the context of Mr. Pritchard's allegedly-false statements shows them to be completely true; they were not dishonest at all. More detail can be provided when the transcripts from the trial have been reviewed, but many of the government allegations can be shown below to be incorrect and unsupportable.

**A. There was no lie about $60 million in financing**. The government argued that Mr. Pritchard lied when he wrote that such a loan had been approved. That government allegation is demonstrably false. On November 5, 2008, there was a Reuters public announcement about that $60 million arrangement involving GPX and Polychrome Pictures and Gold River Entertainment. That announcement is attached as exhibit 423.

**B. There was no lie about a 100 million loan.** The government argued that Mr. Pritchard had lied about a $100 financing arrangement. In fact, there was such an arrangement, as it involved a smaller loan that was guaranteed to be replenished on

7

an periodic basis, up to the limit of $100 million. That announcement was also covered by documents.

**C. There was no lie about 10% commissions being paid for sales.** The government became so desperate for a false statement that they focused on a single sentence in a long writing by Mr. Pritchard. The sentence provided details about the 10% commission being paid and offered to GPX salesmen for particular sales. The government contended that this was incorrect, as the actual percentage was 20%. That allegation is false because of the timing of the writing. In fact, the maximum amount of the sales commission dropped from 20% to 10% when the recession hit GPX. Indeed, that reduction in commission percentage caused many GPX sales employees to leave GPX. Most importantly, at the time of the writing being examined, the actual commission *was* 10%, as the reduction had recently occurred. The government was simply trying desperately to come up with falsehoods, without having thoroughly investigated the situation.

**D. There was no lie about OZ3D money used for production.** In a similar way, the government tried to make the point that Mr. Pritchard was telling lies about OZ3D money being used in production. But that claim is another mistake by government based on their misunderstanding of how money is typically used by entertainment companies like GPX and OZ3D. That more-detailed understanding is attached.

**E. There was no lie about a planned Ernst and Young audit.** Again, the government selected one sentence from one PPM, and tried to make it into a felonious lie. One of the documents did make reference to an expected audit by Ernst & Young (E&Y). However, the context explains things further. Mr. Pritchard and others did meet with E&Y, and E&Y stated preliminarily that an audit would be approved and conducted. Several weeks later, that approval was qualified because some of GPX's problems gave E&Y supervisors concern. However, E&Y agreed to recommend related

8

or subsidiary auditors, who were linked or associated with E&Y, and eventually agreed to do some last minute auditing if Colin Mutton, an auditor at GPX, could do the initial work and just have a formal E&Y auditor sign off. Mutton disapproved, though. At the time of this supposed "lie," the E&Y preliminary approval and later suggestions were still in place or pending. The statement was never a lie.

**F.   There was no lie about GPX's plans for a reverse merger.**  Again, the government tried to create an illegal venture out of GPX and Mr. Pritchard's efforts. One of those claimed falsehoods was a supposedly exaggerated reverse merger plan. Again, that allegation is false. The reverse merger plan was in place and full of details and prior work. It was not false, and it was not exaggerated. Mr. Pritchard and GPX had made extensive and very-real plans to have a complicated reverse merger take place in order to save GPX and protect the shareholders.

We have not had time to review all of the transcripts from the eight-day trial in order to provide all of the particulars about the government's mistakes and exaggerations about Mr. Pritchard's supposed lies. We will do so as soon as possible, and we will make supplemental filings about those issues.

For now, though, it is quite plain that government was simply eager to put together a non-cold-calling case against Mr. Pritchard, and they did so by making last minute allegations that were false, mistaken, and poorly understood.

One more point bears mentioning. Mr. Pritchard had no incentive whatsoever to engage in any of the criminal conduct described by the government. Unlike the sales personnel, he would not receive any commissions for any sales. He did not own any GPX stock. In theory, he would like to be paid his salary, but when GPX was struggling financially, Mr. Pritchard voluntarily gave up his salary of $250,000 per year, for three years.

To take that point a step further, Mr. Pritchard not only gave up his salary from GPX, he actually promised to pay, and he did pay, his own money to GPX. That money was based on an earlier contract with another company, but Mr. Pritchard felt committed to do whatever he could to help GPX out of its financial worries. Thus, not only was he never a thief, he actually forfeited his salary and gave his own money to GPX.

Similarly, Mr. Pritchard had no compelling reason to stay with GPX at all, especially when the recession had hit and the Iowa tax incentives were withdrawn for political reasons. Yet he did stay, and he continued to work diligently to somehow make GPX into a profitable company, which would principally benefit the shareholders.

## IV. Conclusion

Based on the arguments and evidence made above, and based on the supplemental filings that will shortly be made, this Court should grant Mr. Pritchard's motion for a new trial based on this newly-discovered evidence. In fact, we wonder if the government will continue to press this matter once the underlying facts and full background and context are fully understood.

10

## DECLARATION OF DAVID PRITCHARD

I, David Pritchard, hereby declare follows:

1. **Background:** I have been an active senior executive in both operating and creative roles in multiple large and small independent companies (Schlumberger Ltd, Director of Corporate Planning, 2.5 years; Chase Manhattan Bank, VP for Financial Planning, 2 years; Gulf & Western Industries, Director of Corporate Planning, 6 years; HBO, Senior VP of Corporate Affairs, 7 years; Popular Arts, Co-Founder, 7 years [One prime-time Emmy for Dr. Katz]; Film Roman, CEO [NASDAQ], 3 years [Five prime-time Emmys for Simpsons (2), King of the Hill (2) and Family Guy (1)]) and others.

2. I have started and exited several of my own companies (Popular Arts, Fat Rock Entertainment, Principal Media Group Advisory Services, Consensio Partners) and have assisted several companies in repairing their operating efficiency or setting a new overall course with new strategic plans and partnerships (Rubicon, Altimira Corp, Brilliant Digital Entertainment, National Lampoon, Pop Tent and others). Often times, I will bring in or seek to bring in new capital to the company as well.

3. **Joining Gigapix:** I joined Gigapix Studios after meeting Chris Blauvelt, the founder, in the summer of 2006. The Company had been in existence for nearly four years and according to Blauvelt had raised over $5 million from private investors with whom Blauvelt represented he had a prior relationship.

4. **Initial limitations on my time:** In 2006 I was working on three separate deals that had started earlier, as well as an animated TV series and the first feature film to be produced in Jordan. I made it eminently clear to Blauvelt that I would not be available until the end of 2007 for full time employment. He agreed to these specific limitations on my time:

11

A. Blowtorch/5th Year - A start-up business based on a business plan and strategy that I had created that I believed would have some opportunity with Gigapix. With my partners in that company, Blowtorch/5th Year, we secured $50 million in investment from a large Venture Capital fund in Seattle. (Exhibit 428)

B. I also had created and initiated the funding for a $4 billion real estate project in Shanghai, China (Consensio Partners). (Exhibits 426 & 427)

C. An animation studio in the Middle East that I helped to develop (Rubicon, in Jordan) with the potential for a long-term co-production relationship (Exhibit 425).

D. I was finishing production on an animated TV series in Jordan with Rubicon (Ben & Izzy, Exhibit 425).

E. I was also just beginning preproduction on the first feature film to be produced in Jordan with Paper & Pen Productions (the multiple award-winning *Captain Abu Raed*).

5. **Significance of these transactions:** These transactions demonstrate that Gigapix was not the only opportunity I had at the time and that my motivation and intention in joining Gigapix was to determine what opportunities within the current market would be available for Gigapix, not to engage in "cold calling" or to mislead investors. I have a long, successful record as a creative entertainment executive and of building or creating companies and getting them funded. I had every reason to believe I could continue to find similar success within Gigapix.

6. During these prior transactions that had nothing to do with Gigapix, I was

12

offered a chance to run the company, Blowtorch. I believed I had a better opportunity of building a successful business at Gigapix. I chose Gigapix.

7. **Securing post-production capacity, work (and credits) for Gigapix:** I secured post-production "work for hire" for Gigapix on the Jordanian production of Ben & Izzy, an animated TV program I had created in Jordan. This brought Gigapix a $200,000 fee and a credit as the post facility. Through this work-for-hire credit and the addition of a key digital production expert, Clark Graff, I secured a post-production agreement for Gigapix from the Jordanian film production company, Paper & Pen. These two projects were intended to demonstrate that Gigapix could handle post production on a CG (computer generated) television program and on a feature film. These were two important credits for Gigapix. In fact, they were the only two significant credits the company had earned up to that time.

8. **My Jordanian film wins Sundance Award, receives Oscar nominations (co-production credit for Gigapix):** The film I produced in Jordan, *Captain Abu Raed*, won the prestigious Audience Award at the Sundance Film Festival, more than a dozen other major festival awards and garnered Oscar nominations.

9. **I join Gigapix full-time in January 2008:** Through 2007, I closed the transactions mentioned above and officially joined Gigapix full time in January of 2008. Gigapix was riding the wave of attention afforded it through its coproduction credit on an Oscar nominated film (the Jordanian film *Captain Abu Raed*). At Gigapix, I began to develop:

> A. Movie Books (TV production company): We started plans for the launch of a TV production company with Movie Books as the first big project;

13

      B. Kids Films: We started planning a theatrical kids film production, followed by a slate of kids' films.

10. **I discover trouble at Gigapix:** At this time I discovered that my predecessor as the President of Gigapix, John Savage, was suing the company and Mr. Blauvelt. It was also at this time that I saw the resignation letter from Mr. Savage and became aware of significant issues with Mr Blauvelt. (See Exhibit 452) In this letter Mr. Savage describes behavior and actions of Mr. Blauvelt that were troubling and needed to be addressed.

11. **I take steps to resolve the trouble:**

      A. I told Mr. Blauvelt we needed to restructure Gigapix, redistribute the shares of Gigapix stock and grant a more equitable distribution of shares to investors. While he did not immediately agree, he said he would consider a proposal.

      B. I also made it clear to Mr.Blauvelt that Gigapix could only pursue accredited investors with whom we clearly had a prior relationship.

      C. The next step in this process was to find a prestigious law firm to handle the restructuring, so as to ensure that the restructuring would be done right. The firm we chose was Buchanan Ingersall Rooney, and the attorney we selected was Bill Uchimoto, a securities specialist.

      D. Bill Uchimoto recommended a plan for restructuring the company that would better prepare Gigapix to attract institutional investors or to prepare it for a public offering. This was a major undertaking that took more than a year to carry out and cost $500,000 in legal fees.

14

12. This was accomplished entirely by myself, with the law firm Ingersall Buchanan Rooney and securities attorney, Bill Uchimoto, exclusively for the benefit of the existing Gigapix shareholders. This was the first time I had the opportunity to set in place all the proper methods and disclosers for raising funds for the company. My intent was to loosen the stranglehold Mr. Blauvelt had on the Company and to begin to position the company for a public offering or a merger into another public company.

> A. We developed a tax-free plan for redistributing shares of Gigapix stock to investors;

> B. We initiated this plan, in which I convinced Mr. Blauvelt to give back 40% of the corporate stock (his holdings) to existing shareholders. This was completed in September of 2009.  Shareholders went from holding 9% of the company to 49% of the company, at no additional cost to them.

> C. I received no stock in the company.  In fact, at no time did I ever own stock in Gigapix.  The restructuring included the issuance of stock options to me at a purchase price of $.85 per share.

> D. Part of the plan involved an offering to existing shareholders that gave us an opportunity to communicate and fully disclose any risks, liabilities or litigation that had not been disclosed before.  This was carried out and I caused the following documents (June 15, 2009 PPM, July 15, 2009 PPM) to be sent to every Gigapix shareholder.

> E. Prior to mailing these offerings to every existing Gigapix shareholder, we registered the offerings in all fifty states.

13. **Kids Film Strategy:** My analysis of the market showed that approximately

15

20% of the film audience consists of children under the age of 12, but only 4 to 5% of the films distributed each year are made for that audience. This represented a significant market opportunity.

14. **Kids Film Business Plan:** In mid-2008 I finalized a business plan to begin a slate of kids' films under the banner "Recess Films", with the intention that Recess Films would become a new kid-friendly brand. The slate of kids' films was the skeleton around which I planned to rebuild Gigapix as a wholesome kids' film company. This strategy is detailed in the "Iowa Book" (Exhibits 400 - 421). Key elements of the business plan include:

> A. **"Slate" of Kids' Films:** Kids action comedies, like 'Home Alone' and 'Goonies'. Like investing in mutual funds, investors in a slate of kids' films would have a better chance of realizing a positive return, as their risks would be spread across the performance of multiple films.

> B. **Obtain Distribution Prior to Start of Production:** A critical part of the Kids Film Business Plan was to secure signed distribution contracts prior to the start of production, to ensure that films produced by Gigapix would be distributed by Anchor Bay and Essential. That's because each year, thousands of feature films are produced that never find distribution. As a result, these films (and their 'sunk production costs') never have a chance to produce a return to investors.

> C. **Leveraged Financing Strategy:** Production costs were budgeted at $10 million per film. 50% would come from Iowa state tax incentives; 25% would come from international presales; the remaining 25% would come from US video and television presales and gap financing (short term loans) or from a private equity source.

16

D. **Capitalize upon my experience as an award-winning animation executive** by including one animated feature film in each slate of kids' films. OZ 3D was to be our first animated feature film. The same financing strategy applied, except that we planned to produce OZ 3D in Canada where film tax credits of 60% were available.

E. **Gigapix investors were investing in creative project development, distribution contract development and pre-production, NOT in actual production.**

15. **Iowa Suspends Their Film Tax Credit Program, Without NMotice:** The state of Iowa had issued us a signed agreement for over $10 million in tax incentives for our first kids' film, "Blackbeard aka Field Trip" (Exhibits 400 - 421) ($5 million for production costs; $5 million for distribution).

16. Suddenly and without warning, the state of Iowa suspended its film tax incentive program, but repeatedly assured us that their agreement with Gigapix would be reinstated over the next twelve months. Operating in good faith and in reliance upon the state of Iowa's binding legal commitment, we had started preproduction in Iowa (rented offices and production space, hired local staff and tradespeople, started building sets). This unforeseen event drove Gigapix into a deep survival mode of operation.

17. **The Iowa Book (Exhibits 420 - 421) shows that Gigapix had in place the various necessary financing agreements and a completion bond agreement in anticipation of the tax incentives that had been approved in writing by the state of Iowa Film Commission.**

18. Reliance on the state of Iowa's binding legal commitment protracted the situation. Without the Iowa debacle, which was a completely unforeseen business event, or if Iowa would have covered just the base out-of-pocket pre-production

17

expenses Gigapix incurred in Iowa, Gigapix could have survived and found another way to produce the slate of kids' films.

19. **Distribution agreements in place:** The reason for such confidence can be seen in Exhibits 430, 431, and 432. These show that we had distribution agreements in place for the kids films being produced in Iowa, and for the CG (computer generated) animated film OZ3D from both North American and international distributors (Anchor Bay-Overture, Media 8, and Essential Entertainment).

20. Solid distribution agreements are difficult to obtain. That's why so many films are produced each year that do not get distributed. The fact that we had done our homework and had gotten signed distribution deals in place put Gigapix in a favorable position to raise production financing by producing our projects in locations that offered favorable production tax incentives.

21. **Misleading allegation demonstrates misunderstanding of basic film production financing:** The allegation of the prosecutor that Gigapix was spending all the money that was raised on overhead and not on production is misleading. If Mr. Konwiser and Mr. Cardwell, both highly experienced film studio producers, had been permitted to testify, they would have explained that **no independent production company (live action or animation) should spend its money on production. The majority of production costs should NOT be carried by the production company but by the distributors and by banks and other credit facilities.  The appropriate use of investment capital for a production company is:**

>    A. **Executive supervision of creative project and intellectual property development;**

>    B. **Obtaining signed distribution and advertising contracts prior to start of production;**

18

C. **Pre-production costs.**

22. **This was exactly how Gigapix spent the monies that were raised.**
The claim that Gigapix and OZ3D only spent a notional amount of money on production is not an appropriate criticism of management. Investment was intentionally – and appropriately – spent in the manner described above. In fact, in Exhibit 449 there is an actual final accounting of the development expenses for OZ3D. That amount was $1.7 million, which includes the allocations for management, legal and executive supervision and creative development costs. Throughout the film industry, these are directly attributable expenses. This brings the actual amount of the development expenses for OZ3D to about 20% of the monies raised.

23. **Misleading allegation regarding OZ3D letter to shareholders:** The prosecution asserted that a letter was sent to shareholders falsely stating that OZ3D was "in production". To bolster this argument, a comment I made in my interview upon my arrest was taken out of context. (My interview was, apparently, the only interview in this case that the prosecution neglected to record, which makes my remarks vulnerable to out-of-context representation.)

24. In fact, the letter sent to shareholders announcing that OZ3D was in production was completely accurate at the time it was sent. A month earlier, Gigapix had signed an agreement with an animation studio (ARC) and a Canadian distribution company (Multi Media Entertainment) announcing a co-financing agreement and the start of production on OZ3D. (Exhibits 447 and 448) This announcement was made in Toronto by our Canadian partners.

25. **Merger attempts:** There were several attempts to merge with or to have a public company acquire Gigapix, or to merge several companies into a larger operation and take those combined companies public. There are several possible exhibits that

19

will demonstrate the range of opportunities that I was exploring to bring Gigapix into a public trading status.

26. **Board members recruited:** I recruited well-respected executives who agreed to join the board of Gigapix once it became a public company (Exhibit 457).

27. **At my insistence, Mr. Blauvelt resigned from the company in July of 2011 to enable a merger to go forward.** However, Mr. Blauvelt changed his mind and prevented the merger from taking place.

28. **This last attempt to move Gigapix into a publicly traded entity was a "Reverse Shell Merger" with Make Something Happen Entertainment.** The final executed Letter of Intent between the two companies was signed in May 2011 (Exhibit 454). This process was carried out by me with a team of outside consultants, all of whom were not being paid, but were doing it to help salvage Gigapix. Among the agreements signed were the definitive terms, Letter of Intent, a resignation letter from Blauvelt to Gigapix, a subsequent consulting agreement for Mr. Blauvelt with Gigapix, and an Executive Producer agreement with Blauvelt for his services on OZ3D.

29. **Benefit to Gigapix shareholders:** In this structure the Gigapix shareholders would have held on to 41% of the shares of the new public company, reducing their holdings by less than 8%. (They were holding 49% of Gigapix at the time). Management of the new company and a newly constructed board of directors would hold 41% as well, with Blauvelt being reduced to 15% of shares in the new public company and the same for myself. The Make Something Happen Entertainment shareholders were going to take 18% of the combined companies.

30. This would have been a very favorable event for Gigapix Shareholders. It

20

would have given them liquidity, with publicly traded stock, and a newly formed management team lead by a very experienced senior executive from Warner Studios (Jim Cardwell) and a stellar outside Board of Directors (Exhibit 457).

31. **Resignation from operating positions:** Mr. Blauvelt and I were both to resign from operating positions at Gigapix, and the new Company would be run by Jim Cardwell and a new team of executives appointed by Cardwell and the Board of Directors.

32. **Bankruptcy:** When Mr. Blauvelt changed his mind about supporting the "Reverse Shell Merger" of Gigapix with Make Something Happen Entertainment – after he had formally resigned -- and the state of Iowa had still not honored their film tax credit agreement with Gigapix, nor had they reinstated their film tax credit program, there was no other alternative but to take Gigapix into bankruptcy.

33. **I worked for three years without salary:** The final creditor list provided to the bankruptcy attorney (Exhibit 422) shows that David Pritchard was not paid any salary in 2010, 2011, and 2012. In fact, I was owed $795,000 in back wages. During those three years $117,000 in personal expenses were charged to me and deducted from the wage claim, reducing the wage claim to $677,617.

34. **I contributed hundreds of thousands of dollars to Gigapix in producer fees owed to me from the television series "Workaholics" (now in its 7th season on Comedy Central) to keep Gigapix afloat:** The bankruptcy accounting does not include the producer fees and participations due to me for creating and producing the television series, "Workaholics". **In an attempt to keep Gigapix afloat until I could take the company public, I turned over to Gigapix all of my fees and participations in this hit show -- while I was receiving no salary.**

35. **My focus at Gigapix:** I dedicated myself during the entire time I worked at

21

Gigapix to getting the company on firm and forward-looking footing. As a creative entertainment executive at Gigapix, I was primarily focused on:

- Developing over 50 feature screenplays and projects, securing distribution agreements for these projects, and finding co-production partners -- as well as securing all the various financing options;

- Developing over 200 television projects that were presented to various networks with several sold as pilots or series,

- Developing a myriad of potential ventures, mergers, acquisitions and financing scenarios.

I can fully document all of the above with supporting exhibits and testimony.

36. **The role of a creative entertainment executive is to generate creative content and intellectual property for the company.** Like a photographer who takes hundreds of photographs for every one or two award-winning shots, creative entertainment executives develop hundreds of projects for every few that ultimately find commercial success. This is the process in which every studio is engaged. This is the particular expertise and award-winning experience that I brought to Gigapix that resulted in award-winning projects (*Captain Abu Raed*, Baker Boys and Workaholics). **This was where Gigapix investment was appropriately allocated.**

37. **I owned no stock or shareholdings in Gigapix or OZ3D.** The only way my tenure at Gigapix would be of any significant or long term value to me was if I got these projects financed independently of Gigapix's direct investments AND they were commercially successful. I could have left the company at any time, but I didn't because I believed I could pull the company through.

22

38. I worked tirelessly and intelligently to build this company.  What got in the way was:

- First and foremost, a difficult founder who was too deeply entrenched in his company and unwilling to relinquish control, and had started down the slope of funding his company in a manner with which he was most comfortable, and in which I had no experience.

- An economy that was constricting financing options for independent studios and small production companies.

- An industry that was stifling a lot of independent production companies by reducing the number of projects the studios and networks would fund for pilots and series orders.

- Finally, the Iowa debacle and the ongoing misrepresentations made by Iowa government officials that cause us to believe, too long, int heir desire to make things right with Gigapix (Exhibits 400 – 421.  **I gave my full best effort to Gigapix at considerable personal expense.**

39. **Ultimately, I wasn't able to make it work, for the principal reasons described above.**  I stopped paying myself my Gigapix salary in 2010 thru 2012, owned no shares, and I gave up my fees on a very successful long-running television program I was producing to keep the company afloat, because I believed we could ultimately find success.  I continued to work every day to get the company on a course to succeed.  A comprehensive record of my work products will be available in future exhibits.

40. Mr. Blauvelt regularly disappeared for long periods of time.  He provided no

23

1  guidance or assistance in fixing the things that were wrong. Nevertheless, I continued
2  to work through every opportunity I could generate. If given the chance to demonstrate
3  my efforts properly, the facts will exonerate me of the charges.

4

5      41. **I am factually innocent.** In the trial that took place, I was not given
6  adequate time to research and prepare my defense nor to enter into evidence the
7  Exhibits that proved my innocence, which I was gathering and my counsel was starting
8  to review shortly before I took the stand at trial. Furthermore, my witnesses were not
9  permitted to deliver the testimony they came to present.

10      42. **A new trial:** With a new trial in which I am allowed to present critical exhibits
11  and documents and in which my witnesses will be permitted to testify, I will be proved
12  innocent.

13

14      I declare under penalty of perjury that the foregoing is true and correct to the best
15  of my knowledge and belief.

16

17  Dated: November 6, 2014

18                                     DAVID PRITCHARD

19

20

21

22

23

24

25

26

27

28

24