1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Anchor Bay Distribution Agreement
For Kids Films and 0Z3D
Dated November 9, 2009

# EXHIBIT 431

Home   Mail   News   Sports   Finance   Weather   Games   Groups   Answers   Screen   Flickr   Mobile   | More
Press Release AB Ess GPX.doc    1   of 3
Search Mail     Search Web     Home   Cherie

Compose

Inbox
Drafts (20)
Sent
Spam (497)
Trash
Folders (38)

Francisco
Amway 20
Amway 20
Amway 20
Bills
Bills 2011
Bills 2012
BMW
credit
Dodgers
e-bay
e-bay paid
Family 201
Forms 201
friends
GPX 2011
home
Home 201
Inbox
Investors 2
Investors 2
Learning A
legal
Legal Infor
Medical 11
Medical 20
n21 11
network 21
Network 2
Notes
Pand A Fur
Pictures (3
quixtar (1
Real Estate
restaurant
Synced Mc
Tickets (1)
Trade
Trading (3
travel

FOR IMMEDIATE RELEASE:
NOVEMBER 9th, 2009

# GIGAPIX PICKS PARTNERS!

## Anchor Bay Entertainment Will Have First Look
## For Distribution in the U.S.

SANTA MONICA, CA — Essential Entertainment's President of Worldwide Distribution, John Fremes, announced a multi-picture agreement today at AFM with Gigapix Studios ("Gigapix") for five "G" and "PG" rated live action kids films through its subsidiary Recess Films. The five live action films and one CG animated film will be produced by Gigapix Studios over the next three years. Anchor Bay Entertainment will have rights for first look in the U.S. with Essential Entertainment handling all International rights. "This is an exciting slate of films that are in the framework of classic kids action comedy films like *Home Alone* and *Goonies*. These are films that have strong international appeal, universal themes, and broad comedic elements that we believe will work across all international platforms," says Fremes.

Anchor Bay Entertainment and Gigapix have entered into a multi-year first look arrangement on the Recess Film slate where Anchor Bay will be releasing the films in theatrical, home entertainment and television with a commitment from Gigapix to fund a minimum P&A outlay of $6mm and 600 screens per film depending on how well each of the films tests in advance screenings. Each film release may go up to $20mm and 2,000 screens.

Kevin Kasha, Senior Vice President of Anchor Bay Entertainment added, "We are excited to be in business with the production team assembled at Gigapix and to have a worldwide distribution partner in Essential Entertainment. Quality kids' films are going to continue to be a staple of family entertainment spending as they always have been."

The first film, *The Return of Captain Kidd*, written by Jymn Magon (*DuckTales, A Goofy Movie*) and Kern Konwiser, two-time Emmy winning writer/director/producer (*On Hallowed Ground* and *Miss Evers' Boys*), is to be directed by Kern Konwiser.

According to Kip Konwiser, head of production at Gigapix, "All of the live action films will have production budgets of $8-10mm each and the CG animated film will be budgeted at $20mm." This first film in the slate, *The Return of Captain Kidd*, was on the verge of production when it was caught in the temporary suspension of the Iowa State film tax credit program. Gigapix has been assured by the Iowa State representatives that their film has an agreement in place, consequently Gigapix has chosen to go forward on the production with an early 2010 start date. Currently, cast is being reassembled for a revised start date. We will be announcing the start of the next two live action films and production on our CG animated film within a few weeks."

Case 2:14-cr-00282-R   Document 175-3   Filed 11/06/14   Page 3 of 15   Page ID #:1893

Home   Mail   News   Sports   Finance   Weather   Games   Groups   Answers   Screen   Flickr   Mobile   More

Press Release AB Ess GPX.doc   2 of 3   Search Mail   Search Web   Home   Cherie

Compose

Inbox
Drafts (20)
Sent
Spam (497)
Trash
Folders (38)

Francisco
Amway 20:
Amway 20:
Amway 20
Bills
Bills 2011
Bills 2012
BMW
credit
Dodgers
e-bay
e-bay paid
Family 201
Forms 201
friends
GPX 2011
home
Home 201:
Inbox
Investors 2
Investors 2
Learning A
legal
Legal Infor
Medical 11
Medical 2C
n21 11
network 21
Network 2
Notes
Pand A Fur
Pictures (3
quixtar (1:
Real Estate
restaurant
Synced Me
Tickets (1)
Trade
Trading (3
travel

Gigapix recently closed a P&A funding agreement with Main Stream Pictures (MSP) of Los Angeles and secured a lending facility with Capitoline Global Finance (CGF) of Newport Beach California. MSP is a new funding/ advisory and production company with principals Geno Taylor, David Williams and Tony Chopelas and will be a presenting producer on the films. Geno Taylor of MSP said, "I am pleased that we are in business on these films, and the quality distribution partners that Gigapix has put together is ideally suited to maximize the market opportunity in the one stable part of the theatrical film business, which is G and PG rated films. The three partners in MSP will also be Executive Producers.

Capitoline, a private fund manager and investment bank is headed by President, Brian Gilmore, and is facilitated by an advisory group led by entertainment industry veteran, Patrick Murray. David Pritchard, President of Gigapix said, "Brian Gilmore, Pat Murray, and Financial Consultant, Dominic Ianno were all instrumental in developing the overall strategy and financir plan for Recess Films, and Dominic was critical in establishing the distribution relationships wi Anchor Bay and Essential." Ianno will serve as an Executive Producer on the films.

Essential Entertainment provides global sales, distribution and marketing for its sister company Essential Pictures, as well as third-party productions. Founded by Jim Kohlberg in January 200 and headed by John Fremes, President of Worldwide Distribution, the company has quickly grown to become one of the world's premier global sales and distribution companies. For more detailed information, please visit http://www.essential-ent.com.

Anchor Bay Entertainment is the home entertainment division of Starz Media, LLC. It include the Anchor Bay Films and Manga Entertainment brands. It distributes feature films, children entertainment, fitness, TV series, documentaries, anime and other filmed entertainment on DV and Blu-ray formats. It is the exclusive home media distributor in the U.S. of the theatrical title from Overture Films. Headquartered in Beverly Hills, CA, Anchor Bay Entertainment h. offices in Troy, MI, as well as Canada, the United Kingdom and Australia. Starz Med (www.starzmedia.com) is a controlled subsidiary of Liberty Media Corporation.

Gigapix Studios first film production, Captain Abu Raed won the 2008 Sundance Audience Award and is currently in worldwide release thru Fortissimo and NeoClassics in the US. Gigapix features an experienced management team with a history of success in Film, TV and digital media. www.gigapixstudios.com

Capitoline Global Finance is a global investment bank that specializes in media finance and proprietary content acquisition. The Company specializes in transactions that are new and innovative in the capital markets, bringing a level of "financial translation" to the institutional market that is unique and compelling. www.capitolineglobal.com

Text me a link



Patrick Murray is an independent consultant specializing in finance, operations, strategic planning and other advisory services for production companies, distributors and financiers. pmurray13@gmail.com.

Dominic Ianno is the CEO and founder of Indomitable Entertainment, a film financing, production and media strategy firm. The Company provides consulting services, strategic planning, financing advice and management to companies such as ScrollMotion (a leading smart phone application developer), where Ianno is a member of the Board of Directors. In addition, Dominic recently launched Greentrestle Bridge Fund with film finance attorney Michael Barnes to provide bridge financing.

# # #

CONTACT:

**FOR ESSENTIAL ENTERTAINMENT**
Wendy Smith
917. 331.3123

**FOR ANCHOR BAY ENTERTAINMENT**
Sue Procko
323.653.5153
sue@sueprockopr.com

**FOR GIGAPIX STUDIOS**
Mary Woodbury
818-592-0755
mwoodbury@gigapixstudios.com

**FOR DOMINIC IANNO**
Dennis Dembia
310-854-8114

# GIGAPIX STUDIOS

January 15th, 2009

Danny Rosett
COO
Via: Email

Danny:

Thank you for your time last week.  David and I truly enjoyed it.  You guys have a lot of friends in common!

We are excited about the opportunity to work with you regarding the distribution/marketing/& financing of the Permanent Recess Slate. The team all believes that you could be a terrific partner and sees synergy and opportunity in working together.  We've fashioned a proposal for discussion with suggested terms for moving forward.  We are planning to begin production in late June so time is of the essence.  We've highlighted the major points below.

**Slate Parameters/Benefits:**
The slate has the following components:
- Gigapix will produce five pictures over three years.  David Pritchard and Kip Konwiser will produce.
- Family picture genre like "Stand By Me" or "Home Alone" or "Goonies".
- Production budgets $6MM - $10MM
- P&A $10MM - $20MM per picture
  - Gigapix can demonstrate proof of funds
  - 700- 1000 screen targeted releases, suburban markets.  Will expand as necessary.
- Gigapix will be responsible for 55% of each films' budget
  - 40% Net Iowa Tax Credit
  - 15% Gigapix Equity or Gap Borrowing against International
- Overture to put up 45% on each film for total of 5 pictures on a revolving line as an advance (recoupable).
- Gigapix will sell foreign rights.  Essential and Myriad are interested.  We have Media 8 standing by as well.

| Terms | Details |
|---|---|
| **Overture Budget Contribution %** | 45% with key elements and budget approvals |
| **Overture Budget Contribution - $** | $6MM revolver for 5 films/3years |
| **Marketing & Distribution Costs & Approvals** | GPX has approvals on Costs and Overture agrees to no-mark-up on Marketing & Distribution services. |
| **Crossing & Rights** | Crossed on North American Rights |
| **Distribution Fee** | Theatrical 12-15% DVD/HV/VOD 15% TV/PayTV (Starz under standard Overture terms) 20% |
| **Net Profit Participation** | 25% |

Confidential and Proprietary

# GIGAPIX STUDIOS

**Assumptions:**

This proposal has the following assumptions:

- Blackbeard, Big Red, and Elvis and Leon are initial projects we seek pre-approval on.
- P&A structure is a standard structure
    - E.g. –P&A recoups principle and interest first, Distribution fee recoups second, recoupment of negative cost plus interest third and then net profit splits
- We assume you are amenable to a mechanism whereby we can get 5 pictures out in 2-3 years….
    - E.g. – create some mechanism to trigger pictures (you have approval on cast, director, script and budget)
- Marketing /Spending will need to have joint approvals with no mark-up on your services such as on Prints/ AD placement/media/PR...we pay direct costs only.
- We assume you will be putting up the video/DVD marketing.

We look forward to your thoughts and moving this forward.

Best,

Dominic Ianno

## FIRST LOOK AGREEMENT

THIS AGREEMENT ("Agreement") is made as of November 5, 2009, by and between ANCHOR BAY ENTERTAINMENT, LLC c/o, 2950 North Hollywood Way, Third Floor, Burbank, CA 91505 ("Licensee") and GIGAPIX STUDIOS, INC., c/o 9333 Oso Ave., Chatsworth, CA 91311 ("Licensor").

CONDITION PRECEDENT TO EACH PRODUCTION: Licensee's agreement to distribute each Production (as defined below) shall be subject to (i) Licensee's receipt and written approval (to be given in its sole discretion) of the screenplay, Chain of Title, and other information for such Production sufficient for Licensee to exercise its First Look Rights, (ii) Licensor's complete delivery of such Production, and (iii) Licensor's delivery to Licensee of signed copies of a distribution agreement with respect to such Production (which shall be in the form of an agreement incorporating the terms hereof) and any other document Licensee may need signed by Licensor in order to fully and legally exploit all of the rights granted hereunder.

### BASIC PROVISIONS

### PART I - FIRST LOOK PROVISIONS

A.    FIRST LOOK TERM: The "First Look Term" shall commence as of the date of signature of this Agreement and continue until December 31, 2012. The First Look Term may be extended for an additional two (2) years (the "Extended First Look Term") upon mutual agreement of the parties.

B.    FIRST LOOK: During the First Look Term, Licensor shall submit to Licensee any and all projects that Licensor wishes to produce; provided that the foregoing obligation to submit projects shall apply only to projects that the Licensor reasonably believes will be capable of receiving a "G" or "PG" rating; and provided further that each such project shall generally conform to the categories set forth below in B(1), B(2) and B(3). Licensee must accept or reject projects within 20 business days of submission. Failure to give notice within such 20 business day period shall be deemed a rejection. If a project is accepted for distribution, such project shall be deemed a "Production" and shall be governed by the terms of this agreement. If a project is rejected, Licensor may submit such project to a third party, subject to resubmitting to Licensee in the event of any changed material element.

(1)    Recess Films: Live action comedy films produced as entertainment for children with a final going-in-budget ranging from Eight to Ten Million Dollars ($8,000,000 - $10,000,000) and a final negative cost of no less than Five Million Dollars ($5,000,000) excluding any rights, financing, bond and/or contingency, producer or other fees otherwise payable to Licensor.

(2)    GPX Animation: Stereoscopic, computer generated, animated films produced as entertainment for children with a final going-in-budget of no less than Twenty Million Dollars ($20,000,000) and a final negative cost of no less than Fifteen Million Dollars ($15,000,000) excluding any rights, financing, bond and/or contingency, producer or other fees otherwise payable to Licensor.

(3)    Low Budget Production: A film produced as entertainment for children with a final going-in-budget of under Eight Million Dollars ($8,000,000).

C.    SUBMISSION: At such time as Licensor wishes to proceed to production with a particular project, Licensor shall furnish Licensee with all relevant information regarding such project, including the following package of materials, documentation and information: script, budget, proposed director, proposed principal cast, chain of title documents, and schedule for principal photography. Following receipt of a submission package, Licensee shall make a determination, which determination may include request for corporate "greenlight" approval, whether to distribute such project, disapprove the project or request certain alterations be made in the components of the submission package, which shall be considered in good faith by Licensor, provided, however, that the Licensor's decision shall be final and controlling.

D.    LIMITS: Licensee shall not be required to accept more than six (6) Productions during the First Look Term nor more than four (4) Productions during the Extended First Look Term, and no more than two (2) Productions in any one (1) calendar year of the Term. Each Production shall be no less than ninety (90) minutes in length and must be rated no more restrictive than "PG."

E.    ACCEPTED PROJECTS: If Licensee accepts a project as a Production hereunder, then the following provisions shall govern

   (1)    Distribution Rights: All of Licensee's and Licensor's respective rights and obligations in connection with the delivery and distribution of each such picture shall be governed in accordance with the terms and conditions of Part II - Distribution Provisions below which form a part of this agreement.

   (2)    Production Responsibilities: Licensor shall serve as the corporate entity responsible for the production of each picture. Licensor shall be solely responsible for any and all matters in connection with the production, completion and delivery of each Production. The foregoing shall not prohibit Licensor from creating and appointing as its designee for the purpose of producing an individual Production a single purpose production company, provided that such production company is created and exists solely and exclusively for the purpose of producing the relevant Production. For each Production, Licensor shall secure a completion bond from Film Finance or another completion bond guarantee company ("Guarantor") that is reasonably acceptable to Licensee.

   (3)    Presentation to Overture: Licensee shall present each Production to its affiliate, Overture Films, LLC ("Overture"), not later than 15 days after such Production is accepted by Licensee hereunder. If Overture elects, in its sole discretion, to negotiate for any distribution rights, then Licensee shall permit Licensor to negotiate with Overture for a period of up to thirty (30) days ("Negotiation Period"). Any agreement reached between Licensor and Overture shall be solely between them and shall relieve both parties hereto from any obligations and responsibilities set forth herein. If Overture elects not to negotiate to distribute a Production or, if Overture and Licensor fail to conclude an agreement during the Negotiation Period, then such Production shall again be governed in accordance with the terms and conditions of Part II - Distribution Provisions. Licensor warrants that it shall not disclose any involvement with Overture in connection with this Agreement for press purposes without the prior written approval of Licensee. No inadvertent disclosure by Licensor shall be deemed a breach of this Agreement.

F.    REJECTED PROJECTS: If Licensee does not accept a project for which Licensor has presented a submission package, then such project shall constitute a "Rejected Project". Any such Rejected Project may be offered to a third party for distribution, subject to the resubmission in the event of any changed material element. For the avoidance of doubt, Licensor shall not submit any project to any third party unless and until such time as Licensor shall have submitted such project

to Licensee and Licensee shall have rejected such project. Licensee shall have the right to reject any Production submitted by Licensor for any reason.

PART II – DISTRIBUTION PROVISIONS

1. PRODUCTION:   Each project accepted by Licensee pursuant to the First Look Provisions shall be deemed a "Production" hereunder.  The Distribution Provisions hereunder shall apply to each Production.

2.   RIGHTS:

(a)   Licensed Rights:  With respect to each Production, Licensor shall have the sole, exclusive and irrevocable right and license to advertise, market and otherwise exploit in any and all formats and in any and all media whether now known or hereafter devised, and all allied, ancillary and subsidiary rights with respect to such Production (the "Licensed Rights") including without limitation those rights enumerated herein and as may be defined in more detail in the attached "General Terms and Conditions" during the Term and the Sell-off Period (as defined below), in the Territory (defined below) and in accordance with the Distribution Provisions of these "Basic Provisions," the "General Terms and Conditions" attached hereto as Exhibit "A," the "Delivery Schedule" attached hereto as Schedule "DM." A "Short Form License" in the form attached hereto as Exhibit "B" shall be completed and delivered for each Production submitted by Licensor and accepted by Licensee hereunder.   For any Low Budget Production accepted hereunder, the Licensed Rights shall include all rights other than Theatrical Rights.

(b)   Reserved Rights: Unless otherwise agreed to by the parties, Licensor hereby reserves the following rights in and to the Productions:  Stage rights, traditional publishing rights, all forms of video games whether now known or hereafter devised and all licensing rights, Merchandising, Subsequent Production (subject to paragraph 10 below), Airline, Ship, Music Publishing, Soundtrack, and Commercial Tie-In Rights (the "Reserved Rights").  Prior to exercising any of the Reserved Rights or any portion thereof, Licensor shall consult Licensee with respect to Licensee's involvement in the exploitation of the Reserved Rights, if any, and to ensure that exploitation of the Reserved Rights does not conflict or interfere with Licensee's exploitation of any of the Licensed Rights.

(c)   Pay Television: Any Production that is a 'live-action' Production (as opposed to an animated film or documentary, etc.) and is theatrically released by Licensee shall be licensed to Starz Entertainment, LLC ("STE") under an output agreement between STE and Licensee for as long as Licensee's agreement with STE is in effect.  Licensee represents and warrants that, with respect to such output agreement, each Production shall be treated substantially similar to any motion picture licensed from a party other than Licensor.

(d)   Certain Exploitation by Licensor:  Notwithstanding any of the foregoing, Licensor shall have the non-exclusive right to exploit the Digital/Electronic Rights in and to the Production(s) on either its own website or on websites branded solely for each such Production being exploited; it being understood that Licensor shall not begin exploiting such rights until 90 days following the Street Date for said Production.

(e)   International Holdback: Licensor shall not itself nor authorize others to exhibit and/or distribute the Production in any territory not licensed hereunder until the date on which Licensee releases the Production in the United States, on a medium by medium basis (e.g.,

theatrical held back by Licensor until Licensee's theatrical release in the US, home video held back by Licensor until Licensee's home video release in the US).

3.   DISTRIBUTION TERM/EXCLUSIVITY:

(a)   The distribution term ("Term") of Licensee's exclusive Licensed Rights in and to each Production shall commence on the date such Production is accepted by Licensee hereunder in accordance with the First Look provisions and shall continue for a period of ten (10) years after the later of (i) the initial commercial release of the Production by Licensee of such Production or (ii) the date at which all of the materials set out to be delivered to Licensee hereunder in Schedule "DM" (attached hereto and hereby incorporated by this reference) for such Production are actually received and accepted by Licensee and Licensee has issued its Notice of Acceptance of Delivery, plus an additional non-exclusive six month sell off period for Video/DVD Rights. If Licensee desires to extend the Term hereof and/or renew the license of the Licensed Rights licensed herein, or any portion thereof, then at or prior to the expiration of the Term, Licensee shall notify Licensor of the same and upon such notice, Licensor and Licensee will negotiate in good faith for a period of thirty (30) days with respect to the terms and conditions for any such extension and/or renewal. If the parties fail to reach an agreement within such thirty (30) day period, then Licensor shall be free to offer the Production to a third party. During the Term, Licensor will not itself, nor will it authorize anyone else to, exploit the Licensed Rights except as may be expressly permitted hereunder; provided that during any sell off period, Video Rights shall not be exclusive.

(b)   The date upon which Licensor shall deliver the Delivery Materials specified in paragraph 8(a) below shall be mutually determined on a Production by Production basis.

4.   TERRITORY:  The territory ("Territory") shall mean the United States of America and its territories and possessions, and Bermuda and the Bahamas, provided that the Licensed Rights in Bermuda and Bahamas shall be limited to Television only.

5.   ROYALTIES FOR THE LICENSED RIGHTS:

(a)   In connection with the exploitation of the Licensed Rights, and provided that Licensor is not in default of any of its obligations hereunder, Licensee shall pay to Licensor an amount equal to one hundred percent (100%) of Adjusted Gross Receipts actually received by it from exercise of the Licensed Rights.

(b)   "Gross Receipts" shall mean all non-refundable monies actually received, used, or credited to, available to, and earned by Licensee or on its behalf from (i) the lease, sale, rental, distribution or other exploitation of any such rights granted hereunder including all monies received from subdistributors that Licensee, in its discretion, may elect to use, it being understood: (i) that in the case of the Video/DVD Rights, Gross Receipts shall be calculated without deductions for products that are returned and (ii) that (A) sales taxes, turnover taxes and the like, and any monies received by Licensee in the nature of refundable advances or security deposits, or deposits or periodic payments until such monies are earned or forfeited shall not be considered as included in Gross Receipts, and (B) in the case of sales directly to customers by means of direct response radio, internet, telephonic, mail, email or television solicitations Gross Receipts shall be fifty percent (50%) the gross monies received by Licensee from such sales, net of fulfillment costs, credit card fees and the like.

(c)     Gross Receipts does not mean any revenue received by third parties unless and until it is actually received, used, or credited to, available to, and earned by Licensee or on its behalf as set forth in Section 5(b).

(d)     Adjusted Gross Receipts "Adjusted Gross Receipts" shall mean Gross Receipts (as defined above) after deduction in the following priority of: (i) distribution and sales agency fees equal to the percentages listed in paragraph 5(e) below, (ii) credits, discounts, rebates, incentives, co-op, settlements, allowances and deductions for products returned, unless any such item has been otherwise deducted in computing Gross Receipts; (iii) costs of collection; (iv) foreign currency exchange costs; (v) actual out-of-pocket costs for digital linear tape ("DLT"), authoring, mastering, artwork design, and of "bonus" or added material, and of the like; (vi) all manufacturing and production costs, including but not limited to out-of-pocket costs of physical materials (including, for example, prints, tapes, disks, pre-production materials and the like) including any costs of preparation or distribution of product distributed digitally; (vii) payments and costs incurred by Licensee to third parties for distribution and related charges; (viii) subject to prior written approval of Licensor out-of-pocket direct advertising and marketing costs override, time and material charges for any in-house graphic design costs, with the understanding that if these costs are incurred in connection with various products including the Production hereunder, such costs shall be allocated on a reasonable basis by Licensee among such product and shall in any event include an appropriate charge for costs of conventions, trade shows, festivals and trade association dues; (ix) any costs incurred in connection with Licensee's institution of and/or maintenance or defense of any claim by or naming Licensee affecting rights granted by Licensor hereunder; (x) any third party participations and/or music payments and/or payments under any collective bargaining agreement (whether paid or accrued) and any costs incurred in the administering the same that Licensee agrees to or becomes obligated to assume hereunder; (xi) in the case of non-traditional channels (non-traditional channels include, but are not limited to, scan based trading, CBA markets, and third party marketing and/or sales services for one time and/or limited time promotions and programs) all costs of such sales including but not limited to costs of goods, co-op, discounts, and of marketing, selling and distributing the same, and (xii) any other direct out-of-pocket costs paid to third parties of a similar or dissimilar nature actually incurred in connection with exploitation of rights hereunder.

(e)     Licensee shall be entitled to deduct the following distribution and sales agency fees from Gross Receipts:

(i)    Twelve and a half Percent (12.5%) of Gross Receipts for the exploitation of the Theatrical Rights;

(ii)   Fifteen Percent (15%) of Gross Receipts for exploitation of the Video/DVD Rights; and

(iii)  Seventeen and a half Percent (17.5%) of Gross Receipts for exploitation of the Television Rights and all other Licensed Rights other than those enumerated in (i) and (ii) above.

6.     RESERVES; FREE GOODS; RESIDUALS:

(a)     In the case of Video Rights, Licensee may retain a reasonable reserve for returns of any products sold pursuant to exploitation of the Licensed Rights in each quarterly period, to be liquidated within a reasonable time period taking into account current business and market conditions and based upon Licensee's business judgment.

(b)     Licensee shall be permitted to distribute up to five percent (5%) of any products sold pursuant to exploitation of the Licensed Rights hereunder for promotional and review purposes without the payment of royalties.

(c)     Licensor shall be and remain liable for payment of all contingent payments including, but not limited to "residuals" which may be or become due under any applicable collective bargaining agreement as shown on the Union Residual List (see Schedule DM) to be delivered hereunder with respect to each Production; provided, however, that Licensee shall calculate and pay such residuals (inclusive of payroll taxes and fringes) directly to the guilds. Licensee shall deduct such costs, plus third party processing costs of same, from Licensor's share of Adjusted Gross Receipts with respect to each Production.  Licensor warrants that it shall deliver a complete residual list pursuant to Schedule DM and shall indemnify, save and hold Licensee harmless from all damages, losses, penalties, and fees resulting from Licensor's failure to deliver a complete residual list.

7.     ACCOUNTINGS:

(a)     Licensee agrees to account and pay Licensor its royalties hereunder on a calendar quarterly basis within sixty (60) days after the end of the Licensee's fiscal quarter following the initial release of the Production and sixty (60) days following each calendar quarter thereafter for three  (3 years following the rendition of the first statement that is rendered; thereafter such accountings and payments, if any, shall be on a semi-annual basis if any monies are payable to Licensor or, if none are due, then Licensee shall have no obligation to render a statement unless Licensor specifically requests in writing that a statement be rendered, which requests shall be made not more often than once per calendar year.  Each such accounting shall set forth in reasonable detail the amounts and sources of revenue and, where applicable, the permitted deductions therefrom.  Licensor or its designee shall have the right, upon reasonable written notice, not more than once in each calendar year, to engage a firm of licensed, independent, certified public accountants to examine and take excerpts from Licensee's books and records as they pertain to this Agreement, which examination shall be conducted for no more than thirty (30) days at Licensee's principal offices (as designated by Licensee) during normal business hours and shall not unreasonably interfere with Licensee's normal business operations.  If a discrepancy of 10% or more is found then Licensee shall pay for the reasonable cost of such audit. Any such independent certified public accountants shall, upon Licensee's request, sign an appropriate confidentiality agreement. If any such examination results in a conclusion that monies earned for the period were under-reported and/or costs deducted (if applicable) during the period were overstated and if as a result thereof any payment is due, Licensee shall forthwith pay the balance due. Any statement that is rendered hereunder that is not contested within twenty four (24) months shall be final and incontestable as to matters shown thereon.

(b)     If any foreign receipts are frozen or unremittable, Licensee will notify Licensor to such effect and upon Licensor's written request and upon condition that the same shall be permitted by authorities of such foreign country, transfer to Licensor, at Licensor's cost and expense, in such foreign country and in the currency thereof such part thereof to which Licensor would be entitled hereunder if the funds were transmitted and paid in the United States in accordance with the terms hereof. Licensee shall not be liable in any way for any losses caused by fluctuation in the rate of exchange or because of any failure to convert or remit any particular funds to the United States at any particular time or at a more favorable cost or rate of exchange than the cost or rate of exchange at which such conversion and remittance was accomplished, it being agreed that Licensor shall be bound by whatever arrangements Licensee may make for the conversion and remittance of foregoing funds and by whatever cost or rate of exchange is incurred for such conversion and remittance.

8.    MATERIALS TO BE DELIVERED:

(a)    "Delivery" shall mean delivery to and acceptance by Licensee, in its sole discretion, of all delivery items (each a "Delivery Item" and collectively the "Delivery Materials") referenced in the attached Schedule "DM" (the "Delivery Schedule"). At or prior to the date as referred to in Paragraph 3(b) above, Licensor, at its sole cost and expense, shall deliver to Licensee at its address as set forth in the Basic Provisions, or such other place as Licensee may reasonably designate, the materials described in the Schedule DM (the "Delivery Materials"), in technically acceptable condition meeting Licensee's quality control (QC) requirements so that the Licensed Rights may be appropriately and professionally exploited. Licensor shall notify Licensee in writing including the completed Delivery Binder Cover Sheet (Exhibit B) when it has completed delivery of **all** Delivery Materials and Licensee will review the Delivery Materials and will notify Licensor of any defects within thirty (30) days after delivery of all of the Delivery Materials. Delivery of the Delivery Materials shall be deemed complete when Licensee has approved the Materials by sending to Licensor a written notice of acceptance. If at the end of thirty (30) days no notice is given, Licensee is deemed to have accepted the Materials.

(b)    If Licensee shall notify Licensor of any undelivered Delivery Materials or defects in the delivered Materials, Licensor shall within twenty (20) days after receipt of notice cause all such deficiencies or defects to be corrected and new Materials to be made and delivered to Licensee. Each time Licensor delivers any new Materials, the thirty (30) day review period recommences for the new Materials. Licensor shall pay the cost of manufacturing all such new materials. In the event that Licensor fails to correct any defect or to cause such new Materials to be delivered to Licensee within said twenty (20) day period, Licensee may proceed to exploit the Licensed Rights for the relevant Picture by use of the uncorrected delivered materials or may, after determination by Licensee in its reasonable discretion that any defect is incurable, upon written notice to Licensor, terminate this Agreement with respect to such Picture only, with no further liability or obligation to Licensor with respect to such Picture. Notwithstanding the foregoing, Licensee may without any obligation, create any undelivered Delivery Materials or cure any uncorrected Delivery Materials per Paragraphs 1 and 2 of Schedule DM whereupon Licensee will offset the cost thereof against any payments otherwise payable to Licensor hereunder.

(c)    Licensor shall make available to Licensee for copying and use, at Licensor's expense, such reasonable and customary promotional materials not required pursuant to Schedule DM but nevertheless deemed appropriate by Licensee and as Licensor may have in its possession or to which it has access and which Licensee desires to use in exploiting the Licensed Rights hereunder. Licensor shall have access to any material created by Licensee upon payment to Licensee of Licensee's cost to create such materials, plus all access all shipping and duplication costs, any laboratory access fees, if applicable.

(d)    Licensor acknowledges that Licensee plans its release schedules based upon the delivery date(s) specified in this agreement or if none is/are specified then upon delivery dates which are mutually agreed upon between Licensor and Licensee; Licensor's failure to deliver a Production and to complete delivery as provided above, as agreed, shall cause Licensee to not only postpone its release date but to incur additional expenses because of such delay. Licensee shall be entitled to recoup any direct, out-of-pocket costs incurred by Licensee as a result of such delay from any amounts payable hereunder to Licensor.

9.    SUBSEQUENT PRODUCTIONS:   If Licensor or any company controlled by, controlling, or under common control with Licensor seeks to produce, distribute or authorize others to produce or distribute productions related to the characters and/or content of Production,

including but not limited to sequels, prequels or spin-offs ("Subsequent Productions"), then Licensor shall give Licensee written notice of same prior to offering distribution rights or any portion thereof to a third-party or exercising such rights itself, and upon Licensee's request Licensor will negotiate in good faith for a period of thirty (30) days with respect to the terms and conditions for Licensee's acquisition of the distribution right(s) to same. If the parties fail to conclude an agreement for such right(s) within thirty (30) days after such negotiations commence, then Licensor shall be free to offer such right(s) to others on such terms as it may determine.

      10.   THEATRICAL RELEASE:  Each Production shall be tested by a film research/testing service, with OTX and NRG being preapproved, in one or more focus groups, with the costs of such testing being paid by Licensor. Based on the results of such testing, the parties shall mutually determine the theatrical release date, the scope of such theatrical release (e.g., number of markets and number of screens), and the level of the initial print and advertising commitment (the "P&A Commitment") per subparagraph (i) below.

      (i)   For any Production that receives a sixty percent (60%) approval rating (i.e., sixty percent (60%) of the focus group liked the Production) or which is a Recess Film (regardless of test score), the P&A Commitment shall be no less than Six Million Dollars ($6,000,000) and Licensee shall use reasonable efforts to secure a minimum release of at least Six Hundred (600) screens.

      (ii)   For any Production that receives a seventy five to eighty five percent (75%-85%) approval rating (i.e., seventy five to eighty five percent (75%-85%) of the focus group liked the Production) or which is a GPX Animation film, the P&A Commitment shall be no less than Ten Million Dollars ($10,000,000) and Licensee shall use reasonable efforts to secure a minimum release of at least One Thousand (1000) screens.

      (iii)   For any Production that receives an eighty five to ninety percent (85%-90%) approval rating (i.e., eighty five to ninety percent (85%-90%) of the focus group liked the Production), the P&A Commitment shall be no less than Fifteen Million Dollars ($15,000,000) and Licensee shall use reasonable efforts to secure a minimum release of at least Fifteen Hundred (1500) screens.

      (iv)   For any Production that receives a ninety percent (90%) approval rating or higher (i.e., ninety percent (90%) or greater of the focus group liked the Production), the P&A Commitment shall be no less than Twenty Million Dollars ($20,000,000) and Licensee shall use reasonable efforts to cause Overture to secure a minimum release of more than Fifteen Hundred (1500) screens.

      (v)   Failure by Licensee to secure the minimum screen releases mentioned in this paragraph 10 shall not be deemed a breach hereof. If Licensee cannot secure the minimum screen releases for any Production or does not approve the increase in the minimum screens (i.e., an increase in the minimum screens due to the focus group approval rating(s) (the "additional screens")), then Licensor shall have the right to give notice to Licensee that Licensor desires to engage a third party to release the Production on the additional screens and Licensee shall have thirty (30) days to either secure or release in the additional screens or give Licensor notice that it will not elect to do so, at which time Licensor shall be free, at its election, to engage such third party (provided that Licensee shall retain all other Licensed Rights hereunder).

      (vi)   Strategy:  Licensee and Licensor agree to elect Eclipse Advertising (www.eclipseadvertising.com) ("Eclipse") as a non-exclusive consultant to work on the theatrical and video/DVD release of each such Production. Eclipse services shall include but not be limited

to creating and designing strategy for marketing and advertising campaigns and developing art and promotional materials for the release of each such Production as well as for building the Recess Films brand.  The parties agree to consult with Eclipse regarding release strategy for each such Production, including but not limited to the media plan all possible media and sponsorship partners, if any.  Licensor shall directly pay for all such costs associated with Eclipse.  Licensor shall specifically pay for all the media buying strategic consultation provided by Eclipse  and any other consultants elected by the parties and for all of the media purchases (inclusive of any mark-ups that shall be negotiated and mutually approved by both Licensee and Licensor), if any.  If Licensor and Licensee jointly decide and approve to engage the services of additional consultants regarding the theatrical and/or the video/DVD release of any such Production then Licenser shall also directly pay for all such third party costs, if any. In the event of a dispute regarding this paragraph, Licensor's decision shall be final.

       (vii)    Strategy Advisory and Consulting Fee:  Licensor shall pay Licensee the non-recoupable sum of Two Hundred Thousand Dollars ($200,000) (not to be combined and/or associated with any other costs incurred by and/or monies otherwise payable to either party hereunder) per each Production for Licensee's consulting and advisory services in connection with the theatrical release of such Production per subparagraph (vi) above.  Licensor shall pay such fee to Licensee as follows: (1) Fifty percent (50%) payable when Licensor delivers the Director's Cut of such Production to Licensee, and (2) Fifty percent (50%) payable when Licensor delivers the Final Cut of said Production to Licensee.

       (viii)    Costs:  Licensor shall approve and be responsible for any and all costs associated with the theatrical release of any accepted Production hereunder including but not limited to the P&A Commitment as specified above and any other costs associated with this paragraph 10.

    11.    CREDIT:  Licensee shall be credited as the distributor in all prints and advertising material, including but not limited to DVD packaging and the like, billing blocks and the paid ads. In addition, Licensee shall be entitled to (i) an on screen presentation credit (e.g., "Presented by Licensee") at the beginning of the Production, (ii) the right to run an animated logo at the beginning of the Production, and (iii) a static logo at the end of the Production.  All of the foregoing shall be subject to the Territory for such Production and no casual failure by Licensor to comply with these obligations shall be deemed a breach hereof, provided however that Licensor shall use reasonable efforts to cure any such failure.

    12.    OTHER BASIC TERMS:  A courtesy copy of any notice given hereunder shall also be given to Licensee; Attention: Business and Legal Affairs Department, 2950 N. Hollywood Way, Burbank, CA 91505 and to Licensor; Attention: Nadia Davari, 9333 Oso Ave., Chatsworth, CA 91311, Tel: 818-592-0755; Email: ndavari@gigapixstudios.com.

    IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

Licensee:                                    Licensor:
ANCHOR BAY ENTERTAINMENT, LLC          GIGAPIX STUDIOS, INC.

By:  _____          By:  _____

Its:  _____          Its:  _____