# Media 8 Entertainment Agreement
## Dated November 18, 2008

# EXHIBIT 432

Effective Date: November 18, 2008

To: GigaPix Studios
9333 Oso Ave.
Chatsworth, CA 91311
Attention: David Pritchard and Kip Konwiser

Re: Family Slate Output Deal

Dear David and Kip:

This letter will confirm the basic terms of the agreement between Media 8 Entertainment ("Agent") and GigaPix Studios ("Producer"), under which Producer is engaging Agent to act as Producer's foreign sales agent for the Qualifying Pictures (defined below), on the following terms (all dollar amounts will be in United States dollars):

1. Pictures:

    (a)    The motion pictures that will be the subject of this Agreement (the "Pictures") will be all kid-oriented films produced by Producer (each being a "Qualifying Picture" and collectively being referred to as "Qualifying Pictures"), on which photography has begun any time prior to the date (the "End Date") three (3) years from the effective date of this Agreement. In the event of a disagreement as to whether a particular motion picture is "kid-oriented" (i.e., oriented toward a children's audience), Producer's good faith judgment as to that question will control. Once Agent has begun sales efforts for a Picture which is scheduled to commence photography on or before the End Date, Agent will (subject to termination for cause) remain the exclusive sales agent for such Picture, on all the terms of this Agreement, even if photography is delayed until after the End Date. The Qualifying Pictures will include, but not be limited to, the following motion pictures being developed by Producer (to the extent actually produced): "Field Trip, "Soaked" and "Unsupervised." Each Picture will have a budget of at least Two Million Dollars ($2,000,000). Producer will consult meaningfully with Agent with respect to the Key Elements (as that term is defined in paragraph 4 below) for each Picture.

    (b)    During the Term hereof, Producer will submit to Agent the Key Elements (as that term is defined in paragraph 4 below) for each Qualifying Picture, and give Agent a period of thirty (30) days within which Producer will negotiate exclusively with Agent with respect to the Ask/Take prices for the applicable Qualifying Picture. If Agent and Producer fail to agree on the Ask/Take prices within such period, Producer will be free to solicit third party sales agent(s). Once the Ask/Take price list is agreed to, Agent will be "locked in" (subject only to termination in accordance with the terms of this agreement, including for cause, with "cause" meaning a material uncured breach of this Agreement or any subsequently executed applicable agreements related to the Qualifying Picture in question, it being understood and agreed that any termination of this Agreement, for cause or otherwise, will not affect the status of any Distribution Agreement [as that term is defined below] entered into prior to such termination) as the exclusive sales agent for the Qualifying Picture in question (a "Committed Picture"), and will, within ten (10) business days, elect in its sole discretion whether such Committed Picture will be a Guarantee Picture or a Non-Guarantee Picture (as those terms are elaborated on below).

    (c)    In the event that Agent elects to make the Qualifying Picture in question a Guarantee Picture, then the following will apply: Provided in all respects that the Qualifying Picture conforms to the Key Elements and that Producer is not in uncured material breach of its obligations pursuant to the applicable Qualifying Picture sales agency agreement, Agent shall provide the following "Sales Guarantee" to the Producer: Distribution Agreements (and Notices of Assignment, if applicable) for the Picture with minimum guarantees totaling at least 25% of the all-

1

in Qualifying Picture budget (the "Sales Guarantee Amount") shall be obtained no later than first to occur of (a) six (6) months after the initial commercial release of the Picture in the United States or (b) the maturity date of any third party bank financing (the "Sales Guarantee Deadline"). In the event that Agent has not obtained such Distribution Agreements by the Sales Guarantee Deadline, then Agent or one of its affiliate entities shall enter into Distribution Agreements with Producer (within 15 business days after the Sales Guarantee Deadline) in order to acquire distribution rights to the Picture in any of the remaining territories in the Territory at the "take"/"low" price for each Qualifying Picture (the "Purchase Price"), until the total minimum guarantees equal or exceed the Sales Guarantee Amount. Agent shall have the right to sub-license the rights in any of the acquired territories (following reasonable consultation with Producer), and shall be entitled to any monies realized there from until such time as Agent has recouped the Purchase Price and its Sales Commission due thereon. Following repayment of the Purchase Price and recoupment its Sales Commissions due thereon, all remaining amounts (whether MG, advance, guarantee or overage) from such "purchased" territories shall be paid 50% to Agent and 50% to Producer. Agent agrees (if required) to enter into a customary Sales Agent Interparty Agreement with any bank lender(s), completion guarantor, Producer and any third party equity investors, reflecting the terms and conditions set forth herein.

(d)     In the event that Agent elects to make the Qualifying Picture in question a Non-Guarantee Picture, then the following will apply: There will be no Sales Guarantee. However, if by the Cycle End Date (as defined below), Agent has not entered into Distribution Agreements for such Non-Guarantee Picture with minimum guarantees totaling at least 25% of the all-in Qualifying Picture budget, then Producer may, at Producer's election, terminate this Agreement (which must be done by written notice to Agent not later than thirty days after Agent's written notice to Producer of the Cycle End Date), but only with respect to those Qualifying Pictures which have not become Committed Pictures under subparagraph (b) above (i.e., Producer and Agent have not yet agreed to an "Ask/Take" price list). Such termination will have no effect on Qualifying Pictures which are Committed Pictures as of the date of such election, other than with respect to the under-performing Non-Guarantee Picture in question. Notwithstanding the foregoing, the following will apply to Non-Guarantee Pictures only: If by the Cycle End Date, there remain territories as to which Agent has been unable to enter into Distribution Agreements for the "Take" price in such territories, then Producer may, by written notice to Agent not later than thirty days after the Cycle End Date, elect to terminate Agent's rights with respect to the Non-Guarantee Picture in question, with respect to all, or a portion of, the territories in question, and Producer may proceed to sell or license all rights in such Non-Guarantee Picture in such territories (either directly or through another agent), and Agent shall receive no fees or commissions or any kind with respect to such sales. For purposes of this Agreement, the "Cycle End Date" for a particular Qualifying Picture will mean the date which is one (1) year from the commencement of the first film festival or market at which Agent has been given a cut of such Qualifying Picture and authorized to show such cut to potential distributors.

(e)     Agent is also in the business of developing and producing motion pictures. In the event that Agent develops any family-oriented motion picture which is scheduled to commence photography prior to the End Date, Agent will submit such picture (including the script and any attached elements) to Producer, and give Producer a period of thirty (30) days within which Agent will negotiate exclusively with Producer the terms on which Producer will finance such picture. If Agent and Producer fail to agree on material terms within such period, Agent will be free to obtain financing from any source for such picture, without obligation to Producer.

2. Term and Territory:

(a)     The "Term" of rights for each Qualifying Picture will mean the period beginning with the date of approval of the Ask/Price List (as defined below) for that Picture, and ending on the date fifteen (15) years after the first to occur of (i) full delivery of such Qualifying Picture in accordance with paragraph 6 below, or (ii) first commercial exploitation by Agent or any of Agent's sub-licensees. Notwithstanding the foregoing, Agent may enter into Distribution Agreements (as defined in paragraph 4 below) whose term extends beyond the end of the Term [subject to paragraph 4(b) below].

(b)     The "Territory" will mean the world outside of the United States and Canada (and their respective territories, possessions and protectorates). Notwithstanding the foregoing, if any rights in either Canada or Puerto Rico are available (i.e., not granted to the domestic distributor) for any particular Picture, then such territory(ies) will be included in the Territory, to the extent of the rights available.

3. Agency:     Upon each Qualifying Picture becoming a Committed Picture, Producer hereby appoints Agent as Producer's exclusive agent for the sale and/or license of all linear distribution rights in and to the respective Qualifying Pictures, during the Term, throughout the Territory. These include, but are not limited to: theatrical rights, non-theatrical rights, home video rights, all forms of television, and distribution over the Internet via servers located in the Territory (provided that Agent adheres to the reasonable encryption and technology requirements of the applicable Qualifying Picture's domestic distributor, to the extent that Agent is notified of such requirements in writing), as well as all other media of distribution or exhibition whether now known or hereafter devised, and, to the extent owned or controlled by Producer, but shall specifically exclude all so-called "ancillary" rights (e.g., merchandising, soundtrack album, and music publishing), as well as airline and ship rights. Agent is authorized, subject to the terms of this Agreement, to enter into written Distribution Agreements (as defined in paragraph 4 below) on Producer's behalf.

4. Distribution Agreements:

(a)     For purposes of this Agreement: The licensees and distributors of the Qualifying Pictures will be collectively and individually referred to in this Agreement as "Distributors;" the agreements that Agent enters into on Producer's behalf with the Distributors will be referred to as "Distribution Agreements." The "Key Elements" of a Qualifying Picture will mean the elements that Producer and Agent mutually agree are sufficient material elements on which to base sales efforts. The Key Elements will always include the screenplay for such Qualifying Picture, and will typically include one or two principal cast members, the director, and on occasion, an important individual producer or other persons deemed to be critical.

(b)     Each Distribution Agreement entered into during the Term will be substantially in the form of the IFTA standard agreement, provided that Agent may negotiate such changes in any Distribution Agreement as Agent may in good faith elect, so long as such changes do not affect the term or territory of the applicable Distributor's rights, and do not reduce the minimum guarantee or basic contingent compensation payable under such Distribution Agreement. Further, each Distribution Agreement (a) will meet the minimum guarantees pre-approved by Producer as set forth in the applicable ask/take price schedule; (b) will be in Producer's or a designee's name (and Producer hereby designates Agent to execute all Distribution Agreements that conform with the terms and conditions set forth herein); (c) will require that revenues and payments to be in U.S. dollars and must be transferred directly to a Collection Account (Fintage House deemed pre-approved); (d) will provide that the Qualifying Picture may not be altered by international distributors except for censorship, broadcast standards and other legal requirements; (e) shall have a term of no more than fifteen years (twenty-five years for Germany), unless otherwise pre-approved in advance and in writing by Producer; (f) shall not be packaged with any other film or film(s) (other than one or more Qualifying Pictures hereunder) without Producer's prior written approval), (f) shall set forth a schedule of delivery items no more extensive than the delivery items specified on the delivery schedule described in paragraph 6 below; (g) require that Producer be granted access, on request and at Producer's expense, to all materials created by or pursuant to the authority of the Distributor during the term of the applicable Distribution Agreement; (h) set forth industry standard accounting and auditing provisions exercisable by Producer and/or Producer's designee; (i) provide for a delivery date no sooner than that approved by the completion guarantor of the Picture; (j) shall adhere to the holdbacks required by the domestic distributor (which shall be provided to Agent upon request) as well as customary territorial holdbacks (such as between Germany and Benelux), and (k) shall not be sold on a "flat" basis unless approved by Producer in writing (except that Producer pre-approves the making of so-called "flat" deals in

3

Korea, India, Russia and Sri Lanka). Notwithstanding the foregoing, if a potential Distributor tenders an offer to Agent that falls below the "take" prices for any territory, Agent shall (at its election) provide written notice of the offer to Producer with a recommendation whether to accept such offer. If Producer does not specifically reject the offer in writing within five (5) business days (reduced to 24 hours during any film market) from Producer's acknowledgement of receipt of Agent's written notice, the offer shall be deemed accepted by Producer.

(c) Each Picture will have a theatrical release commitment in the United States on not fewer than Five Hundred (500) screens, and Agent may represent this to prospective Distributors (and in Distribution Agreements).

(d) In the event that a Distributor acquires rights in more than one Qualifying Picture in a given territory, and further provided that the financing structure for each of the Qualifying Pictures is such that cross-collateralization as contemplated herein is feasible (as described in more detail hereinbelow), the Distribution Agreement(s) for such Qualifying Pictures may provide for fifty percent (50%) cross-collateralization between or among the applicable Qualifying Pictures. That is, in the event that such Distributor's revenues from one Picture are less than the cumulative guarantee and expenses paid by such Distributor in connection with that Picture, such Distributor may recoup one-half (1/2) of such shortfall from revenues derived from the other Picture(s) acquired by such Distributor. Prior to entering into a Distribution Agreement for a particular Qualifying Picture that allows such cross-collateralization (a "CC Distribution Agreement"), Agent will ask Producer in writing to confirm that such Qualifying Picture's financing structure allows for such cross-collateralization. Producer will answer promptly (not later than five business days from receipt of Agent's notice), and if Producer's response is in the affirmative, then Agent may thereafter prepare and enter into CC Distribution Agreements for such Qualifying Picture, until such time (if ever) as Producer notifies Agent in writing that the financial structure for such Qualifying Picture has changed in a way that precludes any further CC Distribution Agreements.

5. Application of Gross Receipts: "Gross Receipts" of a particular Qualifying Picture will mean all sums actually received in the Collection Account for that Qualifying Picture, pursuant to Distribution Agreements. Gross Receipts, after deductions for any Collection Account fees and expenses, and residuals if applicable, will be applied as follows (on a Picture-by-Picture basis):

(a) First, to Agent's fees, equal to Fifteen Percent (15%) of Gross Receipts. Notwithstanding the foregoing, if any third party bank financier(s) of a particular Qualifying Picture requires that some portion of Agent's fees (but not more than one-half) be deferred as a condition of financing such Qualifying Picture, then Producer will inform Agent of such requirement in writing upon learning of such requirement, and Agent will then have thirty (30) days to engage in discussions and/or negotiations with Producer and the financier in question regarding such deferment. By the end of such thirty-day period, Agent will elect whether to accept the requested deferment (on such terms as Agent may be able to negotiate with Producer and/or the financier), it being understood that Agent will not be required to make such election prior to Producer's designation of the Key Elements for the Qualifying Picture in question. If Agent elects not to accept such deferment, then Agent will cease its representation of the Qualifying Picture in question, provided that Agent will be entitled to (i) its full fee on all Distribution Agreements entered into (or legally committed to) prior to the date of such cessation, (ii) all Marketing Expenses that have been incurred prior to such cessation and are otherwise reimbursable as provided herein, and (iii) a reasonable portion, to be negotiated in good faith of Agent's Marketing Overhead Fee (as defined below) on such Qualifying Picture.

(b) Next, to payment to Agent of a Marketing Overhead Fee in the amount of Sixty-Five Thousand Dollars ($65,000) per Picture. Agent will, in consideration of such Marketing Overhead Fee, guarantee attendance at not less than one (1) full cycle of film markets (including AFM, Cannes, Berlin and Toronto) and will create at least one (1) trailer for each Committed Picture (it being understood that a so-called "promo reel" or similar sales

reel will count as a trailer for this purpose). The Marketing Overhead Fee will cover the following costs, none of which will be included in Marketing Expenses (as defined below): All travel costs to and from markets and festivals, all hotel and lodging costs at markets and festivals, all ground transportation at markets and festivals, all costs relating to registration of Agent's offices, and obtaining passes, at all markets and festivals, all costs relating to the running and equipping of Agent's office at markets and festivals (including telephone rental, computer rental, furniture rental and A/V equipment), and all costs relating to the hiring of temporary workers at markets and festivals.

(c) Next, to recoupment by Agent of all of Agent's Marketing Expenses in connection with the Pictures [plus interest thereon, calculated from the date of expenditure, at a rate equal to the U.S. prime rate plus one percent (1%)]. For purposes hereof, "Marketing Expenses" will mean all third-party, out-of-pocket expenses incurred by Agent in connection with the sales and marketing of the Qualifying Pictures, including the cost of sales materials, the cost of acquiring or creating materials that Producer fails to deliver, and all other expenses customarily incurred in the sales and marketing of motion pictures in the Territory. Expenses which are incurred in connection with multiple motion pictures will be allocated in good faith among the different motion pictures involved. Notwithstanding the foregoing, Agent will not expend more than Thirty-Five Thousand Dollars in Marketing Expenses (over and above the Marketing Overhead Fee, which will include the cost of the trailer/promo reel as described above) without Producer's prior written approval, which approval will not be unreasonably withheld. Such Thirty-Five Thousand Dollars ($35,000) in pre-approved Marketing Expenses will include the cost of posters and one-sheets for market use and Agent shall provide Producer with reasonable back-up documentation evidencing all Marketing Expenses incurred.

(d) The remainder will be paid one hundred percent (100%) to Producer.

Agent will account to Producer with respect to each Picture on a quarterly basis for the first two (2) years from Delivery of such Picture; on a semi-annual basis for the next two (2) years, and annually thereafter. Each accounting statement will be rendered within sixty (60) days after the end of the applicable accounting period, and will become incontestable if Producer does not object, with specificity and in writing, to such statement within two (2) years after its being rendered. Producer will have customary rights to audit and inspect Agent's books and records relating to the Pictures, not more than once a year, using a certified public accountant (Producer may not use a CPA that currently represents Agent or has in the past). The examination will be at Producer's expense unless it uncovers an underpayment of more than ten percent (10%) of the amount shown due Producer on the statements audited, in which case Agent will pay the costs of the examination plus reasonable associated expenses, including but not limited to legal fees and out-of-pocket expenses, on demand.

5A. Special Provisions Relating to Marketing Materials:

(a) The trailer, and all marketing materials, will be subject to Producer's prior written approval, provided that such approval will not be unreasonably withheld, and that Producer will respond to submitted material in a timely fashion (and any material that is submitted, and not disapproved in writing, within five [5] business days from Producer's receipt of same, will be deemed approved).

(b) Producer may elect to pay certain Marketing Expenses directly, rather than have Agent pay such expenses and deduct them as provided herein. Nonetheless, (i) such direct payment will not confer upon Producer any control or approval rights in respect of the process of commissioning, creating or dealing with marketing materials that Producer does not otherwise have under this Agreement, and (ii) in the event that Producer does not make timely payment of any particular Marketing Expense ("timely" will mean within thirty [30] days unless otherwise specified), Agent may pay such Marketing Expense and recoup it as otherwise provided in this

5

Agreement. In the event that Producer elects to pay such expenses, no interest on such expenses shall accrue in accordance with paragraph 5(c) above.

(c)   Producer will use its commercially reasonable best efforts to cause the domestic distributor of each Qualifying Picture to grant access to trailers, advertisements and other marketing materials created by such distributor. If such distributor will grant access to Producer but not directly to Agent (or to the Distributors), then Producer will exercise its right to such access to allow the Distributors access to such materials.

6.   Delivery Schedule:   Producer and Agent will negotiate a list of deliverable items in good faith, in accordance with industry custom and practice.

7.   Related Productions:   A "Related Production" will mean a sequel, prequel, TV Movie or Series, or any other audio-visual production which is based, in whole or in part, on the characters, stories or situations depicted in any Picture. In the event Producer develops or produces any Related Production, Agent will have a thirty-day period of exclusive first negotiation to be Producer's exclusive sales agent for such Related Production (on terms not less favorable to Agent than those of this Agreement), provided that Producer controls such rights. If Producer and Agent fail to come to an agreement with respect to a Related Production within such thirty-day period, then Producer may enter into an agreement with another sales agent with respect thereto, but only if the material financial terms of such agreement are more favorable to Producer than the last offer made by Agent.

8.   Miscellaneous:

(a)   This Agreement shall inure to the benefit of Producer's successors, assigns, designees and licensees, provided that Producer shall remain liable for the performance of all obligations on its part to be performed hereunder. Any assignment of rights made by Producer relating to any of the Pictures will include a provision obligating the assignee to comply with the terms of this Agreement. The services to be rendered hereunder by Agent are personal to Agent and may not be assigned. A waiver of any breach by any party in any one instance shall not constitute a waiver of any subsequent breach, whether or not similar. Nothing contained herein shall constitute a partnership between, or joint venture by, the parties hereto. This Agreement is not intended for the benefit of any third party. In the event of any conflict between any provision of this Agreement and any present or future statute, law, ordinance or regulation, the latter shall prevail, but in such event, the provision of this Agreement affected shall be curtailed and limited only to the extent necessary to bring it within legal requirements. All compensation or other monies payable hereunder shall be subject to all required tax and other governmental withholdings. This Agreement shall be governed by the laws of the State of California applicable to contracts to be wholly negotiated and performed therein. The parties agree that any dispute under, relating to, or arising out of this Agreement will be resolved by binding, final, exclusive, and non-appealable arbitration in Los Angeles, California, under the Rules of Independent Film and Television Alliance (the "**Rules**") in effect as of the date the request for arbitration, which rules and procedures are incorporated into and made part of this Agreement. Producer and Agent agree that they will abide by any decision rendered in such arbitration and each party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any jurisdiction by suit on the judgment or in any other manner provided by law. Producer and Agent submit to the exclusive jurisdiction of the courts located in Los Angeles County, California, as an appropriate place for compelling arbitration or giving legal confirmation of any arbitration award. Producer and Agent agree to accept service of process for all arbitral proceedings in accordance with such Rules and to accept service of process for any judicial or other proceedings by registered mail.

(b)   Each party represents and warrants that it has the right to enter into this Agreement, and to grant the rights herein granted. Producer represents and warrants that each of the Pictures will be original, and that the exploitation of each Picture (and/or any ancillary rights therein) will not infringe upon or violate the rights (including

6

but not limited to copyright or rights or privacy) of any third party. Agent represents and warrants that in the course of rendering services under this Agreement, it will not commit any illegal act or infringe the rights of any third party. Each party will indemnify and hold harmless the other party (and its officers, agents, directors, attorneys, successors and assigns) from and against any claim, demand or lawsuit arising from the first party's breach of any representation, warranty or undertaking under this Agreement.

*THE REMAINDER OF THIS PAGE DELIBERATELY LEFT BLANK TO AVOID ISOLATING SIGNATURES, WHICH APPEAR ON THE NEXT PAGE.*

(c)     For each of the Qualifying Pictures, Producer and Agent will prepare and sign a more formal, long-form agreement embodying the terms of this Agreement, and such other terms as are customary in the motion picture industry (including but not limited to provisions relating to termination for cause, additional customary representations and warranties, delivery parameters [and a customary delivery schedule for Pictures of similar budgets], and formal notice provisions], subject to good faith negotiation between the parties. Until such a long-form agreement is prepared and signed, or if it never is, this Agreement represents the full agreement between the parties, and supersedes any prior agreements or discussions, written or oral, between them, relating to the subject matter of this Agreement. This Agreement may be signed in counterparts, and any signature by fax or electronic transmission (e.g., a pdf) will be binding upon the signing party.

Please indicate your agreement to the foregoing by signing in the space provided below.

Very Truly Yours,

MEDIA & ENTERTAINMENT

By _____

ACCEPTED AND AGREED:

GIGAPIX STUDIOS

By _____ as GPX

7