# Essential Entertainment Agreement
## Dated November 3, 2009

# EXHIBIT 433

Essential Entertainment Media, L.L.C.
9000 Sunset Boulevard, Suite 600
Los Angeles, California 90069

Dated as of November 3, 2009

David Pritchard
Kip Konwiser
Gigapix Studios
9333 Oso Avenue
Chatsworth, CA 91311

Gentlemen:

Set forth below are the principal terms and conditions (the "Agreement") agreed to by and between Essential Entertainment Media, L.L.C. ("Essential") and Gigapix Studios ("Producer"), effective as of November 3, 2009 (the "Effective Date") pursuant to which Essential shall exclusively represent Producer with respect to the sale, distribution, license or transfer of certain rights in and to the motion picture described and defined herein. The principal terms and conditions are as follows:

I. SALES AGENCY

1. The Picture: The motion picture subject to this Agreement is currently entitled "Blackbeard" aka "The Return of Captain Kidd" (the "Picture"). The Picture shall: (a) be substantially based on the existing screenplay written by Jymn Magon & Kern Konwiser; (b) be produced by Producer; (c) be shot in 35mm, in color, with a projection aspect ratio of 1:85:1; (d) star Christopher Lloyd and Ron Perlman (with Essential's right to approve any replacement thereof); (e) be directed by Kern Konwiser; (f) have a running time of not less than 90 minutes nor more than 120 minutes; (g) have an MPAA rating no more restrictive than "PG-13"; (h) have a P&A commitment of US$6,000,000 secured by letter of credit approved by Essential; and (i) an initial theatrical release in the United States by Overture/Anchor Bay (with Essential's right to approve any replacement domestic distributor) on a minimum of 600 screens concurrently.

2. Term: The term of Essential's engagement as exclusive sales agent of the Picture shall commence on the Effective Date and shall continue for a period ending five (5) years from the date of the first sale or license for the Picture (the "Term"). Each party shall notify the other in writing within the final ninety (90) days of the Term, should it elect to renew this Agreement, good faith renegotiation of which shall commence at that time. Essential is authorized to permit the license of the Rights hereunder, as defined below, to certain third parties for a period not to exceed fifteen (15) years, unless otherwise approved in writing by Producer (the "Exploitation Period").

3. Exclusive Sales Agent: For good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Producer hereby engages Essential for the Term, as Producer's sole, exclusive and irrevocable sales agent in connection with the licensing and servicing of the Picture throughout the Territory, defined in paragraph 4 below.

4. Territory: The "Territory" means the universe with the exception of the United States, Bermuda, the Bahamas and their respective territories and possessions. For the avoidance of doubt, the Territory includes Canada and its respective territories and possessions. Essential shall have the sole and exclusive

right and authority to negotiate license agreements with respect to the Picture for the Territory as a whole or for any smaller part thereof.

5. Rights: The exclusive exploitation rights shall include all rights and media under copyright now known or hereafter devised, including, without limitation: theatrical, non-theatrical, public and commercial video, home video rental, home video sell-through, television (including, without limitation free TV and pay TV), pay-per-view, video-on-demand, soundtrack, electronic sell-through, internet (all digital forms of distribution must contain geofiltering technology or such rights may be granted but shall remain frozen during the Exploitation Period), wireless, ancillary rights (including airline, ships and hotel) in the Territory (the "Rights").

6. Sales Fee:

(a) International Sales Fee: With respect to the Picture and the exploitation of the Rights in the Territory the sales fee shall be an amount equal to ten (10%) percent of one hundred (100%) percent of the Gross Proceeds, defined below, to be paid to Essential as and when any portion of the Gross Proceeds, including, but not limited to the minimum guarantees or overages, is received by Producer or credited to its account, in perpetuity, directly or indirectly through a collection account agent (the "International Sales Fee").

(b) "Gross Proceeds" shall mean all amounts actually received by Producer (including but not limited to minimum guarantees or overages) credited to Producer's account or received by the designated collection account agent ("Collection Account" or "FCAM") on Producer's or Secured Party Financier's behalf that are derived from the exploitation of the Rights to the Picture throughout the Territory ("International Gross Proceeds"). "Secured Financing" shall mean any senior, mezzanine or gap financing amounts for the Picture provided by any applicable party ("Secured Party Financier").

7. Market Charge: Essential is entitled to a one-time market charge of One Hundred Thousand US Dollars (US$100,000) as a fixed, pre-approved, non-accountable and non-auditable contribution toward Essential's customary expenses incurred in connection with Essential's cost of attending and representing the Picture at film markets (the "Market Charge"). The Market Charge excludes all other expenses associated with the representation, promotion, license and distribution of the Picture. Accordingly, the Market Charge shall be in addition to any other cost and Expense (defined below) to be charged to Producer hereunder.  ) of the Picture and the Market Charge shall be payable directly to Essential as follows: (a) one-half (1/2) upon the earlier of (i) completion of principal photography of the Picture; and (ii) the collection of Gross Proceeds payable to or for the benefit of Producer per the CAMA (as defined in paragraph 21 below), provided that if the Expenses are payable out of the Collection Account, Expenses shall be payable only after the payment of reasonable and customary fees and costs payable to the collection agent for the administration of the Collection Account; and (b) one-half (1/2) no later than ten (10) days before the first day of the first major film market in which the Picture is exploited (i.e., Cannes Film Festival).

8. Expenses: Essential shall not exceed One Hundred Thousand US Dollars (US$100,000) in Expenses for the Picture in the Territory during the Term without Producer's prior approval ("Expense Cap"). "Expenses" shall mean all of Essential's customary out-of-pocket distribution expenses, including without limitation, the following: advertising and publicity costs (excluding special publicity events, press junkets, press conferences, and the costs associated with the attendance of key talent; such costs will be approved and paid by Producer directly), the appropriate pro rata share of the institutional advertising announcing Essential's slate of films for the relevant film market promotional materials, test screenings (i.e., NR-G, OTX), any costs associated with delivery to licensees (inclusive of the costs of manufacture,

storage, vaulting, freight, delivery and courier costs), fees related to the entry of the Picture in film festivals, messenger and courier costs, reasonable travel and entertaining costs (to the extent that such costs directly relate to the Picture), auditing and collection costs, customary insurance, fees and commissions and any other amounts payable to third parties, and a discretionary amount for necessary but non-budgeted items. Any single Expense in excess of Five Thousand US Dollars (US$5,000) shall be pre-approved by Producer. Expenses shall be payable upon the earlier of (i) the completion of principal photography of the Picture; and (ii) the collection of Gross Proceeds payable to or for the benefit of Producer per the CAMA, provided that if the Expenses are payable out of the Collection Account, Expenses shall be payable only after the payment of reasonable and customary fees and costs payable to the collection agent for the administration of the Collection Account. Notwithstanding the Expense Cap, any out-of-pocket expenses incurred by Essential due to circumstances beyond Essential's control, including, but not limited to, insufficient funds in the Production Budget for Delivery Materials, shall be recoupable as additional distribution expenses and outside the Expense Cap. All Expenses shall be payable to Essential plus interest at a rate of one hundred twenty five (125%) percent of the then current Prime rate, as announced from time-to-time by JPMorganChase Bank, calculated monthly and due when Expenses are due and payable to Essential.

9. **Delivery Materials**: Essential or its designee and Producer will collaborate on the delivery of the Picture to any and all licensees in the Territory, it being agreed that Essential is the sales agent in function hereof for Producer and that the financial responsibility of delivery remains with the Producer. Producer will be responsible for the cost and creation of all of the delivery materials set forth in the delivery schedule (the "**Delivery Materials**"), attached hereto as "**Exhibit 1**" (the "**Delivery Schedule**") and incorporated herein by this reference. Producer is responsible for the creation and delivery of all of the materials in the Delivery Schedule, (a) even if materials or documents in the Delivery Schedule are not bonded by the completion bond company (the "**Completion Guarantor**") and (b) regardless of the existence or non-existence of a domestic distribution deal. As soon as practicable, Producer shall deliver to Essential or its designee or provide Essential or its designee reasonable and customary laboratory access with Producer's prior written approval (at Producer's sole cost and expense) to all Delivery Materials to the specifications and as required in the Delivery Schedule. Producer will order and pay directly for all quality control reports at Essential's laboratory within five (5) business days of delivery of the applicable Delivery Materials to Essential's laboratory. If (a) the Delivery Materials do not conform to customary technical industry standards requirements set forth on Exhibit 1, (b) Producer fails to deliver any materials or documents or (c) the quality control report proves that any of the Delivery Materials are not of acceptable quality, then Essential or its designee shall notify Producer of such nonconformity in writing ("**Notice of Nonconformity**"). Producer shall use commercially reasonable efforts to repair any faults, obtain conforming materials and order and pay directly for subsequent quality control reports within ten (10) business days after receipt of the Notice of Nonconformity. Producer shall indemnify and hold harmless Essential and its designees against all claims and damages arising from Essential's inability to deliver the Picture pursuant to any license agreement as a result of the failure by Producer to deliver any conforming materials which Producer does not correct within ten (10) business days after Essential's Notice of Nonconformity. Actual, third-party costs incurred by Essential in correcting deficient Delivery Materials or in creating Delivery Materials not delivered by Producer, which Producer does not correct within ten (10) business days after Essential's Notice of Nonconformity, will be recoupable from Producer as Expenses hereunder and are not subject to the Expense Cap.

10. **Servicing Agent**: Essential will render all services customarily performed by sales agents in connection with the licensing of the Rights of the Picture, including, without limitation: (a) representing Producer at film markets in connection with the sale of the Picture; (b) overseeing the marketing of the Picture in the Territory; (c) drafting all licensing agreements relating to the license of the Picture in the Territory; (d) collection services; and (e) coordinating delivery to the licensees.

11. **Approvals:** Producer will have the right to approve the following with respect to the Picture: (a) the ask and accept schedule ("Sales Estimates"), as further defined in paragraph 15; and (b) any single Expense exceeding Five Thousand US Dollars (US$5,000). Producer hereby pre-approves any license agreement entered into by Essential at a major film market (i.e., Berlin, Cannes, AFM) for territories where the accept price is reflected on its sales estimates, provided that the minimum guarantee pursuant to any such license agreement is at or greater than the respective accept price. In the event an offered minimum guarantee is less than its estimated accept price, Producer shall have twenty four (24) hours to deny said minimum guarantee upon written notification and request from Essential or said request shall be automatically deemed rejected. The parties acknowledge and understand that time is of the essence for any written notice sent by Essential requesting Producer's approval, especially at the film markets; accordingly, Producer shall designate one authorized representative to any of whom all requests for approval by Essential shall be directed. For the avoidance of doubt, Producer's execution of any short or long-form license agreement is conclusively deemed approval by Producer of the form and substance of the license agreement. Essential and Producer shall have mutual approval of all marketing materials with respect to the Picture, including, but not limited to publicity, press releases, key art, promos and trailers. In the event of a dispute, after meaningful consultation with Producer, Essential's decision shall control in the Territory. Essential shall have the right to approve the international version of the theatrical trailer of the Picture. Essential's inadvertent failure to obtain an approval hereunder, does not constitute breach of this Agreement.

12. **Essential Authority:** All contracts with licensees shall be entered into by Essential as agent only, and Producer, or Producer's designee (including any licensing intermediary) as the licensing party. Essential is not authorized to execute any contract on Producer's behalf or to in any way bind, or hold itself out as having the authority to bind, Producer to any agreement with a third party unless such contract provides for a minimum guarantee and/or licensing fee which equals or exceeds the "accept" price for the Picture for that portion of the world, or: (i) such lesser amount as Producer shall approve in writing; or (ii) such lesser amount that Producer approves orally to Essential when time is of the essence.

13. **Third-Party Obligations:** Producer shall be responsible for paying all third-party payments, per the CAMA, including, but not limited to any acquisition, production and financing costs with respect to the Picture, any third-party participations arising from the sale or commercial exploitation of the Picture, and any residuals due and owing to any of the guilds or unions. Producer will provide for residuals as a separate line item in the Production Budget which shall be payable into the Collection Account for the Picture as described in Paragraph 19 below. Producer shall also be responsible for all music clearance fees with respect to the use of any musical elements embodied in the Picture for its exploitation, advertising and promotion (whether "in-context" or "out of context").

14. **Future Projects:** (a) "Recess Films" shall be live action comedy films produced as entertainment for children with a final going-in budget ranging from Eight Million US Dollars (US$8,000,000) to Ten Million US Dollars (US$10,000,000) and a final negative cost of no less than Five Million US Dollars (US$5,000,000), excluding any rights, financing, bond and/or contingency, producer or other fees otherwise payable to Licensor; and (b) "GPX Animation" shall be stereoscopic, computer generated, animated films produced as entertainment for children with a final going-in budget of no less than Twenty Million US Dollars (US$20,000,000) and a final negative cost of no less than Fifteen Million US Dollars (US$15,000,000), excluding any rights, financing, bond and/or contingency, producer or other fees otherwise payable to Licensor. With respect to Recess Film Projects and GPX Animation Projects (as such terms are defined above), Producer shall, during the Submission Period (as defined below), submit to Essential, on an exclusive "First Look" basis, Producer's Recess Film Projects and GPX Animation Projects and Essential shall have the exclusive right and option to accept any and all of such Recess Film Projects and GPX Animation Projects. For purposes hereof, the term "**Submission Period**" shall mean

the period commencing upon the date hereof and continuing for a period of four (4) years thereafter. The submission process shall be as follows ("**Submission Process**"):

(a) <u>Submitted Project</u>: Producer shall provide Essential with respect to each Recess Film Project and GPX Animation Project with sufficient information, including, but not limited to each such project's screenplay, casting, production budget and film financing as well as all ideas, materials and/or properties contained therein and related thereto (each a "**Submitted Project**"). Essential shall thereafter have a period of five (5) business days to read the Submitted Project ("**Reading Period**"). Upon conclusion of the Reading Period, Essential shall either (a) reject the Submitted Project or (b) elect to perform additional diligence, for a period not to exceed twenty (20) business days ("**Diligence Period**"), in order to gather sufficient information to reject or accept the Submitted Project. In the event that Essential accepts a particular Submitted Project (each an "**Accepted Project**"), such Accepted Project shall be deemed to be a Picture hereunder and all terms and conditions set forth in this agreement shall be applicable to such Accepted Project.

(b) In the event that Essential rejects any such Submitted Project for any reason and thereafter Producer makes any substantive or material changes or additions to the screenplay of such rejected Submitted Project, then Producer shall be obligated to resubmit such previously rejected Submitted Project and Essential shall be entitled to the Reading Period and Diligence Period in accordance with paragraph 14(a).

(c) In the event that Essential rejects any such Submitted Project and thereafter Producer makes any substantive or material changes or additions to the elements of such rejected Submitted Project, other than the screenplay (e.g., a material change in financial terms or change to an actor, director or producer), then Producer shall be obligated to resubmit such previously rejected Submitted Project and Essential shall be entitled to a fifteen (15) business day Diligence Period, but will not be entitled to an additional Reading Period.

15.  <u>Sequels and Derivative Works</u>: Essential shall have the right to sell theatrical sequels, prequels, remakes and television spinoffs (including television series and direct-to-video), subsequent productions, stage plays, video games, computer and electronic and other games, interactive uses, and all other productions of the Picture, whether for initial release theatrically, on home video, on television or as stage plays or any other media on the same terms as applicable to the Picture.

16.  <u>Sales Estimates</u>: As between Essential and Producer, the "**Sales Estimates**" shall mean the table summarizing Essential's collective opinion of the minimum guarantees which potential licensees are likely to pay for the Picture, assuming: (a) that the Picture is: (i) filmed in substantial conformity with the draft screenplay written by Jymn Magon & Kern Konwiser dated August 13, 2009, that Producer authorized Essential to send to potential Licensees; and (ii) filmed substantially in color on 35mm film stock; (b) that there is no material deterioration in the economic conditions within the respective territories or the Theatrical, Video and/or Television markets within such territories; (c) the Picture is directed by Kern Konwiser; (d) the Picture is produced by Producer; (e) the Picture stars Christopher Lloyd and Ron Perlman and/or other talent mutually approved by Producer and Essential; (f) the Picture is produced with direct above and below-the-line costs not less than Nine Million US Dollars US Dollars (US$9,000,000.00); (g) the Picture has a P&A commitment of US$6,000,000 secured by letter of credit; (h) and an initial theatrical release in the United States by Overture/Anchor Bay on a minimum of 600 screens concurrently. Producer hereby acknowledges that said domestic release commitment may be expressly listed as an essential element to any and all international distribution agreements and notices of assignment for the Picture, with Essential's right to approve any replacement distributor. Essential shall prepare Sales Estimates for Producer approval no later than five (5) days prior to the first major film market in which the Picture is exploited. Within thirty (30) days of Essential screening the director's cut

of the Picture (per Paragraph 20 below), Essential will submit any necessary revisions to the Sales Estimates for Producer approval. The parties hereto acknowledge that the Sales Estimates are inherently speculative; accordingly, Essential does not represent, warrant, covenant or guarantee that such offers will be forthcoming or that such minimum guarantees will be obtained by Producer. Producer hereby waives any rights or remedies against Essential if any such offers are not forthcoming, license agreements for such territories and amounts are not entered into by Producer and/or such amounts are not collected under any or all license agreements and/or received by Producer.

17.  Reports/Accountings/Audit Rights: Essential shall render a quarterly basis statement to Producer, sixty (60) days in arrears, beginning upon the delivery of the Picture and continuing for a period of three (3) years thereafter, provided that no statements need be provided if the Collection Account agent is rendering regular statements or sales made or amounts collected are less than One Thousand US Dollars (US$1,000) during any statement period, and thereafter Essential shall render such statements on a quarterly basis, sixty (60) days in arrears. Producer will have the right to request an updated written statement no more frequently than sixty (60) days after the close of the calendar quarter. During the Term, Producer shall have the right to audit the books and records of Essential with respect to the Picture, once per year, and upon reasonable written notice to Essential. All statements rendered by Essential in connection with the Picture shall be conclusively binding upon Producer and not subject to any objection unless specific objection in writing is given to Essential within two (2) years from the date such statement is rendered and an audit for that statement is completed within six (6) months after such objection notice is given. If Producer's audit of such statement rendered by Essential concludes that there is a discrepancy of ten (10) percent or more, then Essential shall pay Producer's cost of the audit for that statement.

18.  Failure to Commence Principal Photography: The parties expressly acknowledge and agree that Essential's reasonable expectation under this Agreement is that Producer will complete and deliver the Picture to Essential or its designee (for delivery to licensees) and that Essential has incurred some indeterminate opportunity cost by accepting the engagement as agent hereunder. Accordingly, Producer shall use best efforts to ensure that Essential is a named beneficiary in the completion guaranty, at Essential's cost, and such that if after the completion guaranty is in effect, Producer abandons the Picture or otherwise fails to make delivery of the Picture, Producer and/or the Completion Guarantor immediately pays Essential any and all entitlement to the Expenses, Market Charge and International Sales Fee (calculated against advances for all license agreements), upon receipt of which this Agreement shall be deemed terminated (the parties hereby acknowledge that Essential will not be named as a beneficiary in the completion guaranty for "Blackbeard" aka "The Return of Captain Kidd"; however, the parties acknowledge that this provision remains in effect for all Accepted Projects, Sequels, Prequels and Derivative Works). Notwithstanding the foregoing, Producer must pay Essential one-third (1/3) of the Market Charge and all accrued Expenses within ten (10) days of the earliest of: (a) Producer's failure to commence principal photography within six (6) months from the date of the first offer for the license of the Picture; and (b) otherwise failing to make delivery of the Picture prior to the bonded delivery date. Thereupon this Agreement shall be deemed terminated and, within ten (10) days thereof, Producer shall return (or authorize the Collection Account manager to return) any and all deposits collected to date from licensees. Unless and until Producer receives written and express authorization from Essential, Producer hereby acknowledges that Producer may not utilize any licensee's deposit or minimum guarantee payment for any purpose prior to the close of the production financing for the Picture, which means that no minimum guarantee (or any portion thereof) may be used for any financial purpose as to the Picture or any other picture prior to confirmation that: (a) a verifiable production financing plan is in place, (b) there is a completion bond company commitment letter for the Picture, (c) there is a confirmed date for the commencement of principal photography, and (d) the Secured Financing for the Picture is closed.

19.  Credits: Essential will be entitled to a company presentation credit on the screen in all positive prints of all releases of the Picture in the Territory, including, without limitation, theatrical releases, film

festival and market screenings of the Picture. Such credit may be a moving or animated logo on a separate card ahead of the "Title" of the Picture. Such credit will also be tied to Producer's company credit and will be included in all trailers, paid advertising and the billing block, subject to customary exclusions, in a size equal to that used to display Producer's credit. In addition, Essential shall receive an "International Sales by Essential Entertainment" credit (a) on the screen, in the end crawl of all positive prints of the Picture in the Territory, and (b) in all press releases, press kits and announcements. Producer also agrees to include Essential's logo on all artwork and promotional materials in the Territory and on all prints of the Picture screened at any film market, in proximity with and in equal size to Producer's logo. No casual or inadvertent failure by Producer to accord such credit, nor the failure for any reason by third parties to comply with the provisions of this paragraph, shall be deemed a breach hereof by Producer; provided, however, that Producer agrees to use reasonable efforts to cure prospectively any failure to accord such credit promptly following Producer's receipt of written notice of any such failure.

20. Previews: Essential shall be entitled to the following preview rights: (a) upon commencement of principal photography, Essential will be provided with "dailies" on a weekly basis, which will be provided to Essential on DVD, tape or electronically; and (b) Essential will be shown all "cuts" and "previews" of the Picture.

21. Priority of Disbursements from Collection Account: Together with certain other third-parties, Essential and Producer shall be parties to a collection agreement that provides for the payment of Gross Proceeds and residuals into, and disbursement of those certain sums due to Essential, including but not limited to the Expenses, the Market Charge and the International Sales Fee, from a Collection Account ("CAMA"). In the event that payment of the sums due to Essential are not timely made as set forth herein, then Producer shall pay Essential within fifteen (15) days of receipt of an invoice for the same. It is a material term of this Agreement and a condition precedent of Essential's obligations hereunder that Essential be a party to the CAMA, that the CAMA provide that it cannot be modified without Essential's express written consent, and that unless and until Essential, in its sole discretion, grants such written consent, all funds received in the Collection Account with respect to the license agreements must be disbursed as and when received in the order of priority as set forth on Schedule "1" attached hereto.

22. Vault and Return of Materials: Until the expiration of the Term of this Agreement or any prior termination of this Agreement and following delivery to the licensees, Producer shall be responsible for the costs associated with the vaulting or storage of the Delivery Materials. Following the expiration or any prior termination of this Agreement, Essential shall within sixty (60) calendar days deliver to Producer all of the materials delivered or supplied to it pursuant to this Agreement and all other materials manufactured or created by Essential in respect of the Picture plus copies of all other materials then in Essential's possession relating to the Picture or the performance of its obligations hereunder or shall, if Producer so elects by notice in writing to Essential, erase or destroy all such materials and supply a certificate of destruction signed by an officer of Essential.

23. Assignment: Producer may assign any and all rights hereunder to any production entity, financier, lender, bond company and/or guild, provided that Producer shall remain secondarily liable hereunder and provide written notice to Essential of such.

24. Representation of Other Films/Producers: Producer acknowledges that it has been advised by Essential that Essential will act as the sales representative for third parties and/or for films owned or controlled by third parties and/or films that Essential owns or controls and that such acts are not in violation of the terms of this Agreement.

25. Conditions Subsequent: Essential's obligations hereunder shall be subject to the following "Conditions Subsequent":

(a) <u>Chain of Title</u>: Producer acknowledges and agrees that it is a material term of each license agreement Essential concludes, and that Essential will represent to any prospective licensee that Producer has the right to grant the Rights it purports to grant pursuant to such license agreement. Accordingly, as a condition subsequent to any obligation of Essential hereunder, promptly upon execution of this Agreement, and to the extent it may change thereafter, Producer shall provide Essential with the complete chain of title, at Producer's sole cost and expense, which Essential may have reviewed by independent outside counsel (the cost of which is a reimbursable Expense). In the event that Essential provides Producer with notice of any deficiencies in the chain of title which would materially impair the ability of any licensee to exploit any of the licensed Rights or is likely, in Essential's sole and reasonable judgment, to expose Essential to liability or otherwise adversely impact Essential's performance hereunder, Producer shall use all reasonable efforts to correct such deficiencies promptly. Essential may suspend its performance hereunder until such deficiencies are corrected and may, if such deficiencies cannot be corrected within fifteen (15) business days of notice from Essential, terminate this Agreement. For purposes of clarity, approval of chain of title by Essential does not waive any of Essential's rights to indemnity hereunder.

(b) <u>Errors and Omissions Insurance</u>: Producer shall maintain or cause to be maintained in full force in effect, during the first three (3) years of delivery of the Picture, standard form Producer's liability insurance (error and omissions insurance) with liability limits of not less than One Million US Dollars (US$1,000,000) per occurrence and Three Million US Dollars (US$3,000,000) in the aggregate and with a maximum deductible of not greater than Twenty Five Thousand US Dollars (US$25,000) naming Essential Entertainment Media, L.L.C. and its officers, employees, representatives, attorneys, successors, and assigns as additional insureds. Such insurance coverage shall extend to all customary uses of the Picture by Essential hereunder as are covered by customary E&O policies. Producer shall ensure that the errors and omissions insurance may not be terminated without thirty (30) days prior written notice to the above-mentioned additional insured parties and the certificates issued naming such parties as additional insured entities shall include statements to this effect. As a condition subsequent to Essential's obligations hereunder, Producer shall furnish Essential with a certificate of such insurance within fourteen (14) days of signature of the issuance of such policy

26. <u>Termination</u>: Producer shall have the right to terminate its obligations hereunder with respect to the Picture if: (a) Essential materially breaches this Agreement and fails to cure within twenty-one (21) days; (b) at any time during the Term Essential becomes insolvent or is unable to pay its debts generally as they arise; (c) Essential files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law; (d) a petition is presented or resolution passed for the winding up of Essential, or proceedings are started for the reorganization of Essential or the appointment of a receiver or trustee for all of Essential's assets; (e) Essential suspends or threatens to suspend its general operations, or (f) Essential's assets are seized or appropriated by or on behalf of any governmental authority.

27. intentionally deleted.

28. <u>Indemnity</u>: Producer shall defend, indemnify and hold harmless Essential (including its affiliates, officers, directors, partners, employees, agents, exhibitors, licensees, and assignees) from and against any and all third-party claims, liabilities, liens, losses, injuries, damages, costs and expenses (including actual, out-of-pocket, reasonable expenses and reasonable outside attorney's fees) of any kind or nature incurred or suffered in connection with any and all demands, claims, proceedings, suits or actions (whether or not such is meritorious) arising out of or relating to: (i) the development and production of the Picture, (ii) any breach by Producer of any representation, warranty, obligation or covenant herein; (iii) any gross negligence or conduct by Producer; (iv) any claim or action relating to or arising out of any item enumerated in Exhibit 1 attached hereto, but which item is either incompletely delivered or not delivered

at all, including but not limited to any unexecuted or partially executed talent agreements and/or music licenses; and (v) the license agreements (provided they are in Essential's standard form or a form approved by Producer), the CAMA and any financing arrangements for the Picture, provided that Essential has not engaged in gross negligence or breach of the Agreement through its conduct or omission directly giving rise to such action, and to the extent not resulting from a material breach by Essential of its obligations under this Agreement.

Except to the extent that Producer is in breach of this Agreement or has acted in a tortiously intentional or grossly negligent manner, Essential shall defend, indemnify and hold harmless Producer (including its members, affiliates, officers, directors, partners, shareholders, agents, employees, exhibitors, licensees, and assignees) against any and all third-party claims, liabilities, liens, losses, injuries, damages, costs and expenses (including actual, out-of-pocket, reasonable expenses and reasonable outside attorney's fees) of any kind or nature incurred or suffered in connection with any and all demands, claims, proceedings, suits or actions (whether or not such is meritorious) arising out of or relating to: (i) any failure by Essential to perform any of its obligations created by or assumed under this Agreement; (ii) any gross negligence or intentional misconduct by Essential; (iii) in connection with any third party claim or action relating to any material that Essential adds to and/or changes in the Picture (provided such addition and/or change was not approved by Producer) except as such claim or action may be caused by any breach of any representation or warranty herein or any gross negligence by Producer; or (iv) any material breach by Essential of any representation, warranty, obligation or covenant herein.

## II. GENERAL TERMS AND CONDITIONS:

1.  Confidentiality: Other than as may be required by any applicable law, government order or regulation, or by order or decree of any court of competent jurisdiction, neither party hereto shall publicly divulge or announce, or in any manner disclose to any third party, any confidential information or matters revealed to such party pursuant hereto, or any of the specific terms and conditions of this Agreement, and both parties hereto shall do all such things as are reasonably necessary to prevent any such information from becoming known to any party other than the parties involved with the transaction.

2.  Notices and Statements: All notices, statements and/or requests for approvals ("Notices") that either party hereto is required or may desire to give to the other shall be given in writing by addressing the same to the other at the address hereinafter set forth, or at such other address as may be designated in writing by any such party in a notice to the other. Notices shall be delivered in person, by express mail, by certified mail, by private overnight delivery or by electronic transmission. Delivery of Notices shall be deemed conclusively made (i) at the time of delivery, if personally delivered, (ii) twenty-four (24) hours after mailing, properly addressed and postage prepaid, if delivered by express mail, (iii) seven (7) calendar days after mailing, properly addressed and postage prepaid, return receipt requested, if delivered by certified mail, (iv) twenty-four (24) hours after delivery by the party giving the notice to the private overnight deliverer, if delivered by private overnight delivery, and (v) at the time of electronic transmission, if receipt thereof is verified.

The addresses to which Notices shall be given are:

    To Essential:    Essential Entertainment Media, L.L.C.
                              9000 Sunset Blvd Suite 600
                              Los Angeles, CA 90069
                              Attn: Business & Legal Affairs
                              Fax: (310) 550-9101

    To Producer:    Gigapix Studios

9333 Oso Avenue
Chatsworth, CA 91311
Attn: David Pritchard, Kip Konwiser and Nadia Davari
Fax:

3. **Governing Law**: This Agreement is to be construed, interpreted and enforced in accord with the laws of the State of California, excluding California's choice of law provisions, and by the laws of the United States of America as applied by the Ninth Circuit ("Governing Law").

4. **Arbitration**: The parties shall submit any action, suit or proceeding arising out of or related to the subject matter of, or transactions contemplated by, this Agreement ("Action") to binding arbitration in English in Los Angeles, California, pursuant to the IFTA® Rules for International Arbitration in effect as of the Effective Date of this Agreement ("IFTA® Rules"). The parties hereto waive any right to adjudicate any dispute in any other court or forum *except* that a party may seek interim relief before the start of arbitration as followed by the IFTA® Rules. Accordingly, Producer and Essential, each as to and for the benefit of the other hereby irrevocably submit to the jurisdiction of courts of the State of California and the United States for the purpose of any Action, to compel arbitration, to confirm an arbitration award and with respect to interim relief. The parties will abide by any decision in the arbitration and any court having jurisdiction may enforce it. The parties agree to accept service of process in accordance with the IFTA® Rules and agree that so doing satisfies all requirements to establish personal jurisdiction over the parties. The parties waive the procedures for service of process pursuant to the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters. The prevailing party will be entitled to recover costs from the non-prevailing party, including, without limitation, all court costs and reasonable fees of attorneys, accountants and expert witnesses incurred in bringing or defending such Action.

5. **Severability**: If any of the provisions of this Agreement become invalid, illegal or unenforceable in any respect under any law, for any reason, such provision is deemed automatically adjusted to the minimum extent necessary to conform to the requirements for validity as declared at such time and, as so adjusted, are deemed a provision of this Agreement as though originally included herein. In the event that the provision invalidated is of such a nature that it cannot be so adjusted, the provision is deemed deleted from this Agreement as though such provision had never been included herein, and the validity, legality and enforceability of the remaining provisions hereof are not in any way affected or impaired.

6. **Counterparts**: This Agreement may be executed simultaneously in one or more counterparts, and/or by facsimile, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

7. **Formal Agreement**: This Agreement represents the complete understanding of the parties hereto with respect to the subject matter hereof and expressly supersedes any prior agreements, understandings and negotiations, and may not be modified except by an agreement in writing executed by both Essential and Producer. Headings contained herein are for reference only and are not given any legal effect. If the foregoing is in accord with your understanding please execute where indicated below.

If the foregoing is in accord with your understanding please execute where indicated below.

ESSENTIAL ENTERTAINMENT MEDIA, L.L.C.      GIGAPIX STUDIOS
("Essential")                              ("Producer")

By: _____              By: _____
Its: CHIEF FINANCIAL OFFICER/CHIEF OPERATING   Its: _____
     OFFICER

## SCHEDULE 1

### Distribution of Collected Gross Proceeds

All collected Gross Proceeds arising from the exploitation of the Picture shall be distributed by FCAM as follows:

1. To FCAM in payment of FCAM's Remuneration and the FCAM Expenses; and thereafter

2. in payment to the guilds for payment of residuals from the residuals set-aside accruing solely from the Territory, solely with respect to the payments to be made pursuant to sections 3, 3A and 4 below (and not accruing from the United States with respect to the payments to be made pursuant to sections 3, 3A and 4 below) as set out in Schedule 6 of the CAMA; and thereafter

3. to Essential in repayment of any incurred Expenses up to a maximum amount of USD $100,000 to the extent not previously paid to Essential; and thereafter

3A. to Essential in payment of the Market Charge in the amount of $100,000 to the extent not previously paid to Essential; and thereafter

4. to Essential in payment of Essential's International Sales Fee in the amount from time to time equal to Ten (10%) percent of all collected Gross Proceeds; and thereafter

5. to _____ until full recoupment of _____ production facility and any interest and fees and costs accrued thereon, the exact amount to be notified to FCAM in writing by _____ and Producer jointly. FCAM may rely on the accuracy of the information provided by _____ and Producer jointly in writing; and thereafter

6. on a pro-rata and pari passu basis to (a) Gigapix Studios, LLC until full recoupment of the Gigapix contribution and any interest accrued thereon, the exact amount to be notified to FCAM in writing by Gigapix Studios, Inc. and Producer jointly, and; (b) _____ until full recoupment of the _____ Contribution and any interest accrued thereon, the exact amount to be notified to FCAM in writing by _____ and Producer jointly. FCAM may rely on the accuracy of the information provided by _____ and Producer jointly; and thereafter,

7. to the Completion Guarantor in respect of monies paid out (if any) pursuant to the terms of the Completion Guarantee, the exact amounts to be notified to FCAM in writing by Completion Guarantor. FCAM may rely on the accuracy of the information provided to FCAM in writing by Completion Guarantor; and thereafter

8. to the deferrees until full recoupment of the deferments; and thereafter

9. the balance remaining after the payment of all the sums referred to above shall form the "Net Profits" of the Film and shall be paid to the Net Profit Participants, on a pari passu basis, as follows:

- ____ percent to _____ ;
- ____ percent to _____ ;
- ____ percent to _____ ; and
- the balance remaining to Producer or as Producer may direct FCAM in writing.