Production Announcement and
Multiple Media Agreement
Dated As Of March 7, 2011

EXHIBIT 448

STARZ ANIMATION TORONTO, MULTIPLE MEDIA ENTERTAINMENT, AND GIGAPIX STUDIOS ANNOUNCE THE COMMENCEMENT OF PRODUCTION OF AN ADAPTATION OF L. FRANK BAUM'S "THE WONDERFUL WIZARD OF OZ".

Toronto, ON-April 6, 2011-Starz Animation Toronto, Multiple Media Entertainment (MME), and Gigapix Studios announced that they are set to begin production on the stereoscopic CG animated feature film, with the working title OZ3D, a humorous and contemporary adaptation of the L. Frank Baum classic book, "The Wonderful Wizard of Oz."

The film is budgeted at $20MM CDN with Michael Taylor and Drew Craig of MME Executive Producing. The deal was brokered by Starz Animation's EVP Jeff Young. The script was penned by Connor Pritchard (co-creator of the new Comedy Central series *Workaholics*).

According to Taylor, "Coming off the tremendous job that Starz Animation Toronto did on the hit *Gnomeo and Juliet*, they were undeniably the place to go for world class production talent and experience to execute on such an internationally known and beloved property like OZ." Young adds, "We're thrilled to now step into the producing role and maximize the strength of our studio on all levels." Young continued, "Creatively, the OZ3D project is hilarious, perfect for the modern audience and at the same time is respectful of the underlying material."

President of Gigapix Studios, David Pritchard commented, "Working with Starz Animation and MME gives us an unparalleled combination of creative talent and executive experience that provides an excellent foundation for building a long lasting relationship to create and produce high quality animation for OZ3D as well as other projects to come."

Worldwide distribution for the film will be handled by MME. MME and Gigapix have entered into a US representation agreement with Gigapix Studios' distribution company, Gigapix Releasing, securing through its newly formed P&A fund, a minimum commitment of $10MM for a theatrical release on a minimum 1,000 screens.

Starz Animation's Rob Silvestri will be directing. Previously Rob created and directed the multiple award-winning animated short *Ormie* and worked extensively on *Gnomeo & Juliet* and the Tim Burton produced animated film "9".

###

Page 92



As of March 7, 2011

2257908 Ontario Inc.
230 Richmond Street East
Toronto, ON M5A 1P4
Attention: Jeff Young

Gigapix Studios, Inc.
9333 Oso Ave.
Chatsworth, CA 91311
Attention: David Pritchard, Jim Cardwell

Dear Sirs:

This letter (the "**Letter**") forms the basis of forming a new Canadian corporation (the "**Corporation**") among Multiple Media Entertainment Inc. ("**MME**"), 2257908 Ontario Inc. ("**225**") and Gigapix Studios, Inc. ("**Gigapix**") for purposes of developing, producing, distributing and otherwise exploiting a feature-length, theatrical quality, stereoscopic, CGI animated film currently entitled *"OZ3D"* (the "**Film**"), as well as any sequels, prequels, spinoff series or other programs based on the Film or any element thereof (the "**Spinoffs**"), and with the intent of working together on other theatrical quality, stereoscopic, CGI animated films (the "**Future Projects**").

## The Corporation

1. The Corporation shall be incorporated under the *Business Corporations Act* (Ontario) (the "**Act**"), shall initially have its head office in Toronto, Ontario, and shall at all times be Canadian (as such term is defined in the *Investment Canada Act*). In that regard, each of MME and 225 represents and warrants to the other and to Gigapix that two or more members who are Canadians (as defined in the *Investment Canada Act*) own and control a majority of its voting interests.

2. Subject to paragraph 1 above, each of MME, 225 and Gigapix, or their nominees, shall own one-third (1/3) of the voting interests of the Corporation. In connection therewith, MME, 225 and Gigapix (collectively, the "**Members**") will enter into a members agreement (the "**Members Agreement**") in respect of the Corporation. The Members Agreement will address all matters that are customary in unanimous shareholders agreements, shall be negotiated by the Members in good faith, and shall include the key provisions set out in Schedule "A" attached hereto.

3. The Corporation shall be used for developing, producing, distributing and otherwise exploiting the Film, and in that regard, the Corporation shall be the copyright owner of the Film. The Corporation, or one or more subsidiaries of the Corporation (the "**Subsidiaries**"), as agreed by all Members shall be used for developing, producing, distributing and/or otherwise exploiting any Spinoffs, and any Future Projects. For clarification, unless otherwise agreed by all Members: (a) any matter of any such Subsidiary that requires shareholder approval (i.e. by the Corporation) shall require the voting shareholder approval specified in the Shareholder Agreement; and (b) any such Subsidiary shall otherwise be constituted and governed by the same provisions that are contained in the Members Agreement.

4. The Members will share the costs of creating, operating and administering the Corporation, and any Subsidiaries (whether directly or indirectly) on a 1/3 – 1/3 – 1/3 basis. Correspondingly, subject to the provisions of paragraph 12 below, the Members will share all after-tax profits of the Corporation and any Subsidiaries (whether directly or indirectly) on a 1/3 – 1/3 – 1/3 basis.

5. In connection with the efficient operation and administration of the Corporation, and any Subsidiaries, the Members agree to provide access to their ongoing infrastructures and resources, subject to the prior written approval of all of the Members, such Members may attribute reasonable value to any such contributions for purposes of charging such contributions to the Corporation and Subsidiaries.

**The Film**

6. The Film shall be based upon the screenplay currently entitled *"OZ3D"* written by Connor Pritchard (the "**Screenplay**") and currently owned by Gigapix. Upon incorporation of the Corporation, Gigapix agrees to assign to the Corporation all rights it may have in and to the Screenplay, and the Corporation shall further develop the Screenplay in order to secure sufficient financing for the Film. In the event that the Film is not completed within three (3) years from the date hereof, then all such rights in and to Screenplay shall automatically revert to Gigapix, subject only to the reimbursement to the Corporation of any out-of-pocket development costs incurred by it on the first day of principal photography of the Film by Gigapix or any assignee of such rights.

7. The Film is intended to be produced as: (a) a "Canadian film or video production" pursuant to the guidelines of the Canadian Audio-Visual Certification Office ("**CAVCO**") and the regulations under the *Income Tax Act* (Canada); and (b) a "eligible Ontario production" pursuant to the guidelines of the Ontario Media Development Corporation and the Ontario Film and Television Tax Credit Regulations to the *Taxation Act* (Ontario), for purposes of maximizing federal and Ontario tax credit financing, all of which tax credit financing shall be made available to Corporation to finance production of the Film.

8. 225 or its Ontario-based affiliates will provide full production services for the Film, from pre-production and visual development through final delivery. Without limiting the generality of the foregoing, CGI animation of the Film shall be performed by 225 or its



Ontario-based affiliates, with a view to qualifying and maximizing Ontario tax credit financing under the Ontario Computer Animation and Special Effects Tax Credits ("OCASE"), all of which OCASE tax credits shall be made available to finance the Film. In respect of the foregoing, and subject to any mutually-approved strategy to maximize federal and Ontario tax credit financing, the Corporation shall enter into a customary production services agreement (the "PSA") with 225 upon terms as are unanimously approved by all of the Members, and consistent with the final budget. For clarification, among other items, the PSA will specify all applicable parameters of the Film, including, without limitation, the production and delivery schedule, and a listing of all required deliverables.

9. MME will serve as the distributor of the Film in the Canadian market in all media.

10. Gigapix or its affiliates shall own and control all rights to distribute the Film in the U.S. market, and may provide a theatrical release on up to of 1,000 screens, as supported by a minimum prints and advertising ("P&A") spend of up to U.S. $10 million. In respect of the foregoing, the Corporation shall enter into a customary "all rights" distribution agreement with Gigapix or its affiliates upon terms as are mutually approved.

11 The Members agree to work together in good faith to access additional financing for the Film (including, without limitation, pitching the Film to potential distributors and licensees subject to paragraphs 9 and 10 above, applying for available investments and grants, seeking private equity or non-equity financing, and accessing company rebates). To the extent of any deficiency in financing for the Film, the Members agree to defer the Corporation's request for reimbursement of overheads per paragraph 5 above, and then to defer any budgeted fees payable to them, on a pro rata basis. For clarification, subject to the final approval of the Film's financing plan as set out in the Members Agreement, each of the Members shall be authorized to introduce the Film to third party financiers and, in consultation with the other Members, to negotiate (but not finalize) potential financing arrangements with such third parties. Also, for clarification, the Corporation shall attribute a "finder's fee" (not to exceed 3% of monies received) to the Member(s) that were responsible for the introduction of the Film to those third party private financiers whose financing forms part of the financing plan, and to make appropriate adjustments to the budgeted fees of such Partner(s).

12. Notwithstanding the provisions of paragraph 11 above, a Member shall be free to invest additional private financing in the Film, subject to unanimous approval by the other Members. For clarification, any such additional investment by a Member shall permit such Member to receive either a direct profit participation in the Film or a greater share of after-tax profits of the Corporation.

13. Subject to final approval of the Film's key creatives as set out in the Members Agreement, the Members shall mutually consult on all matters pertaining to the Film.

14. Subject to CAVCO requirements governing "courtesy" credits provided to non-Canadians, each of the Members shall be entitled to (a) credit in all billing blocks pertaining to the Film, (b) at least one (1) single card "Executive Producer" screen credit in the main titles; and (c) a corporate presentation screen credit. For clarification, all credits provided,

4

and the duration and/or location of all credits, shall be on a "most favoured nations" basis among all Members.

### The Spinoffs and the Future Projects

15.   The Members will work together to maximize the potential profitability of any Spinoffs. In that regard, unless otherwise agreed by all Members, any such Spinoff shall be produced in accordance with paragraphs 7 through 14 above.

16.   Subject to the successful completion of the Film, and subject to the sole, good faith discretion of Gigapix to assign to the Corporation applicable rights to projects to which Gigapix owns or controls rights, the Corporation shall develop at least three (3) Future Projects (as well as any Spinoffs based on such Future Projects or any element thereof), and the Members will work together to maximize the potential profitability of all such Future Projects, provided that no actual development expenditures shall be required to be made by the Corporation on any such Future Project until such time as all Members have agreed to the optimal business strategy for the development, production, distribution and exploitation of such Future Project.

### General

17.   The Members shall provide all such reasonable assurances as may be required to formalize the arrangements contemplated hereby.

18.   Neither MME nor 225 nor Gigapix will make any public announcement concerning this Letter without other Members' prior written approval, except as may be required by law (in which case the disclosing Member shall seek input from all other Members as to the public announcement).

19.   Neither MME nor 225 nor Gigapix will, without the prior written consent of the relevant Partner, disclose any Confidential Information of the other Members that it may learn in the course of dealing with the other Members pursuant to this Letter. Notwithstanding the foregoing, a party may disclose Confidential Information to the extent required: (a) to any consultants, contractors, and counsels who have a need to know in connection with this Letter and have executed a reasonably protective non-disclosure letter with the disclosing Partner; (b) to any party that controls, is controlled by or is under common control with the disclosing Partner, or to its lenders, financiers or potential investors; or (c) by operation of law, or by a court or governmental agency, or if necessary in any proceeding to establish rights or obligations under this Letter; provided, the disclosing Partner shall, unless legally prohibited, provide the non-disclosing Partner(s) with reasonable prior written notice sufficient to permit the non-disclosing Partner(s) an opportunity to contest such disclosure. For purposes of this memorandum of understanding, "Confidential Information" means any non-public information of any of the Members hereto relating to its business activities, financial affairs, technology and other proprietary information or trade secrets.

20.   This Letter applies only to the Film, the Spinoffs, and the Future Projects, and does not constitute a more formal relationship between the Members. The relationship among the

Members shall at all times be that of independent contractors, and nothing contained herein shall render or constitute the Members to be joint venturers, Members, agents or fiduciaries of each other, and none of the Members shall hold itself out to third parties other than as set forth herein. None of the Members shall have the right to bind any other Partner, and none of the Members shall be liable for any representation, warranty, covenant, Letter, act or omission of the other Members, except as may specifically be set out in this Letter, the Members Agreement, the PSA or any other written agreement contemplated hereby.

21. This Letter supersedes all previous agreements in respect of its subject matter and embodies the entire agreement between the parties. No amendment hereto may be made except in writing by the parties, and no waiver of any breach of any provision of this Letter is effective unless made in writing and signed by the party purporting to give such waiver.

22. This Letter shall be governed by the laws of the Province of Ontario and the laws of Canada applicable therein.

23. This Letter may be executed in any number of counterparts. A counterpart unconditionally executed and delivered by a party binds that party. All counterparts taken together constitute the same instrument.

24. Unless and until one or more longform agreements are created to supersede this Letter, this Letter shall be binding on the parties and their successors and permitted assigns.

If the foregoing accurately reflects your understanding of our agreement, would you kindly sign below and return a copy to us.

Yours truly,

**MULTIPLE MEDIA ENTERTAINMENT INC.**

Per:_____
    Authorized Signing Officer

Acknowledged and Agreed:

**2257907 ONTARIO INC.**

Per:_____          _____
    Authorized Signing Officer                    Date

**GIGAPIX STUDIOS, INC.**

Per:_____          8/29/11
    Authorized Signing Officer                    Date