1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Letter of Intent With MSH Entertainment Dated May 10, 2011
## Employment Agreement - Blauvelt
## Consulting Agreement - Blauvelt
## Resignation Letter - Blauvelt
## Inducement Agreement - Blauvelt

# EXHIBIT 454

# GIGAPIX STUDIOS-MSH ENTERTAINM ENT LETTER OF INTENT

May 10, 2011
MSH Entertainment Corp.
Attention: Mr. Chuck Walker, President

RE: Letter of Intent between Gigapix Studios, Inc. and MSH Entertainment Corp.

Dear Mr. Walker:

This letter of intent, ("LOI") is entered into as of May 10, 2011, by Gigapix Studios, Inc. ("Gigapix"), a California corporation, with offices located at 9333 Oso Avenue, Chatsworth, California 91311 and MSH Entertainment Corp. ("MSH"), a Utah corporation with offices located at 808 Gladstell, #309, Conroe, Texas, 77304. This LOI sets forth the key terms and conditions which will be included in a binding merger agreement ("Merger Agreement") between Gigapix and MSH. Such acquisition shall be completed through issuance of new MSH stock to Gigapix stockholders and surrender of Gigapix stock to MSH.

## TERMS

## WARRANTIES

1. MSH represents and warrants that it currently has 145,800,150 shares of common stock issued and no shares of preferred stock. Additionally, there are no investments, convertible debts/loans, stock options, warrants or any other ~struments or "poison pill" provisions that may result in dilution of MHS common stock. Other than specified herein, .ere will be no events that result in the issuance of additional stock, common or otherwise that could cause dilution of MSH stock. MSH agrees that from the date hereof until the earlier of the termination of this LOI or completion of the Merger that no new shares of MSH or any other convertible or any other dilutive instrument, except as provided for herein, have been or will be issued. Any shares or dilutive instruments issued after the Merger unless provided for in this LOI shall be subject to the prior written approval of the new board of MSH.

2. Gigapix represents and warrants that immediately prior to the Merger it will have issued 22,934,758 shares of common stock and 4,214,370 shares of preferred stock. Gigapix agrees that from the date hereof and except as provided for herein, no new shares of Gigapix will be issued, without the prior written approval of the board of directors of MSH.

3. MSH has notified Gigapix that additional share grants are outstanding for pre-Merger services rendered to MSH, loans to MSH, and settlements on behalf of MSH. These shares will be issued post-reverse split and post-Merger and cumulatively will not exceed 500,000 common shares in MSH. Simultaneous with the closing of the Merger, MSH shall issue 12,000,000 options to purchase post reverse split shares of MSH at the option price of $0.10 each for 9,675,525 of such shares (for management and board of MSH) and no charge for 2,324,475 of such shares (for Gigapix's founder). Those options will be granted to the new board and the management of MSH. A copy of the pre-Merger and post-Merger capital structure of each of Gigapix and MSH is attached hereto as Exhibit A. It is anticipated by the parties that at the closing of the Merger but prior to the issuance of the shares contemplated to be issued in this paragraph 3 that the current shareholders of MSH shall cumulatively have 4,860,005 shares of MSH and former Gigapix shareholders (including former preferred shareholders) shall cumulatively have 10,854, 011 shares of MSH.

Initial: ___ / _____ / _____ / _____

**Letter of Intent**

## AGREEMENT

### I. Pre Merger conditions

4. MSH acknowledges and agrees, as a condition to the Merger, and before the issuance of any new shares contemplated by this LOI, that it will reverse split its common shares at one (1) for thirty (30). It is anticipated that at the time of the Merger after the surrender of Gigapix stock and the issuance of MSH stock but before the issuance of the stock and the stock options described in paragraph 3 above that the shareholders of MSH will have 4,860,005 MSH shares in MSH and former Gigapix common (including former preferred shareholders) shall have the total of 10,869,761 shares in MSH.

5. Gigapix agrees to minimize dilution of Gigapix stock to enhance the value of MSH shares. It is planned for MSH to be listed on NASDAQ approximately 15 months from completion of the Merger. In consideration for the surrender of all outstanding shares of Gigapix to MSH, MSH will issue 10,869,761 common shares (at no cost) from treasury to Gigapix shareholders, on the basis one for one to preferred shareholders and 9 for 20 to common shareholders, and 12,000,000 options to former Gigapix management purchase shares of MSH (at the exercise prices in paragraph 3 above to former Gigapix management). Former Gigapix shareholders and management will then control approximately 82% of MSH (*i.e.* the total of 22,869,761 which shall include 10,869,761 common shares and 12,000,000 options to purchase additional shares). Former MSH shareholders will then own approximately eighteen percent (18%), (*i.e.* 4,860,005 shares), of the issued shares of MSH. The valuation of MSH will be set by the public market. Gigapix will provide the necessary capital as specified in paragraph 9 below to fund the Merger and operations of MSH.

6. Completion of the Merger shall be subject to MSH's and/or its designee's satisfactory due diligence review of the business and financial statements of Gigapix prior to closing.

7. Completion of the Merger shall be subject to Gigapix's and/or its designee's satisfactory due diligence review of the business and financial statements of MSH prior to closing.

8. MSH shall fully disclose to Gigapix all debts, judgments, settlements, and liabilities, if any, and MSH will use its "best efforts" to mitigate such potential liabilities, prior to completion of the Merger.

9. No deposit shall be required from MSH or Gigapix as a condition of entering into this LOI. Gigapix and MSH agree that the consideration for entering into this LOI and fulfilling the conditions herein, is Gigapix obligation to pay for the legal, accounting, regulatory, filing, printing, listing fees and investor relations services costs related to this Merger. These costs may exceed $300,000. Gigapix at its sole discretion shall select and pay all providers of such services. In addition, Gigapix will provide services and expertise to develop, produce, license and otherwise exploit the "Van-pires" property. In no event shall either party hereto, be obligated to the other for any fees, penalties, loss of opportunity or any other "break-up" fees if the Merger is not completed.

### II. Post Merger conditions and terms

10. Post-Merger, MSH shall issue (i) up to 4,000,000 shares (at no charge but valued at $0.50 per share) to convert Gigapix promissory notes of up to $2,000,000; (ii) up to 500,000 shares priced at $0.50 each to satisfy and retire pre-Merger obligations of Gigapix; and,(iii) up to 500,000 shares priced at $0.50 each to satisfy and retire pre-Merger obligations of MSH. The proceeds from the issuance of the notes referred to in 10 (i) above shall be applied as provided in paragraph 29.

11. It is the intention of the parties hereto that immediately after completion of the Merger but prior to issuance of shares contemplated in paragraph 10 above, the former shareholders and managers of Gigapix will hold a controlling interest in MSH representing at least 82% of the issued and outstanding shares (including options) and former MSH stockholders will control approximately 18% of the outstanding shares.

Initial: _____ / _____ / _____ / _____

**Letter of Intent**

12. MSH will maintain MSH's status on the pink OTC Markets and will apply for a NASDAQ listing at the appropriate

13. MSH will prepare and file the necessary Securities and Exchange Commission filings, including Forms 8-K, and Forms 3 and 4. MSH and Gigapix will each make any appropriate notifications to their respective shareholders and regulatory agencies in connection with the Merger.

### III. Miscellaneous

14. Gigapix agrees to provide audited financial statements for its two most recent fiscal years within forty five (45) days from the date of this LOI. These will be prepared and audited at Gigapix's expense. MSH will also provide audited financial statements for its two most recent fiscal years within forty five (45) days from the date of this LOI. These will be prepared and audited at MSH's expense.

15. If either MSH or Gigapix shareholders are entitled to dissenter's rights, in connection with any action of MSH or Gigapix which are required to be resolved prior to the completion of the Merger, MSH and/or Gigapix shall resolve such obligations to the dissenting shareholders immediately prior to, completing the Merger as may be required by the laws of the State of Utah and/or the State of California.

16. The pre-Merger shareholders and directors of MSH agree to indemnify Gigapix former shareholders and management from any known or unknown liabilities of MSH, which may arise during the twelve month period following the Merger. The parties hereto agree that MSH shall use its "best efforts" to secure- "directors and officers" insurance and "errors and omissions" insurance as soon as practical after execution of this LOI.

17. After execution of this LOI, the parties hereto agree to negotiate a formal agreement to complete the Merger and to direct their respective officers to do all acts necessary to complete the Merger in a timely manner.

18. The parties hereto agree to use good faith efforts to finalize the Merger by August 1, 2011, unless this LOI is extended in writing by both parties hereto. The parties hereto estimate that it will take approximately 3 months to complete this Merger from the date that there is sufficient capital to engage appropriate legal and financial counsel to commence activities. Time is of the essence. In the event that the Merger is not completed by August 1, 2011, or by the date specified in any mutually agreed extension thereof, this LOI may be terminated by either party hereto. If this LOI is terminated the parties hereto shall have no further obligation to the other and each party shall return the confidential information to the other party. The prior sentence shall survive the termination of this LOI. Each of the parties hereto represents and warrants that it has the full right, power and authority to enter into this LOI.

19. This LOI is binding and enforceable, subject to the conditions precedent stated below in paragraph 25.

20. Prior to closing and to expedite completion of the Merger, Gigapix and its divisions shall continue operating in the ordinary course of business and provide MSH and its agents with reasonable information as needed. MSH will not dispose, mortgage, lease, or otherwise hypothecate or sell any of its assets or compromise any of its liabilities, pay dividends, or repay any capital to any shareholder and/or investor or proceed with any new business, or transactions other than those necessary for completing this Merger. Continued development and exploitation of the "Van-pires" property is a permitted activity of Gigapix and MSH.

21. The parties hereto agree that any information relating to this LOI and the Merger are confidential. Further, this LOI shall be governed under the laws of the State of Utah and may not be assigned, in whole or in part, without the consent of all parties hereto. It is agreed that this LOI may be executed in counterparts and by facsimile.

22. No press releases or other publicity will be issued by any party to this LOI without the prior written approval of both MSH and Gigapix. Such approvals will not be unreasonably withheld. The parties hereto acknowledge and agree to issue such press releases as necessary to ensure that Gigapix and MSH comply with applicable laws and regulations.

Initial: _____ / _____ / _____ / _____

**Letter of Intent**

The costs of preparing necessary financial and legal documents, proxy statements, etc, if any, valuation reports and other legal requirements related to the Merger shall be borne equally by Gigapix and MSH. Gigapix and MSH shall each be responsible for its own costs of preparing and auditing financial statements, notices to shareholders and other documentation that may be reasonably required. (See paragraph 9 herein).

24. The completion of the Merger is subject to the following conditions precedent:

a) Issuance of or completion of approvals, if any, for the issuance and distribution of stock and options as described in paragraph 3 and paragraph 10 herein.

b) Completion of due diligence by Gigapix and MSH no later than sixty (60) business days following the date of this LOI and receipt of sufficient funds to pay legal and financial costs associated with the Merger (see 18 above). For the purpose of this sub-paragraph "due diligence" shall include the parties agreeing on the tax structure of the Merger and the terms and conditions of the agreements required to complete the Merger. Such agreements will be on terms and conditions typical of similar types of transactions. This condition is solely for the benefit of the shareholders of MSH and Gigapix.

c) Approval by all applicable regulatory authorities and by the directors and shareholders of both Gigapix and MSH. Such regulatory approval is to be obtained no later than August 1, 2011, and such Board approvals to proceed with the due diligence process after execution of this LOI to be obtained not later than ten (10) days following satisfaction of conditions in sub-paragraph 25(b).

25. At the time of completion of the Merger, MSH's Board of Directors will be comprised of at least five (5) nominees of former Gigapix board members and two (2) nominees of former MSH board members. All former directors of Gigapix and MSH shall resign. Future management of MSH shall be as directed by current Gigapix management.

26. Gigapix and MSH each agree to provide the other party with financial statements and any other applicable information to complete due diligence on a timely basis. All information supplied by either party shall be kept confidential.

27. MSH and Gigapix agree to provide Personal Information Forms with respect to prospective directors, officers and insiders as required by regulatory authorities.

28. The shareholders of Gigapix will surrender all of the issued and outstanding shares of Gigapix to MSH. Additionally and in keeping with the parties' intention to complete this Merger in the most tax effective manner all references herein to "the shareholders of MSH and the shareholders of Gigapix" shall be deemed to be a reference to the shareholders of any other company that may be incorporated to own the assets of MSH and Gigapix, or any corporation itself in the event of the sale of MSH and/or Gigapix assets to such corporation. To comply with the foregoing, the provisions of this LOI shall be amended accordingly.

29. As a condition to the Merger, Gigapix will offer private placement(s) in the form of convertible promissory notes of no more than $2,000,000. The proceeds from such placement will be used collectively by Gigapix and MSH for continuing operations and for administration, accounting, legal, filing fees and other costs associated with the Merger. This will provide additional cash on hand of no more than $2,000,000 (the "Gigapix Cash"). Any remaining Gigapix Cash after the completion of the Merger will form part of MHS's assets. As described in paragraph 10, the lenders of Gigapix Cash shall have the option to convert their promissory notes to MSH stock valued at $0.50 a share (see a copy of the Convertible Note Purchase Agreement attached hereto as Exhibit B). Such stock shall be issued post-Merger.

30. The terms and conditions governing the transactions described in the above paragraphs will be set forth in the Merger Agreement, which shall be subject to the approval of the parties hereto and their respective counsels. Such terms and conditions shall include (i.) warranties, representations and indemnities including those usually given in

Initial: ___ / ___ / ___ / ___

**Letter of Intent** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

transactions of the nature herein contemplated, satisfactory to the majority of both parties' shareholders relating to
'S's structure, organization, business, operations and financial condition; (ii.) usual conditions which must be
₃ₐₜisfied before parties to transactions of this type are obligated to close, including, but not limited to, obtaining any
required consents relating to material contracts, (iii.) the absence of any litigation or other legal proceeding relating to
this transaction or MSH; and (iv.) provisions relating to compliance with applicable securities laws.

31. This LOI may be signed in any number of counterparts and by facsimile, PDF, JPEG, or TIFF. Each such
counterpart shall be deemed to be a duplicate original, all of which shall constitute one agreement and shall
become effective when a copy signed by each party has been delivered to the other party. Such separate
execution shall be of full force and effect so long as each Party has executed the same agreement. Facsimile,
PDF, JPEG, or TIFF copies of this LOI and signatures thereon shall be valid and binding on the parties. All
of such counterparts shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have executed this LOI on the date first above written.

MSH Entertainment Corp. ("MSH")

Chuck Walker, President

Gigapix Studios, Inc. ("GIGAPIX")

vid Pritchard, President

Initial: _____ / _____ / _____ / _____

EX...T A

| | | | |
|---|---|---|---|
| Preferred | 4,214,370 | | 15.2% |
| Common | 4,372,766 | 8,587,136 | 15.8% 31.0% |
| Employees | | 450,000 | 1.6% |
| Blauvelt | 1,832,625 | | 6.6% |
| Add: Blauvelt "Top Up" | 2,324,475 | 4,157,100 | 8.4% 15.0% |
| | | 13,194,236 | 47.6% |
| Vendor Share Issue | - | | 0.0% |
| Convertible Note | - | | 0.0% |
| Common Shareholders in Newco | | 13,194,236 | 47.6% |
| Management & Executives Options | 12,000,000 | | 43.3% |
| Less: Blauvelt "Top Up" | (2,324,475) | 9,675,525 | -8.4% 34.9% |
| | | 22,869,761 | |
| MSH Shareholders | 145,800,150 | | |
| Ratio of Reverse split to 1 to | 30 equals --> | 4,860,005 | 17.5% |
| Final Share Capital after Merger/Options | | 27,729,766 | 100.0% |

**CURRENT MANAGEMENT OF GPX**

| | | | | |
|---|---|---|---|---|
| Mgmt & Exec - Options | 12,000,000 | | | |
| Chris Blauvelt after conversion | 1,832,625 | | | |
| Total Mgmt & Exec | 13,832,625 | 49.9% | | |
| Chris Blauvelt - Founder | 1,832,625 | | | |
| Chris Blauvelt - Options "Top Up" | 2,324,475 | @ 10 cents (to be paid by Co.) | | |
| Chris Blauvelt Total Shares & Options | 4,157,100 | 15.0% | | |
| David Pritchard Total Options | 4,157,100 | 15.0% | | No. of People |
| Management - Options | 4,268,425 | 15.4% | | (23) |
| Board Member's Options | 1,250,000 | 4.5% | | (6) |
| | 5,518,425 | 19.9% | | |
| | 13,832,625 | 49.9% | | |

T A

| | | | |
|---|---|---|---|
| Preferred | 4,214,370 | | 12.9% |
| Common | 4,372,766 | 8,587,136 | 13.4% 26.2% |
| Employees | | 450,000 | 1.4% |
| Blauvelt | 1,832,625 | | 5.6% |
| Add: Blauvelt "Top Up" | 2,324,475 | 4,157,100 | 7.1% 12.7% |
| | | 13,194,236 | 40.3% |
| Gigapix Obligations | | 500,000 | 1.5% |
| Convertible Note | | 4,000,000 | 12.2% |
| Common Shareholders in Newco | | 17,694,236 | 54.1% |
| Management & Executives Options | 12,000,000 | | 36.7% |
| Less: Blauvelt "Top Up" | (2,324,475) | 9,675,525 | -7.1% 29.6% |
| | | 27,369,761 | |
| MSH Shareholders | 145,800,150 | | |
| Ratio of Reverse split to 1 to | 30 equals --> | 5,360,005 | -14.8% |
| MSHE Obligations | | 500,000 | -1.5% |
| | | 4,860,005 | 16.4% |
| Final Share Capital after Merger/Options | | 32,729,766 | 100.0% |

**CURRENT MANAGEMENT OF GPX**

| | | | | |
|---|---|---|---|---|
| Mgmt & Exec - Options | 12,000,000 | | | |
| Chris Blauvelt after conversion | 1,832,625 | | | |
| Total Mgmt & Exec | 13,832,625 | 42.3% | | |
| Chris Blauvelt - Founder | 1,832,625 | | | |
| Chris Blauvelt - Options "Top Up" | 2,324,475 | @ 10 cents (to be paid by Co.) | | |
| Chris Blauvelt Total Shares & Options | 4,157,100 | 12.7% | | |
| David Pritchard Total Options | 4,157,100 | 12.7% | | No. of People |
| Management - Options | 4,268,425 | 13.0% | | (23) |
| Board Member's Options | 1,250,000 | 3.8% | | (6) |
| | 5,518,425 | 16.9% | | |
| | 13,832,625 | 42.3% | | |

6 g/7

# EXHIBIT B

## CONVERTIBLE NOTE PURCHASE AGREEMENT

**THIS CONVERTIBLE NOTE PURCHASE AGREEMENT ("Agreement")**, is made as of the ___ day of May, 2011, by and between Gigapix Studios, Inc., 9333 Oso Avenue, Chatsworth, California, 91311 a California corporation (the **"Company"**) and Make Something Happen Entertainment, Inc. (**"MSH"**), a Utah corporation with offices located at 808 Gladstell, #309, Conroe, Texas, 77304, on the one hand, and _____ (the **"Note Holder"**), on the other.

Subject to the terms and conditions set forth herein, the Company desires to sell and the Note Holder desires to purchase from the Company, pursuant to and in accordance with the terms of this Agreement, and the convertible note set forth as Exhibit A attached hereto (the **"Convertible Note"**) and by reference made part of this Agreement. The Convertible Note shall be freely assignable, negotiable and marketable with no restrictions on such transferability other than applicable state and federal securities laws, if any, and subject to the execution and/or delivery by transferee of such documents that the Company may require.

1.    **Convertible Note.**

1.1    Sale and Purchase. Subject to the terms and conditions of this Agreement and the subscription agreement ("**Subscription Agreement**") dated as of May _, 2011, between Company and MSH, on the one hand, and the Note Holder (in the Subscription Agreement referred to as the Subscriber), on the other, at the Admission Date (defined below), the Company will execute, deliver and issue the Convertible Note to the Note Holder in the principal amount of _____ (the **"Principal Amount"**).

1.2    Purchase Price. As consideration for the sale of the Convertible Note, the Note Holder will advance and deliver to the Company the Principal Amount. The Principal Amount shall be paid in such form as the Company may require.

1.3    Admission Date. The closing of the purchase and sale of the Convertible Note (the **"Admission Date"**) will take place at such time and place as the Company and the Note Holder agree in writing as described in the Subscription Agreement.

2.    **Representations and Warranties of the Company.**

The Company and MSH hereby represent and warrant to the Note Holder that:

2.1    Organization, Good Standing and Qualification. Each of Company and MSH are a corporation duly organized, validly existing and in good standing under the laws of the States of California and Utah respectively, and each has all requisite corporate power and authority to carry on its business as now conducted and as proposed to be conducted.

2.2    Authorization. All corporate action on the part of each of the Company and MSH, each of its respective officers, directors and shareholders, necessary for the authorization, execution and delivery of this Agreement and the performance of all obligations of the Company hereunder has been taken. MSH or its successors or assignees in interest has reserved a sufficient number



1

7 of 17

of shares of its capital stock to fulfill its obligations upon conversion of the Convertible Note. This Agreement and the transactions contemplated hereunder constitute valid and legally binding obligations of the Company and MSH, enforceable in accordance with their respective terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' and lenders' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief and/or other equitable remedies.

   3. **Representations and Warranties of the Note Holder**. The Note Holder hereby represents and warrants to each of Company and MSH that:

   3.1 Authorization. The Note Holder has full power and authority to enter into this Agreement, and this Agreement constitutes its valid and legally binding obligation, enforceable in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' and lenders' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief and/or other equitable remedies.

   3.2 Disclosure of Information. The Note Holder believes it has received all the information it considers necessary or appropriate for deciding whether to purchase the Convertible Note. The Note Holder has a preexisting personal or business relationship with the Company. The Note Holder further represents that it has had an opportunity to ask questions and receive answers from the Company regarding the business, assets, prospects, financial condition, results of operations and properties of Company and MSH. The foregoing, however, does not limit or modify the representations and warranties of the Company and/or MSH contained herein or the right of the Note Holder to rely thereon.

   3.3 Investment Experience. The Note Holder is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the purchase of the Convertible Note and any consideration issuable upon conversion of the Convertible Note (collectively, the **"Securities"**).

   3.4 Accredited Investor. The Note Holder is an "accredited investor" within the meaning of Securities and Exchange Commission (**"SEC"**) Rule 501 of Regulation D, as presently in effect. The Note Holder is acquiring the Convertible Note for investment for its own account only, not as nominee or agent, and not for resale.

   4. **Covenants**.

   4.1 Conversion to Common Stock. If the Convertible Note is converted into Common Stock of MSH, the Note Holder covenants and agrees to execute and deliver such documents as reasonably requested by the Company containing the representations and warranties required to comply with applicable federal and state securities laws.

   4.2 Information Rights. For so long as any obligations remain outstanding under the Convertible Note, the Company shall provide the following:

   4.2.1 Annual Reports. Furnish to the Note Holder, as soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Company, unaudited consolidated financial statements.



4.2.2 Quarterly Updates/Reports. Furnish to the Note Holder, as soon as available, but in any event within forty-five (45) days after the end of each fiscal quarter of the Company (except the last quarter of the Company's fiscal year), unaudited consolidated financial statements, if available, and any Company "updates", press releases and or any material information about the Company that has transpired in the previous quarter.

4.2.3 Business Plan and Operating Budget. Furnish to the Note Holder, as soon as practicable, but in any event within a reasonable time after approval by the board of directors of the Company, an annual business plan, any amendments thereto, operating budget and any amendments thereto.

5. **Miscellaneous**.

5.1 Survival of Warranties. The representations, warranties and covenants of Company, MSH and of the Note Holder contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of the Note Holder or Company or MSH.

5.2 Successors and Assigns. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of each of the parties hereto (including transferees of any Securities). Nothing in this Agreement, express or implied, is intended to confer upon any person or entity other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

5.3 Finder's Fee. Each party represents that the other parties will not be obligated for any finders' fee or commission in connection with the transactions contemplated by this Agreement.

5.4 Amendments and Waivers. This Note is being issued in connection with the issuance of a series of notes by the Company on or about the date hereof. Any term of this Agreement may be amended, waived or modified (a) in writing, signed by the Company and the Note Holder if and to the extent such amendment, waiver or modification does not have an adverse effect on any other holder of notes issued by the Company on or about the date hereof; or (b) to the extent that such amendment, modification or waiver would have such an adverse effect, then any of the terms of this Agreement may be waived or modified only in writing, signed by the Company and holders of a majority in principal amount of all notes issued by the Company in such series. Any amendment or waiver effected in accordance with this Section 5.6 shall be binding upon Note Holder, and each holder of Common Stock of MSH and the Company, and their respective successors and assigns.

5.5 Severability. If any provision of this Agreement is held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

5.6 Governing Law. This Convertible Note, and all matters arising out of or relating to this Agreement, shall be governed by the laws of the State of California, without regard to the conflicts of law principles. In any dispute, action or proceeding arising out of, related to, or in connection with this Agreement, the parties hereto consent to be subject to the exclusive jurisdiction and venue of the federal and state courts in Los Angeles, California. Each of the parties hereto consents to the service of process in any action commenced hereunder by certified or registered mail, return receipt requested, or by any other method or service acceptable under federal law or the laws of the State of California. In the event of a



3                                                                                    $9417$

dispute under this Agreement, the parties hereto agree to binding arbitration pursuant to the rules and regulations of the American Arbitration Association in the State of California. Such arbitration shall take place in Los Angeles, California and California law shall apply; the parties hereto waiving any claim or defense that such forum is not convenient or proper. The prevailing party shall be entitled to attorneys' fees and costs. If Company or MSH breach this Agreement, Note Holder shall be limited to its remedy at law for money damages, if any, and shall not have the right to in any way enjoin or restrain the distribution, advertising, marketing or exploitation of the of any projects and/or any work or activities of Company, MSH or their affiliates. It is the intention of the parties that the laws of the State of California relating to contracts made in, and to be performed wholly within, such State, shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the parties.

5.9     Waiver of Jury Trial/Submit to Arbitration.   THE PARTIES HERETO HEREBY AGREE TO WAIVE EACH OF THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY PERMITTED CLAIM OR CAUSE OF ACTION ARISING OUT OF THIS AGREEMENT, ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, OR ANY DEALINGS BETWEEN ANY OF THE SIGNATORIES HERETO RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY. The scope of this waiver is intended to encompass any and all disputes that relate to the subject mater of this Agreement or any of the transactions contemplated hereby, including, without limitation, contract claims, tort claims, and all other common law and statutory claims. This waiver is irrevocable, meaning that it may not be modified either orally or in writing, and this waiver shall apply to any subsequent amendments, supplements or other modifications to this Agreement, any of the transactions contemplated hereby or to any other document or agreement relating to the transactions contemplated hereby.

5.10    Representation by Counsel.  Each party hereto represents and agrees with the other that it has been represented by, or had the opportunity to be represented by, independent counsel of its own choosing, and that it has had the full right and opportunity to consult with its respective attorney(s), that to the extent, if any, that it desired. It availed itself of this right and opportunity, and it, or its authorized officer (as the case may be) have carefully read and fully understand this Agreement in its entirety and have had it fully explained to them by such party's respective counsel, that each is fully aware of the contents thereof and its meaning, intent and legal effect, and that it or its authorized officer (as the case may be) is competent to execute this Agreement and has executed this Agreement free from coercion, duress or undue influence. The parties to this Agreement participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, then this Agreement will be construed as if drafted jointly by the parties to this Agreement, and no presumption or burden of proof will arise favoring or disfavoring either party to this Agreement by virtue of the authorship of any of the provisions of this Agreement.

5.11    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

5.12    Entire Agreement.   This Agreement and the documents referred to herein constitute the entire agreement among the parties with respect to the subject matter and no party shall be liable or bound to any other party in any manner by any representations, warranties or covenants except as specifically set forth herein or therein.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.



4

10 8/7

**GIGAPIX STUDIOS, INC. ("COMPANY")**

Dated: _____     By: _____

                                    Its: _____

                                    Address:   9333 Oso Avenue,
                                               Chatsworth, California 91311


**MAKE SOMETHING HAPPEN, INC. ("MSH")**

Dated: _____     By: _____

                                         Its: _____

                                    Address:
                                               _____
                                               _____


                                    _____ **"NOTE**
                                    **HOLDER"**

Dated: _____     By:

                                    Its: _____

                                    Address:



5

11/8/17

## "EXHIBIT A"

## CONVERTIBLE NOTE

THIS CONVERTIBLE NOTE AND THE SECURITIES ISSUABLE UPON CONVERSION OF THIS CONVERTIBLE NOTE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATES. THESE SECURITIES MAY BE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

## CONVERTIBLE NOTE
## OF
## GIGAPIX STUDIOS, INC.

$_____

May ____, 2011

This convertible promissory note ("**Convertible Note**") is entered into as of May ___, 2011 (the "**Admission Date**"). For value received, Gigapix Studios, Inc., a California Corporation (the "**Company**"), with principal offices at 9333 Oso Avenue, Chatsworth, California 91311 and Make Something Happen Entertainment, Inc. ("**MSH or Public Company**"), a Utah corporation with offices located at 808 Gladstell, #309, Conroe, Texas, 77304, hereby promise to pay to _____ (the "**Note Holder**") the sum of _____Thousand Dollars ($_____) (the "**Principal Amount**"), plus interest, (**see below**) accrued on the unpaid Principal Amount (the "**Accrued Interest**") at a rate equal to fifteen percent (15%) per annum, accrued annually based on a 365-day year, and compounded quarterly from the Admission Date until the Principal Amount and all Accrued Interest are paid (or converted, as provided in Section 3 hereof) by wire transfer or by mail to the address of the registered holder of this Convertible Note in lawful money of the United States, unless this Convertible Note shall have been converted pursuant to Section 3. Company shall accept minimum investment increments of $50,000 (Lesser amounts may be accepted with written approval of Company.) Maturity Date shall be as described in paragraph 1 below. This Convertible Note shall be freely assignable, negotiable and marketable with no restrictions on such transferability other than applicable state and federal securities laws, if any. The valuation of the Company prior to the issuance of the Convertible Notes and prior to receipt of the Principal Amount is estimated to be $20,000,000.

1.      Maturity Date: No earlier than four (4) months and no later than twelve (12) month after Admission Date at Company's sole discretion. Subject to the written approval of the Note Holder and the Company, the Maturity Date may be extended.

2.      Preemptive Rights: In the event of a post-Merger public offering, each Note Holder will have pre-emptive rights to purchase such Note Holder's pro rata share of the publicly offered shares issued by the post-Merger Public Company, based on the ratio of the each Note Holder's aggregate post-Merger shares to the total post-Merger shares of the Public Company.



6

12/8/17

3.      Redemption/Conversion: Convertible Note and Accrued Interest thereon are redeemable, at Company's sole option, in cash or shares at the earlier of Maturity Date or completion of the Merger. If Company converts the Convertible Note to shares in the Public Company, such shares shall be valued at $0.50 each. Note Holders shall be entitled to receive shares with a value equal to the um of the Principal Amount and Accrued unpaid Interest.

Additionally, a portion of the Principal Amount and Accrued unpaid Interest are convertible at the option of each Note Holder at maturity or when Merger is complete into investments in the following off-balance sheet projects:

(i)      Up to 10% of Note Holder's pro rata share of the Principal Amount of the Convertible Note and Accrued unpaid Interest thereon as an equity investment in Company's CGI animated feature film entitled "OZ3D".

(ii)     Up to 10% of Note Holder's pro rata share of the Principal Amount of the Convertible Note and Accrued unpaid Interest thereon as an equity investment in Company's slate of five (5) kids' comedy live action feature films known as Recess Films.

(iii)    Up to 10% of Note Holder's pro rata share of the Principal Amount of the Convertible Note and Accrued unpaid Interest thereon as an equity investment in Company's interest in Gigapix Releasing, LLC.

The balance of such Note Holder's pro rata share of the Principal Amount of the Convertible Note and Accrued unpaid Interest thereon will be converted into shares of the Public Company or redeemed in cash at Company's option.

4.      Loan/Use of Loan: $1,000,000 loan secured by Convertible Notes with a provision allowing Company to accept an additional $1,000,000. Company is entering the final stages of its plan to become a publicly traded, fully integrated state of the art film and television production/distribution company. Company is offering Convertible Notes to expedite its final stage of financing which includes among other things: (i) financing the cost of the Merger (as such term is defined below), (ii) funding the operating costs of Company, (iii) providing funds for development, production and distribution of a slate of kids' live action comedy feature films, and (iv) providing development, production and distribution funding for 3D animated films for which some funding is committed (see attached "Schedule A" and "Schedule B"). Company plans to raise up to $8,000,000 in additional funds through a public offering, facilitated by acquiring and merging (the "Merger") with a publicly traded company (the "Public Company") with a history in the media industry. A letter of intent to merge with the Public Company has been executed by Company and the Public Company. Company may raise additional funds through sponsorships, advertising revenues, licensing fees, monetization of tax credits and other sources.

5.      No Rights or Liabilities as Stockholder. This Convertible Note does not in itself entitle the Note Holder to any voting rights or other rights as a stockholder of the Company or the Public Company. In the absence of conversion of this Convertible Note into common stock of MSH , no provisions of this Convertible Note, and no enumeration herein of the rights or privileges of the Note Holder, shall cause the Note Holder to be a stockholder of the Company or the Public Company for any purpose.

6.      No Impairment. The Company and the Public Company will not, by amendment of its certificate of incorporation or bylaws, or through reorganization, consolidation, merger, dissolution, issue or sale of securities, sale of assets or any other voluntary action, willfully avoid or seek to avoid the observance or performance of any of the terms of this Convertible Note, but will at all times in good faith assist in the



7                                                                                                     13817

carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate in order to protect the rights of the Note Holder under this Convertible Note against wrongful impairment. Without limiting the generality of the foregoing, the Company and the Public Company will take all such actions as may be necessary or appropriate in order that the MSH may duly and validly issue fully paid and non-assessable shares of common stock upon the conversion of this Convertible Note into MSH common stock.

9.      Prepayment. Notwithstanding anything to the contrary in this Agreement, Company may "call" and prepay any Convertible Note in whole or in part at any time upon thirty (30) days prior written notice to the Note Holder; provided that such Note Holder will have the right within such notice period to exercise such Note Holder's conversion options as described above. However, if the Merger, is not complete, Company may, in its sole discretion, elect to redeem the Convertible Note plus Accrued Interest thereon in cash (or Note Holder may elect to convert its Principal Amount and unpaid Accrued Interest into Company's off-balance sheet projects as described above in Paragraph 3. i- iii). Company may redeem the Convertible Notes in whole or in part from the proceeds of a public offering and/or revenues generated by Company from broadcasting fees/revenues, feature film sales, P&A Fund fees, the sale of sponsorships, advertising, licensing revenues, consulting services, operating income or other sources.

10.      Expenses: Company will draft documents. Each party hereto shall pay its own fees and expenses of in connection with the Convertible Note.

11.      Waivers. The Company and all endorsers of this Convertible Note hereby waive further demand, presentment, dishonor, notice of dishonor, protest, notice of protest and any other notice or formality, to the fullest extent permitted by applicable laws.

12.      Governing Law. This Convertible Note, and all matters arising out of or relating to this Convertible Note, shall be governed by the laws of the State of California, without regard to the conflicts of law principles. In any dispute, action or proceeding arising out of, related to, or in connection with this Convertible Note, the parties hereto consent to be subject to the exclusive jurisdiction and venue of the federal and state courts in Los Angeles, California. Each of the parties hereto consents to the service of process in any action commenced hereunder by certified or registered mail, return receipt requested, or by any other method or service acceptable under federal law or the laws of the State of California. AS TO ANY ACTION OR PROCEEDING ARISING OUT OF, RELATED TO OR IN CONNECTION WITH THIS AGREEMENT, THE PARTIES HERETO HEREBY AGREE TO WAIVE THEIR RIGHTS TO A TRIAL BY JURY. In the event of a dispute under this Agreement, the parties hereto agree to binding arbitration pursuant to the rules of the American Arbitration Association. Such arbitration shall take place in Los Angeles, California and California law shall apply; the parties hereto waiving any claim or defense that such forum is not convenient or proper. The prevailing party shall be entitled to attorneys' fees and costs. If Company or MSH breach this Convertible Note, Note Holder shall be limited to its remedy at law for money damages, if any, and shall not have the right to in any way enjoin or restrain the distribution, advertising, marketing or exploitation of the of any projects and/or any work or activities of Company, MSH or their affiliates. It is the intention of the parties that the laws of the State of California relating to contracts made in, and to be performed within, such State, shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the parties.

13.      Headings. The headings and captions used in this Convertible Note are used for convenience only and are not to be considered in construing or interpreting this Convertible Note. All references in this Convertible Note to sections and exhibits shall, unless otherwise provided, refer to sections hereof and exhibits attached hereto, all of which exhibits are incorporated herein by this reference.



8

144 17

14.    Notices. Unless otherwise provided, any notice required or permitted under this Convertible Note shall be given in writing and shall be deemed effectively given upon personal delivery to the party to be notified or upon deposit with the United States Post Office, by registered or certified mail, postage prepaid and addressed to the Note Holder at the last address furnished to the Company by the Note Holder in writing in the Exhibit A to the Subscription Agreement or, in the case of the Company or the Public Company, at the principal offices of the Company, or at such other address as the Note Holder or the Company or the Public Company may designate by giving written notice to any other party.

15.    Severability. If one or more provisions of this Convertible Note are held to be unenforceable under applicable law, such provision(s) shall be excluded from this Convertible Note, and the balance of this Convertible Note shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with it terms

IN WITNESS WHEREOF, the undersigned, who is duly authorized to execute and deliver this Convertible Note on behalf of the Company, has duly executed and delivered this Note this __day of _____, 2011.

**GIGAPIX STUDIOS INC:**

By: _____

Name: _____

Title: _____

Address:    9333 Oso Avenue
            Chatsworth, California 91311

**MAKE SOMETHING HAPPEN, INC.:**

By: _____

Name: _____

Title: _____

AGREED AND ACKNOWLEDGED:    Address: _____

**THE NOTE HOLDER:**

By: _____

Name: _____

Title: _____

Address: _____



9

15 of 17

"SCHEDULE A"

### USE OF PROCEEDS
2011

| 2011 | |
|---|---|
| **Personnel/Salaries** | $325,000 |
| **General & Administration** | $100,000 |
| **Programming, Development &Acquisitions** | $200,000 |
| **Merger Expenses** | $300,000 |
| **Miscellaneous** | $ 75,000 |
| **Total** | $1,000,000 |



10

"SCHEDULE B"

PROJECTS

"OZ3D": "OZ3D" is in production at Arc Productions (formerly Starz Animation). Company has raised nearly all the production budget from Canadian tax credits, advances for Canadian rights, licensing advances, international presales and private equity investments. Arc recently produced and released a 3D version of "Gnomeo & Juliet" through Disney which generated in excess of $97,000,000 at the North American box office. The Company and its partners expect OZ3D to be in theaters in the third quarter of 2013.

Recess Films: A slate of five kids' live action comedies to be financed and produced in Canada using Canadian tax credits, Canadian presales, international presales and an equity investment of 40-50% of the budget. Company has developed this cross-collateralized slate to be funded with off balance sheet financing. The total production budget of the films is $50,000,000.

Gigapix Releasing, LLC: This company currently has two films slated for U.S. release. "Mother's Day"- intended for wide theatrical and DVD release through Vivendi; and "The Tortured"- limited theatrical and DVD release through Vivendi. The Company plans to release these titles with a $13,000,000 revolving line of credit for prints and advertising and is in the market closing a $100,000,000 print and advertising fund. Gigapix Releasing, LLC plans to theatrically release 8-12 feature films per year over the next three years.

Gigapix TV: Company has its first prime time TV series ("Workaholics") on Comedy Central which premiered on April 6, 2011, behind the new season premiere of "South Park". Company released its first documentary series "Baker Boys: Inside the Surge" through EOne video into the DVD market, after a premiere television run on HDNET. Company is working with TV personalities Melissa and Joan Rivers to produce shows and is additionally closing the sale of three new TV series to cable networks since the arrival of its new head of TV, Chuck Labella.



11

17 817

## AGREEMENT

This Confidential Agreement ("Agreement") dated as of May 6th, 2011, is between Gigapix Studios, Inc., ("Gigapix") a California corporation located at 9333 Oso Ave. Chatsworth CA 91311, and MSH Entertainment Corp. ("MSH"), a company with its principle offices located at 808 Gladstell, #309, Conroe, Texas, 77304 OZ3D, LLC, a Nevada limited liability company also located at 9333 Oso Ave. Chatsworth CA 91311 ("OZ3D"), and Gigapix Releasing, LLC. a California limited liability company also located at 9333 Oso Ave. Chatsworth CA 91311 ("Gigapix Releasing") (collectively "Companies") and David Pritchard, an individual residing at *2010 N Uwe Los Andela* on the one hand, and Christopher Blauvelt ("Executive"), an individual residing at *1049 Fautino dr snoocat 9104*, on the other. The term "Parties" shall refer collectively to Companies and Executive the term "Party" shall refer to Companies or Executive or Gigapix or OZ3D or Gigapix Releasing individually.

## WARRANTS AND RECITALS

WHEREAS, Executive is the CEO, Founder and Chairman of the Board of Gigapix who presently holds 12,217,500 shares of Gigapix common stock representing 46.72% of the Company's outstanding shares; and

WHEREAS, Executive is the Founding and Managing Member of OZ3D; and

WHEREAS, Gigapix represents and warrants to Executive that Gigapix is a Managing Member with 33.33% vested interest in Gigapix Releasing with the capacity and authority to enter into and bind Gigapix Releasing to this Agreement and to the Consulting Agreement referenced herein; and

WHEREAS, MSH Entertainment Corp. ("MSH"), a company with its principle offices located at808 Gladstell, #309, Conroe, Texas, 77304 , is engaged in the development, production and distribution of live action and animated television (TV) specials, TV movies, and TV series, as well as movies for broadcast TV, cable, satellite, and syndicated TV, has indicated its interest in entering into a binding merger agreement with Gigapix ("Proposed Merger"), which will result in the formation of a new public entity and successor to Gigapix, ("NEWCO"); and

WHEREAS, Gigapix represents and warrants to Executive that pursuant to the terms of the Proposed Merger, Gigapix has the capacity and authority to enter into and to bind NEWCO as its successor entity to the Consulting Agreement referenced herein; and

WHEREAS, MSH represents and warrants to Executive that pursuant to the terms of the Proposed Merger, MSH has the capacity and authority to enter into and to bind NEWCO as its successor entity to the Consulting Agreement referenced herein; and

WHEREAS, the Parties desire for the Executive to continue his affiliation with the Companies and NEWCO pursuant to the terms of a Consulting Agreement and the terms set forth herein.

NOW THEREFORE, in consideration of the mutual promises exchanged herein, and the representations and warrants made by the Parties in the Recitals above, which the Parties acknowledge and agree are binding and material, the Parties agree:

## AGREEMENT

### *Modification of Terms of Executive's Employment with Gigapix*

1. Gigapix, for itself and on behalf of NEWCO, MSH, for itself and on behalf of NEWCO, and Gigapix Releasing agree to employ the Executive pursuant to the Consulting Agreement attached hereto as "**Exhibit A**."

2. In consideration of the mutual promises set forth herein and the terms and conditions of employment pursuant to the Consulting Agreement, Executive agrees to resign as chairman and chief executive officer of Gigapix and to remain as a board member of Gigapix's Board of Directors until the Proposed Merger is consummated, but immediately thereafter to resign as a member of the Gigapix's Board.

3. The Parties agree to make a joint announcement of the Executive's resignation from Gigapix, subject to written approval by all Parties.

4. In the event that the animated feature"OZ3D" is produced by OZ3D, LLC, Executive shall receive (i) credit as an "executive producer", credit placement is subject to distributor approvals, and (ii) after all participants in the project and the members of OZ3D, LLC have been paid, two and a half percent (2 ½%) of Gigapix's net receipts, if any, for the period of seven (7) years from the date of the earlier of its initial theatrical release or other commercial release. For avoidance of doubt or confusion, the definition of net profits for applying Executive's participation shall be defined on a most favored nations basis with other producer participants and as any proceeds received by Gigapix from OZ3D, LLC or any and all successors after all payments are made to retire the OZ3D, LLC's investors and all interest thereon, production and print and advertising investors and any interest thereon and any and all other standard entertainment industry obligations.

### *Executive's Interest in and Agreement to Vote Gigapix and NEWCO Shares*

5. Executive agrees to vote Executive's common shares in Gigapix certificate #C10000 (representing 12,217,500 shares) in favor of the Proposed Merger at any duly constituted meeting of the Board of Directors held prior to October 31, 2011.

6. Post-Merger, Executive shall exchange his shares in Gigapix representing 12,217,500 shares, which currently represent 46.72% of Gigapix, for shares in NEWCO representing 15% of the outstanding shares and capitalization of NEWCO at the closing of the Merger.

7. Executive or his transferees, assigns or heirs shall vote Executive's shares in NEWCO along with David Pritchard's shares as directed by the board of directors of the NEWCO for the period commencing on the date of the full execution of this Agreement and continuing uninterrupted for a period of two (2) years.

### *Executive's Access to Gigapix, Gigapix Releasing, OZ3D and NEWCO Documents*

8. Executive and his attorneys and CPAs retained to advise him on matters related to the subject matter herein shall have the right to inspect and copy on demand all business records related to Gigapix, Gigapix Releasing, OZ3D and NEWCO until such time as tphe Proposed Merger is completed, including, but not limited to, all documents and financial information related to

Proposed Merger. Following the Proposed Merger, Executive shall have all of the rights and remedies of a major shareholder of the Company in accordance with the Securities and Exchange Commission regulations and NEWCO's by-laws.

## *Executive's Resignation and Terms of This Agreement Are Contingent Upon Consummation of the Proposed Merger*

9. The Parties acknowledge and agree that this Agreement, and the mutual promises, terms and conditions set forth herein, are contingent upon the consummation of the Proposed Merger and the Parties acknowledge and agree that if the Proposed Merger is not consummated by October 31, 2011, this Agreement shall be rescinded and the Parties will be returned to the position they held immediately before entering into this Agreement, which shall include, but not be limited to, a rescission of the Executive's resignation and the reinstatement of the Executive as Chairman and CEO of Gigapix with 12,217,500 shares of Gigapix common stock representing 46.72% of the Gigapix's outstanding shares, and the restoration of all of Executive's control of, and interest in, Gigapix, OZ and Gigapix Releasing.

### *Pre-Dispute Arbitration Clause*

10. This Agreement shall be governed and construed in accordance with the laws of the State of California. In any dispute, action or proceeding arising out of, related to, or in connection with this Agreement, the Parties consent to be subject to the exclusive jurisdiction and venue of the federal and state courts in Los Angeles, California. Each of the Parties consents to the service of process in any action commenced hereunder by certified or registered mail, return receipt requested, or by any other method or service acceptable under federal law or the laws of the State of California. AS TO ANY ACTION OR PROCEEDING ARISING OUT OF, RELATED TO OR IN CONNECTION WITH THIS AGREEMENT, THE PARTIES HEREBY AGREE TO WAIVE THEIR RIGHTS TO A TRIAL BY JURY. In the event of a dispute under this Agreement, the Parties agree to binding arbitration pursuant to the rules of the American Arbitration Association. Such arbitration shall take place in Los Angeles, California and California law shall apply; the parties hereto waiving any claim or defense that such forum is not convenient or proper. The prevailing party shall be entitled to attorneys' fees and costs. If Gigapix or OZ3D, LLC, or Gigapix Releasing LLC or MSH or NEWCO breach this Agreement, Executive shall be limited to its remedy at law for money damages, if any, and shall not have the right to in any way enjoin or restrain the distribution, advertising, marketing or exploitation of the of any projects and/or any work or activities of Gigapix, OZ3D, LLC or Gigapix Releasing LLC or their respective affiliates.

### *Non-Disparagement*

11. Executive agrees not to disparage the Companies, its officers, directors, employees, shareholders, and agents, in any manner likely to be harmful to its or their business, business reputation, or personal reputation; provided that Executive will respond accurately and fully to any question, inquiry or request for information when required by legal process. The Companies and their executives and officers, including David Pritchard and Colin Mutton, agree not to disparage Executive in any manner likely to be harmful to his business, business reputation, or personal reputation; provided that The Companies may respond accurately and fully to any question, inquiry or request for information when required by legal process.

*Miscellaneous Provisions*

12. The Parties agree that in the event any inconsistencies between this Agreement and the standard Gigapix shareholder agreement and/or the standard NEWCO shareholder agreement, if any, the terms of this Agreement shall supersede and prevail.

13. The Parties understand and agree that the promises and payments in consideration of this Agreement shall not be construed to be an admission of any liability or obligation by any of the parties to the other and the Parties make no such admission.

14. This Agreement, including "**Exhibit A,**" constitutes the complete, final and exclusive embodiment of the entire agreement between Executive and the Companies with regard to its subject matter. It is entered into without reliance on any promise or representation, written or oral, other than those expressly contained herein, and it supersedes any other such promises, warranties or representations. This Agreement shall supersede and extinguish all prior employment agreements, express or implied, verbal or written, between Executive and the Companies. This Agreement may not be modified or amended except in a writing signed by both Executive and a duly authorized officer of each of the Companies. This Agreement will bind the heirs, personal representatives, successors and assigns of both Executive and the Companies, and inure to the benefit of both Executive and the Companies, their heirs, successors and assigns. If any provision of this Agreement is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of this Agreement and the provision in question will be modified so as to be rendered enforceable. Any ambiguity in this Agreement shall not be construed against either Party as the drafter. Any waiver of a breach of this Agreement shall be in writing and shall not be deemed to be a continuing waiver or a waiver of any successive breach. This Agreement may be executed in counterparts and facsimile signatures will suffice as original signatures.

15. The provisions of this Agreement will be held in strictest confidence by the Parties and will not be publicized or disclosed in any manner whatsoever; provided, however that: (a) the Parties may disclose this Agreement in confidence to their respective attorneys, accountants, auditors, tax preparers, and financial advisors; (b) the Companies may disclose this Agreement as necessary to fulfill standard or legally required corporate reporting or disclosure requirements; and (c) the Parties may disclose this Agreement insofar as such disclosure may be necessary to enforce its terms or as otherwise required by law. In particular, and without limitation, Executive agrees not to disclose the terms of this Agreement to any current or former Companies' employee.

16. This Agreement may be signed in any number of counterparts and by facsimile, PDF, JPEG, or TIFF. Each such counterpart shall be deemed to be a duplicate original, and all of which shall constitute one agreement. Such separate execution shall be of full force and effect so long as each party has executed the same agreement. Facsimile, PDF, JPEG, or TIFF copies of this agreement and signatures thereon shall be valid and binding on the parties.

If the foregoing is in accord with your understanding please execute where indicated below:

AGREED AND ACCEPTED

Christopher Blauvelt ("Executive")

Date: 5/6/11

AGREED AND ACCEPTED
Gigapix Studios, Inc. ("Gigapix")

By:

David Pritchard
Its:    President

Date: 5/6/11

AGREED AND ACCEPTED
OZ3D, LLC

By:

David Pritchard
Its:    Managing Member

Date: 5/6/11

AGREED AND ACCEPTED
Gigapix Releasing, LLC ("Gigapix Releasing")

By:

Gigapix Studios, Inc.
Its:    Managing Member

Date: 5/6/11

AGREED AND ACCEPTED
Gigapix Releasing, LLC ("Gigapix Releasing")

By:

Tisho Taylor
Its:    Managing Member

Date: 5/8/11

AGREED AND ACCEPTED
MSH Entertainment Corp. ("MSH")

By: _____

Its:

Date: _____

AGREED AND ACCEPTED

David Pritchard

Date: 5/6/11

Page 5 of 5

## Exhibit A

## CONSULTING AGREEMENT

This Consulting Agreement ("Consulting Agreement" or "Agreement") dated as of May 6th, 2011, is between Gigapix Studios, Inc., ("Gigapix") a California corporation located at 9333 Oso Ave. Chatsworth CA 91311, MSH Entertainment Corp., a company with its principle offices located at 808 Gladstell, #309, Conroe, Texas, 77304 ("MSH") and OZ3D, LLC, a Nevada limited liability company also located at 9333 Oso Ave. Chatsworth CA 91311 ("OZ3D"), and Gigapix Releasing, LLC. a California limited liability company also located at 9333 Oso Ave. Chatsworth CA 91311 ("Gigapix Releasing") (collectively "Companies"), on the one hand, and CHRIS BLAUVELT CONSULTING, INC. ("Consultant") a California corporation with its principle offices located at 10949 FRUITLAND DR STUDIOCITY CA 91604, on the other. The term "Parties" shall refer collectively to Companies and Consultant.

## WARRANTS AND RECITALS

WHEREAS, Gigapix is a California corporation and OZ3D is a Nevada limited liability company both with offices located at 9333 Oso Avenue, Chatsworth, California 91311; and

WHEREAS, Gigapix represents and warrants to Consultant it is a Managing Member with 33.33% vested interest in Gigapix Releasing with the capacity and authority to enter into and bind Gigapix Releasing to this Consulting Agreement; and

WHEREAS, MSH Entertainment Corp. ("MSH"), a company with its principle offices located at 808 Gladstell, #309, Conroe, Texas, 77304, is engaged in the development, production and distribution of live action and animated television (TV) specials, TV movies, and TV series, as well as movies for broadcast TV, cable, satellite, and syndicated TV, has indicated its interest in entering into a binding merger agreement with Gigapix ("Proposed Merger"), which will result in the formation of a new publicly traded entity and successor to Gigapix, ("NEWCO"); and

WHEREAS, Gigapix and MSH represent and warrant to Consultant that pursuant to the terms of the Proposed Merger, former Gigapix shareholders' interest in NEWCO will be 82.5%, and, Gigapix and MSH have the capacity and authority to enter into and to bind NEWCO to this Consulting Agreement; and

WHEREAS, the Parties desire for Consultant to provide services to the Companies and NEWCO pursuant to the terms of a Consulting Agreement and the terms set forth herein.

NOW THEREFORE, in consideration of the mutual promises exchanged herein, and the representations and warrants made by the Parties in the Recitals above, which the Parties acknowledge and agree are binding and material, the Parties agree to enter into this Consulting Agreement.

## AGREEMENT

**1.      TERM.** The Companies will employ Consultant on the terms and conditions set forth herein. Consultant's employment shall commence on the date this Consulting Agreement is fully executed by all Parties ("Commencement Date") and shall continue uninterrupted for a period of three (3) years (the "Agreement Term").

## 2.  TITLE/DUTIES OF EXECUTIVE.

2.1      Consultant shall designate an Executive who shall provide services to the Companies as a consultant ("Designated Executive" or "Executive"). The Consultant hereby designates Christopher Blauvelt as such Executive who shall serve as the Executive pursuant to this Consulting Agreement. The Executive will have such duties, responsibilities and authorities as are customary for an executive in a position as an executive producer in the film entertainment industry. Each Executive shall enter into an "Inducement Agreement" a copy of which is attached hereto as Schedule A and made a party of this Agreement by reference.

2.2      The Executive designated by Consultant shall devote such of Executive's business time to the performance of his duties as an executive producer to the Companies as may be reasonably necessary to promote and advance the business of the Companies.

2.3      The Executive designated by Consultant may be employed to provide services to another company except on a full time or first priority basis, and may serve on advisory boards, and may engage in any other business activities (whether or not pursued for pecuniary gain), so long as such other activities do not violate Executive's obligations under this Agreement.

**3.      COMPENSATION AND BENEFITS.** During the Agreement Term, as compensation for services to be rendered by the Consultant under the terms of this Consulting Agreement, the Companies jointly and severally unconditionally agree to compensate Consultant with the following:

3.1      FEE. The Companies shall pay Consultant a fee of Seven Hundred Fifty Thousand Dollars ($750,000), payable at Two Hundred Fifty Thousand Dollars ($250,000) per year, for the three year Agreement Term commencing the sooner of either August 1, 2011, or the date the Proposed Merger is complete (the "Fee"). The Fee shall be payable in equal monthly payments for the Agreement Term. The Fee shall not be subject to any withholdings, including withholding taxes.

3.2      EXECUTIVE PRODUCER CREDIT. Consultant shall designate an Executive who shall receive credit as an "executive producer" (or other equivalent credit) on the animated feature film entitled "OZ3D". In addition Consultant shall receive 2.5% of the "net proceeds" of Gigapix from "OZ3D"consistent with the definition as applied to Gigapix and/or NEWCO.

3.3      MEDICAL BENEFITS. The Companies will provide Christopher Blauvelt, Becky Blauvelt, and Jack, Joseph and Kathryn Blauvelt, with full and uninterrupted, medical, dental, and disability insurance coverage that provides at least the same coverage as currently provided,

and the Companies will pay all premiums for such coverage for five (5) years from Commencement Date.

3.4     EFFECT OF DEATH OR DISABILITY. In the event of death or total disability of the executive designated by Consultant during the Agreement Term, no later than ten (10) calendar days following the applicable death or disability date, the Companies shall pay or provide Executive's estate, as the case may be, (i) the continued Fee and Benefits and (ii) in the case of death of the Executive, such remaining Fee and Benefits shall be provided to the estate of the deceased Executive for his family under the then existing terms of this Consulting Agreement.

## 4.     PROPRIETARY INFORMATION AND NON-DISCLOSURE.

4.1     Consultant understands and acknowledges that the Companies possess and will continue to possess information that has been created, discovered, or developed by, or otherwise become known to, Gigapix (including, without limitation, information created, discovered, developed or made known to by Executive during the period of or arising out of his employment with Gigapix) or in which property rights have been or may be assigned or otherwise conveyed to Gigapix, which information has commercial value in the business in which Gigapix is engaged and is treated by Gigapix as confidential. Except as otherwise provided herein, "Proprietary Information" shall include, without limitation, all project data, budgets, lists, creative developments, designs, marketing plans, financial statements, strategies, licenses, prices, costs, research, technology, improvements, screenplays, treatments, TV concepts/formats, contracts and agreements with talent and potential acquisition candidates.

4.2     Notwithstanding the foregoing, Proprietary Information shall not include information that: (i) is or becomes part of the public domain through no act or omission of the Consultant and/or Executive; (ii) was in the lawful possession of Consultant and/or Executive prior to the disclosure and had not been obtained by Consultant and/or Executive on a confidential basis, given that executive was a founder of the Company all materials and concepts in the hands of executive at Company formation are not considered proprietary to the Company; (iii) is lawfully disclosed to Consultant and/or Executive by a third party without restriction on disclosure; or (iv) is required to be disclosed by any federal or state law, rule or regulation or by any applicable judgment, order or decree or by any court or governmental body or agency having jurisdiction on the matter.

4.3     All Proprietary Information shall be the sole property of Gigapix and its successors and assigns unless otherwise agreed in writing by Gigapix and Consultant. At all times during the Agreement Term and for a period of one (1) year thereafter, Consultant and Executive will keep in strictest confidence and trust all Proprietary Information, and other than in connection with or in a manner related to the performance of his duties hereunder, Consultant and Executive shall not use or disclose any Proprietary Information without the written consent of Gigapix as determined by a majority of the Board.

5. NOTICES. For the purpose of this Agreement, notices and all other communications between Consultant and Gigapix shall be in writing and deemed to have duly given when

3

personally delivered or three (3) days after being sent by registered or certified mail, return receipt requested, or upon delivery by common carrier to the following address:

To the Consultant:                              To Gigapix:
Chris Blauvelt Consulting, Inc.                 Gigapix Studios, Inc.
10949 FRUITLAND DR                              9330 Oso Ave.
STUDIO CITY CA 91604                            Chatsworth CA 91311

**6. BINDING AGREEMENT.** Each party represents and warrants to the other that the person signing this Agreement below has the authority to bind the party to this Agreement and that this Agreement will legally bind both the Companies and Consultant. This Agreement will be binding upon and benefit the parties and their heirs, administrators, executors, successors and permitted assigns. To the extent that the practices, policies, or procedures of Gigapix, now or in the future, are inconsistent with the terms of this Agreement, the provisions of this Agreement shall control.

7. **ENTIRE AGREEMENT.** This Agreement is intended to be the final, complete, and exclusive statement of the terms of Consultant's relationship with respect to the subject matter hereof. Any ambiguity in this Agreement shall not be construed against either party as the drafter.

8. **AMENDMENTS; WAIVERS.** Neither this Agreement nor any term hereof may be amended, waived, discharged, or modified except by a writing signed by Consultant and by a duly authorized representative of the Companies. Any waiver of the application of any term or provision herein or breach hereof shall not be deemed to be a waiver of any other term, provision or breach and shall not be deemed a waiver of any subsequent application of such term or provision or the occurrence of a subsequent breach.

9. **SEVERABILITY.** If any provision of this Agreement is held to be unenforceable, invalid or void by a court of competent jurisdiction, such provision shall be enforced to the fullest extent permitted by law, and the remainder of this Agreement will remain in full force and effect.

**10. HEADINGS.** Headings used in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

11. **GOVERNING LAW.** This Agreement, and all matters arising out of or relating to this Agreement, shall be governed by the laws of the State of California, without regard to the conflicts of law principles. In any dispute, action or proceeding arising out of, related to, or in connection with this Agreement, the parties hereto consent to be subject to the exclusive jurisdiction and venue of the federal and state courts in Los Angeles, California. Each of the parties hereto consents to the service of process in any action commenced hereunder by certified or registered mail, return receipt requested, or by any other method or service acceptable under federal law or the laws of the State of California. AS TO ANY ACTION OR PROCEEDING ARISING OUT OF, RELATED TO OR IN CONNECTION WITH THIS AGREEMENT, THE PARTIES HERETO HEREBY AGREE TO WAIVE THEIR RIGHTS TO A TRIAL BY JURY. In the event of a dispute under this Agreement, the parties hereto agree to binding arbitration

4

pursuant to the rules of the American Arbitration Association. Such arbitration shall take place in Los Angeles, California and California law shall apply; the parties hereto waiving any claim or defense that such forum is not convenient or proper. The prevailing party shall be entitled to attorneys' fees and costs. If Gigapix, MSH or NEWCO breach this Agreement, Consultant shall be limited to its remedy at law for money damages, if any, and shall not have the right to in any way enjoin or restrain the distribution, advertising, marketing or exploitation of the of any projects and/or any work or activities of Gigapix, MSH or NEWCO or each of their affiliates.

12. **COUNTERPARTS.** This Agreement may be signed in any number of counterparts and by facsimile, PDF, JPEG, or TIFF. Each such counterpart shall be deemed to be a duplicate original, and all of which shall constitute one agreement. Such separate execution shall be of full force and effect so long as each party has executed the same agreement. Facsimile, PDF, JPEG, or TIFF copies of this agreement and signatures thereon shall be valid and binding on the parties.

IN WITNESS WHEREOF, this Agreement has been duly executed by Gigapix and Chris Blauvelt Consulting, Inc. as of the date first above written.

GIGAPIX STUDIOS, INC.

Name:

Title: President

CHRIS BLAUVELT CONSULTING, INC.

Name: _____ 5/6/11

Title: CEO

OZ3D, LLC

Name:

Title: Managing Member

GIGAPIX RELEASING, LLC

Name:

Title: Transum Member

Managing Member

GIGAPIX RELEASING, LLC

Name:

Geno Taylor

Title:

Managing Member

MSH Entertainment Corp. ("MSH"),

Name: _____

Title: _____

"Schedule A"
Inducement Agreement

May 6th, 2011

NEWCO
Gigapix Studios, Inc.
9330 Oso Ave.,
Chatsworth, California 91311

Re: Consulting Agreement- Chris Blauvelt Consulting, Inc. f/s/o Christopher Blauvelt

Ladies/Gentlemen:

Reference is made to the agreement ("**Agreement**") dated concurrently herewith between you and Chris Blauvelt Consulting, Inc. ("Consultant") for the services of Christopher Blauvelt the undersigned, in connection with.

As a material inducement to you to enter into the Agreement, the undersigned hereby represents, warrants and agrees as follows:

1.    I have heretofore entered into an agreement (the "**Employment Agreement**") with Consultant requiring me to render services to Consultant for at least the full term of the Agreement and authorizing Consultant to enter into the Agreement and to furnish my rights and services to you upon the terms, covenants and conditions thereof.

2.    I am familiar with all of the terms, covenants and conditions of the Agreement and hereby consent to the execution thereof; I shall be bound by and will duly observe, perform and comply with all of the terms, covenants and conditions of the Agreement as if I had executed it directly as an individual, even if the Employment Agreement should hereafter expire or be terminated or suspended, or if Consultant should be dissolved or should otherwise cease to exist; I hereby confirm that there have been granted to Consultant all of the rights granted by Consultant to you under the Agreement; and I hereby join in and confirm all grants, representations, warranties and agreements made by Consultant under the Agreement.

3.    I am under no legal or other obligation or disability that would prevent or restrict me from performing and complying with any of the terms, covenants and conditions of the Agreement to be performed or complied with by me.

4.    Unless I am deemed substituted for Consultant as a direct party to the Agreement pursuant to paragraph 7, below, I will look solely to Consultant and not to you for compensation for the services and rights I may render and grant to you under the Agreement and for the discharge of all other obligations of my employer with respect to my services under the Agreement.

5.      You agree to notify me and Consultant in writing immediately upon receiving notice from any state or federal authority which purports to require you to pay any taxes or withhold monies from the compensation payable to Consultant or me under the Agreement and agree you shall cooperate with me, my advisors and the Consultant in responding to such state or federal authority prior to paying or withholding any amount allegedly required or permitted to be deducted ("Notice Provision"). If you have complied with this Notice Provision, I will indemnify and hold Gigapix, MSH, NEWCO and you and your parents, affiliates, subsidiaries, employees, directors, officers, agents, successors, assigns and licensees, and each of them, harmless from and against *any and all taxes* which you may have to pay and any and all any and all liabilities, judgments, losses, claims, demands, damages, penalties, interest, costs and expenses of every kind whatsoever (including, without limitation, reasonable attorneys' and accountants' fees and disbursements) which may be obtained against, imposed upon or suffered by you or any of the aforementioned parties or which you or any of such parties may incur *by reason of your failure to deduct and withhold from the compensation payable under the Agreement any amount required or permitted to be deducted and withheld from the compensation of an employee under the provisions of any current state or federal statute and/or any amendments thereof and/or any statutes hereafter enacted requiring the withholding of any amount from the compensation of an employee*. Inasmuch as you have the right to control my services and I am your "special employee" for purposes of all applicable workers' compensation laws, the rights and remedies of the undersigned and/or my heirs, executors, administrators, successors, and assigns shall be governed by and limited to those provided under such workers' compensation statutes if I should suffer or incur any injury, illness, disability or death arising out of or occurring in the course of my special employment pursuant to the Agreement.

6.      If Consultant or its successors in interest should be dissolved or should otherwise cease to exist, or for any reason should fail, refuse or neglect to perform, observe or comply with the terms, covenants and conditions of the Agreement, I shall be deemed to be employed directly by you for the balance of the term of the Agreement upon the terms, covenants and conditions set forth therein.

7.      If you serve Consultant with any notices, demands or instruments relating to the Agreement or the rendition of my services thereunder, such service upon Consultant shall constitute service upon me.

Very truly yours,

5/6/11

Christopher Blauvelt

2